UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

THE STATE OF GEORGIA; GEORGIA
DEPARTMENT OF COMMUNITY
HEALTH,

PLAINTIFFS,

v.

CHIQUITA BROOKS-LASURE, in her official
capacity as Administrator of the Centers for
Medicare and Medicaid Services; THE
CENTERS FOR MEDICARE AND
MEDICAID SERVICES; XAVIER
BECERRA, in his official capacity as Secretary
of Health and Human Services; THE UNITED
STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; THE UNITED STATES
OF AMERICA,

DEFENDANTS.

CIVIL ACTION NO. __CV222-006____

## COMPLAINT

The State of Georgia and Georgia Department of Community Health bring this civil action

against the above-listed Defendants for declaratory and injunctive relief and allege as follows:

### INTRODUCTION

1.      This case is about whether the federal government must keep its promises. CMS has

attempted a regulatory bait and switch of unprecedented magnitude that would eviscerate the

contractual terms at the heart of a carefully negotiated federal-state program.

2.      As originally enacted, Medicaid required States to cover only "certain discrete

categories of needy individuals—pregnant women, children, needy families, the blind, the elderly, and

the disabled." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 575 (2012). In the wake of the Patient

Protection and Affordable Care Act (ACA) and the Supreme Court's holding in *NFIB v. Sebelius*, States

have a choice to "expand medical coverage to low-income adults who did not previously qualify" for Medicaid. *Gresham v. Azar*, 950 F.3d 93, 96 (D.C. Cir. 2020).

3.      Georgia has chosen not to fully expand Medicaid under the ACA.

4.      In 2019, however, Georgia decided to pursue a unique demonstration project under Section 1115 of the Social Security Act, which authorizes CMS to approve "any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives" of Medicaid. 42 U.S.C. §1315(a).

5.      The result of Georgia's exhaustive negotiations with the federal government (and consideration of stakeholder input) was a Section 1115 demonstration project known as Georgia Pathways to Coverage. Georgia Pathways is an innovative program to voluntarily expand Medicaid coverage to tens of thousands of otherwise-ineligible, low-income Georgians while also ensuring that those individuals were taking steps to benefit themselves and their communities. Georgia Pathways accomplished this objective by conditioning coverage on participants meeting, and continuing to satisfy, a minimum number of "qualifying hours" through work, job training, education, volunteering, or other similar activities.

6.      After multiple public comment periods, CMS approved Pathways on October 15, 2020. CMS also later confirmed on January 4, 2021, that the Pathways program reflected a binding contract between Georgia and the federal government. But just weeks after President Biden was inaugurated, CMS sent Georgia a letter declaring that it was reconsidering its previous approval of Pathways and had preliminarily determined that the demonstration's qualifying hours requirement would not further the objectives of Medicaid.[1]

---

[1] The Georgia Pathways documents referenced in this complaint can be found at https://bit.ly/3AhtFvi.

7.      Several months later, on December 23, 2021, CMS formally rescinded its approval of the terms at the heart of Georgia Pathways—primarily its qualifying hours and premium requirements. But CMS said that the remaining part of the demonstration expanding coverage was still in place. The result: significant Medicaid expansion in Georgia without condition. This is not what Georgia signed up for and represents an egregious regulatory bait and switch on the core terms of a massive federal-state program. Because Section 1115 demonstration projects represent a contract between States and the federal government, and because CMS's actions reflect paradigmatic arbitrary and capricious decisionmaking, this Court must vacate CMS's attempt to renege on its promise and unilaterally rewrite the terms of the program.

## PARTIES

8.      Plaintiff State of Georgia is a sovereign State of the United States of America.

9.      Plaintiff Georgia Department of Community Health is an administrative agency organized under the laws of Georgia. It is the State agency designated under 42 C.F.R. §431.10 to administer Georgia's Medicaid program and demonstration projects related to that program.[2]

10.      Defendant Chiquita Brooks-LaSure, sued in her official capacity, is the Administrator of the Centers for Medicare and Medicaid Services. She signed the December 23, 2021, letter challenged in this lawsuit.

11.      Defendant the Centers for Medicare and Medicaid Services ("CMS") is a federal agency organized under the laws of the United States. It is responsible for federally administering Medicaid and for approving State applications for demonstration projects and waivers under Medicaid. CMS maintains a regional office in the State of Georgia for administering its operations in Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, and Tennessee.

---

[2] For ease of reference, Plaintiffs will be referred to collectively as "Georgia."

12.     Defendant Xavier Becerra, sued in his official capacity, is the Secretary of the Department of Health and Human Services. He is charged by statute with approving demonstration projects and waivers.

13.     Defendant United States Department of Health and Human Services ("HHS") is a federal agency organized under the laws of the United States. It is responsible for administering federal healthcare policy and is the cabinet-level Department of which CMS is a part.

14.     Defendant United States of America is the federal sovereign.

## JURISDICTION & VENUE

15.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§1331, 1346, 1361, 2201; 5 U.S.C. §§701-706.

16.     This Court may grant declaratory and injunctive relief under 5 U.S.C. §706, 28 U.S.C. §§1361, 2201, and 2202, and its inherent equitable powers.

17.     Venue is proper in this district because Defendants are United States agencies or officers sued in their official capacities, the State of Georgia is a resident of this judicial district, and no real property is involved. *See* 28 U.S.C. §1391(e)(1); *Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892); *see also California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018); *Alabama v. U.S. Army Corps of Engineers*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005) ("[A] state may bring suit under 28 U.S.C. § 1391(e)(3) in any district within the state.").

18.     Georgia has standing to challenge CMS's recission of key parts of Georgia Pathways because it has suffered direct injury as well as injury in its quasi-sovereign and parens patriae capacities. Georgia has invested substantial resources in direct reliance on the Georgia Pathways Approval. Georgia has also amended its laws and policies in reliance on Pathways. S.B. 106 (2019) *codified as* O.C.G.A. §49-4-142.3. Moreover, Georgia has expended significant manpower to implement the

program. Finally, the Recission prevents Georgia from implementing a duly authorized project and prevents it from implementing the eligibility conditions at the core of the demonstration.

## BACKGROUND

### I.      Overview of Medicaid.

19.     Since 1965, the federal government and the States have worked together to provide medical assistance to certain vulnerable populations under Title XIX of the Social Security Act, commonly known as Medicaid. *See* 42 U.S.C. §1396a et seq.; *see also Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985) (noting that Congress designed Medicaid to "subsidize[ ]" States in "funding ... medical services for the needy").

20.     Medicaid is the quintessential "cooperative federalism" program. *King v. Smith*, 392 U.S. 309, 316 (1968). It is "financed largely by the federal government" but "administered by the States." *Id.*; *see also Georgia Hosp. Ass'n v. Dep't of Med. Assistance*, 528 F. Supp. 1348, 1351 n.1 (N.D. Ga. 1982) ("Title XIX of the Social Security Act, 42 U.S.C. s 1396, et seq., provides for the establishment of cooperative Federal-State programs, commonly called 'Medicaid,' to provide payments for "necessary medical services" rendered to qualified 'needy individuals whose income and resources are insufficient to meet the costs of these services.'").

21.     The Social Security Act charges the Secretary of Health and Human Services with a wide range of administrative responsibilities relating to maintaining the programs under his purview, including Medicaid. *See* 42 U.S.C. §301 et seq.

22.     States that elect to participate in Medicaid must propose comprehensive State plans that meet federal requirements. *See* 42 U.S.C. §1396a; 42 C.F.R. §§430.10-25. "Once each plan is approved, the States 'administer Medicaid with little to no oversight, but the federal government pays a large portion of state administrative expenses.'" *Texas v. Brooks-LaSure*, 2021 WL 5154219, at *1 (E.D. Tex. Aug. 20, 2021) (quoting Nicole Huberfeld, *Federalizing Medicaid*, 14 U. Pa. J. Const. L. 431,

447 (2011)); *see also Georgia Hosp. Ass'n*, 528 F. Supp. 1348, 1351 (N.D. Ga. 1982) ("The various Medicaid programs, once approved, are administered by the respective States.").

23.     The portion of each State's Medicaid program that is subsidized by the federal government varies by State and is based on a federal medical-assistance percentage (FMAP). Georgia's FMAP is currently 73.05%. *See FY 2022 Federal Medical Assistance Percentage (FMAP) for Medicaid and Multiplier*, KFF, https://bit.ly/3ftNmGV.

24.     The Centers for Medicare & Medicaid Services, a federal agency within the Department of Health and Human Services, has primary responsibility for overseeing the Medicare and Medicaid programs.

25.     "The current Medicaid program requires States to cover only certain discrete categories of needy individuals—pregnant women, children, needy families, the blind, the elderly, and the disabled." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 575 (2012) (citing 42 U.S.C. §1396a(a)(10)).

26.     In the wake of the ACA and the Supreme Court's holding in *NFIB v. Sebelius*, States have a choice to "expand medical coverage to low-income adults who did not previously qualify" for Medicaid. *Gresham v. Azar*, 950 F.3d 93, 96 (D.C. Cir. 2020) (citing §1396a(a)(10)(A)(i)(VIII); *NFIB*, 567 U.S. at 583).

## II.     Section 1115 Demonstration Projects.

27.     Section 1115 of the Social Security Act allows States and the federal government to work collaboratively to implement innovative Medicaid programs. Although Medicaid establishes certain minimum requirements, Section 1115 allows States to deviate from them in the form of "experimental, pilot, or demonstration project[s]." 42 U.S.C. §1315(a). Section 1115 authorizes the Secretary to approve "any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives" of Medicaid. *Id.*; *see also Crane v. Mathews*, 417

F. Supp. 532, 536 (N.D. Ga. 1976) ("While state requirements under Title XIX are mandatory upon the states, Title XI of the Act, section 1115, 42 U.S.C. s 1315, provides a mechanism whereby such requirements may be waived in certain circumstances."). The Social Security Act authorizes the Secretary of HHS to approve these projects. 42 U.S.C. §1315(a). The Secretary has largely delegated this authority to CMS's Administrator. 42 C.F.R. §430.25(f)(2).

28.     Congress enacted Section 1115 to ensure that Medicaid requirements do not "stand in the way of experimental projects designed to test out new ideas and ways of dealing with the problems of public welfare recipients." S. Rep. No. 87-1589, at 19 (1962), *reprinted in* 1962 U.S.C.C.A.N. 1943, 1961.

29.     Section 1115 allows a State to propose an alternative plan that varies from the Social Security Act's default requirements and serves the goals of Medicaid and Medicaid beneficiaries within the State. *See Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 224 (5th Cir. 2019). Such "§ 1115 demonstration projects provide benefits to people who wouldn't otherwise be eligible for Medicaid benefits; and the costs of these benefits are treated as if they are matchable Medicaid expenditures." *Id.*

30.     The Section 1115 application process is collaborative, exhaustive, and transparent. To obtain a waiver, a State must "file an application with CMS and comply with various statutory and regulatory requirements." *Texas*, 2021 WL 5154219, at *1. The application process includes two public notice and comment periods. First, before submitting its application, "the State must conduct a 30-day notice-and-comment period at the state level, along with at least two public hearings to allow citizens and relevant stakeholders to provide their input." *Id.* (citing 42 C.F.R. §431.408). Second, after CMS receives the State's application, it must "solicit public comment in a federal notice-and-comment period." *Id.* (citing 42 C.F.R. §431.416). The Secretary must then approve or deny the demonstration application. 42 U.S.C. §1315(d); 42 C.F.R. §431.412. Only after this exhaustive process—often

including extensive negotiation and compromise between CMS and the State—can a State implement a Section 1115 demonstration.

31.    Section 1115 does not specifically authorize CMS to withdraw approval for a demonstration. Relying on its authority to establish "a process for the submission to the Secretary of periodic reports by the State concerning the implementation of the demonstration project," 42 U.S.C. §1315(d)(2)(D), CMS has promulgated regulations providing that the "Secretary may suspend or terminate a demonstration in whole or in part, any time before the date of expiration, whenever it determines that the State has materially failed to comply with the terms of the demonstration project" and that the "Secretary may also withdraw waivers or expenditure authorities based on a finding that the demonstration project is not likely to achieve the statutory purposes." 42 C.F.R. §431.420(d)(1), (2).

## III.    CMS and Georgia Comprehensively Negotiate Georgia Pathways.

32.    As a result of the Supreme Court's ruling in *NFIB v. Sebelius*, States may choose to expand Medicaid, reject expansion altogether, or implement hybrid expansion through Section 1115.

33.    Georgia has chosen not to fully expand Medicaid under the ACA.

34.    In 2019, however, Georgia decided to pursue a Section 1115 waiver for an innovative new program that would deliver coverage to tens of thousands of additional participants while also ensuring that the recipients were taking steps to better themselves and their communities. O.C.G.A. §49-4-142.3 (authorizing Section 1115 waiver request). The State began the process by researching other states' experiences with expansion, conducting environmental scans of Georgia's population, and analyzing potential options.

35.    Georgia officials held meetings with CMS officials in late 2019 to work collaboratively to develop the waiver and incorporate a qualifying hours and activities requirement for newly eligible

recipients that would require them to complete a minimum number of hours of work, education, job training, community service, or other similar activities to receive and maintain coverage.

36.    These collaborative meetings continued regularly, often weekly, into 2020. Starting in February 2020, CMS and the State began engaging in weekly negotiation calls to discuss various elements of Georgia's application. In these exhaustive give-and-take negotiations, CMS made several recommendations to alter Georgia's plan. For example, CMS asked Georgia to modify its proposal to ensure that there would be coverage for new recipients affected by COVID-19. Georgia responded by agreeing to special terms and conditions (STCs) that excused compliance with the qualifying hours and community activities requirement through a "good cause exception" when a "beneficiary is quarantining in response to having COVID-19 symptoms, a COVID-19 diagnosis, or exposure to COVID-19, or because of a closure of the place(s) where the beneficiary was meeting the hours requirement related to COVID-19 and as a result, is unable to fulfill the hours and activities requirement." Georgia and CMS also agreed that the State would provide "reasonable accommodations to individuals with disabilities protected by the ADA," which may include an accommodation for disabilities caused by COVID-19 after a participant enrolled. And Georgia and CMS agreed that GED programs and enrollment and active engagement in the Georgia Vocational Rehabilitation Agency would count as qualifying activities.

37.    These negotiations resulted in a comprehensive plan that benefitted all stakeholders. Each side made compromises. CMS advanced its goal of expanding Medicaid coverage to individuals in Georgia who were not otherwise eligible. Georgia advanced its goal of sustainably increasing coverage while promoting activities to help individuals attain independence and self-reliance. Georgians with income up to 100% of the federal poverty level became eligible for Medicaid benefits for the first time. In short, even though Georgia had no obligation to expand eligibility, the State worked with CMS in good faith to adopt an innovative program to deliver coverage to a new category

of individuals while helping them build important skills and become more independent and self-reliant.

38. As required by the Act, Georgia Pathways was subjected to two public comment periods—one federal and one State. The federal comment period occurred from January 8, 2020, through February 7, 2020. CMS received 1,729 comments and provided a written response in its Approval.

**IV.    Georgia Pathways to Coverage.**

39. The compromise plan that emerged from this exhaustive negotiation, analysis, and public input is called "Georgia Pathways to Coverage." Georgia Pathways is an innovative program to voluntarily expand Medicaid coverage to tens of thousands of otherwise-ineligible, low-income Georgians while ensuring that those individuals were taking steps to build skills, find work, complete additional education, or volunteer in their communities.

40. Georgia Pathways provides Medicaid coverage to low-income adults ages 19-64, with incomes up to 95 percent of the federal poverty line (FPL) (effectively 100 percent with the 5 percent income disregard), who are not otherwise eligible for Medicaid coverage.

41. The central component of Georgia Pathways is its pathway to coverage for those otherwise ineligible for Medicaid. This pathway—the eligibility mechanism—requires that to qualify and maintain eligibility, applicants must complete a minimum of 80 hours of qualifying activities in the month prior to approval. Pathways participants must then complete 80 hours of qualifying activities per month to maintain eligibility.

42. A wide range of activities can be used to satisfy the 80-hour requirement including: unsubsidized employment, subsidized private sector employment (including self-employment), on-the-job training, specified job readiness activities, certain community service activities, specified vocational educational training, and enrollment in an institution of higher education.

43.     Another component of the pathway to coverage is the premium payment. Most applicants with incomes between 50 to 95 percent of the FPL are required to make initial and ongoing monthly premium payments. Such applicants will have 90 days following their eligibility determination to make the initial monthly payment before their coverage begins. The premium payment helps participants build personal responsibility through contributions to their health and prepares them for transition into commercial insurance. Failure to make the initial payment results in closure of the individual's application, but the individual may reapply at any time. The premium is on a sliding scale based on family income and is calculated to not exceed two precent of household income. Participants with incomes from 50 to 84 percent of the FPL must pay $7.00 a month and participants with incomes from 85 to 95 percent of the FPL are required to pay $11.00 a month. Not all Pathways participants must pay a premium payment, as participants with incomes below 50 percent of the FPL are exempt from the premium requirement.

44.     As part of the approved Georgia Pathways demonstration, Georgia agreed to provide reasonable accommodations to enable individuals with disabilities (who are not otherwise eligible for Medicaid on the basis of disability) to meet the qualifying hours requirement. Such reasonable accommodations may include an assessment to determine eligibility for another category of Medicaid assistance; referral to a State vocational rehabilitation program for assessment to determine the appropriate accommodation, which may include a reduction in the number of hours required to participate in a qualifying activity; or an alternate way to report compliance with the qualifying activities requirement.

45.     Georgia also agreed to allow participants enrolled in the demonstration who had been compliant with the qualifying hours requirement but who become unable to comply with the requirements moving forward for good cause to have a maximum of 120 hours of noncompliance during the benefit year. These good cause circumstances include, but are not limited to: the participant

or an immediate family member is hospitalized; the participant or an immediate family member experiences a serious illness; the participant experiences a short-term injury or illness; the participant experiences the birth, adoption, or death, of an immediate family member; the participant accepts a foster child or kin-ship care placement; the participant experiences a natural or human-caused disaster (including a public health emergency); the participant has a family emergency or other life event (e.g., divorce, civil legal matter, or is a victim of domestic violence); the participant is temporarily homeless; or other good cause reasons as defined and approved by the State.

46.     Individuals admitted to Georgia Pathways must report compliance with the qualifying hours requirement through methods including in-person confirmation, online reporting, or reporting by mail. Georgia agreed that participants who have reported compliance with the qualifying activities requirement for six consecutive months will be exempt from the monthly reporting requirement until they are reevaluated for eligibility during the annual redetermination period. Georgia is required to notify individuals determined to be eligible for Georgia Pathways of the premium payment requirement and need to continue to participate in the qualifying activities requirement in order to continue receiving Medicaid coverage.

**V.     CMS Approves Georgia Pathways.**

47.     On October 15, 2020, CMS formally approved Georgia Pathways as a Section 1115 demonstration project. The October 15 Approval Letter (hereinafter "Approval") provides a comprehensive analysis of Georgia Pathways with several express factual findings of why the demonstration will further the objectives of the Medicaid program.

48.     CMS began by identifying the objectives of the Medicaid program: "[t]o enable states to 'furnish … medical assistance'—i.e., healthcare services—to certain vulnerable populations and to furnish those populations with rehabilitation and other services to help them 'attain or retain capability

for independence or self-care.'" Approval at 2 (quoting 42 U.S.C. §1396). CMS then went on to make several specific findings that Georgia Pathways would further these goals.

49.     *First*, CMS found that "the only impacts on eligibility or enrollment will be to expand" Medicaid eligibility and coverage because Georgia Pathways "applies only to beneficiaries who previously were not eligible for Medicaid." *Id.* at 3. Thus, the demonstration "expands the Medicaid eligible population in Georgia." *Id.* CMS specifically found that Georgia Pathways "is expected to result in a significant coverage expansion in Georgia" and noted that the state "estimates approximately 64,336 individuals will enroll in Medicaid throughout the life of this demonstration." *Id.* at 8. Moreover, CMS found that the demonstration would expand coverage because Pathways "is designed to make compliance with the qualifying hours and activities requirement attainable, and Georgia has taken steps to include protection to ensure that individuals can reasonably be expected to meet the requirements." *Id.*

50.     *Second*, CMS found that the demonstration "would promote the sustainability of Georgia's Medicaid program." Approval at 9. CMS noted that "Georgia expects that some of these beneficiaries will gain financial security, averting their need for future, longer term public assistance as they secure employer-sponsored or other commercial coverage or otherwise transition from Medicaid eligibility." *Id.*[3] By promoting such fiscal sustainability, CMS found that Pathways "will provide greater access to coverage for low-income beneficiaries than would be available absent the demonstration."

---

[3] Georgia's application explained this point at length:

> Georgia Pathways to Coverage will provide Georgians with an experience similar to commercial health insurance in order to better prepare them for their transition into a commercial health insurance plan.  Building personal responsibility through financial contributions toward their health will empower Georgia Pathways members to more actively engage in managing their own health and develop important skills needed for a smooth transition into commercial health insurance.  These transitions are especially critical to maintain health outcomes that the members may achieve through Georgia Pathways and to avoid potential disruptions in insurance status as a member transitions out of Medicaid.

*Id.* Thus, Pathways would allow Georgia "to expand coverage in a way that is economically practicable and sustainable for the state." *Id.* Moreover, CMS found that by incentivizing healthy behaviors, the demonstration would cause participants to "consume fewer health care resources while they are enrolled in Medicaid and potentially reduce the need for future Medicaid enrollment." *Id.*

51.    *Third*, CMS found that Georgia Pathways would further Medicaid's objective of "attain[ing] or retain[ing] capability for independence or self-care." Approval at 2, 10-11 (quoting 42 U.S.C. §1396). CMS determined that the demonstration is designed to test policies that seek to "strengthen employment and earnings among individuals subject to the demonstration requirement, which [CMS] expect[s] will lead to other health insurance coverage from employers and other commercial sources for the populations eligible for this demonstration." *Id.* at 10. CMS also found that it expects that the demonstration "will result in greater financial independence for the demonstration population as well as improved health status." *Id.* The demonstration would also yield key information and research for other future programs due to the exhaustive evaluation design in which Georgia must "identify, through robust statistical methods, viable in-state or out-of-state comparison populations, or use of other rigorous methodological approaches, such that the impact of the demonstration can be estimated." *Id.*

52.    In the Approval, CMS also directly responded to the extensive comments received during the federal comment period.

53.    CMS addressed comments asserting that participants would lose coverage. CMS responded by emphasizing that the demonstration's only effect is to expand coverage and will not affect current beneficiaries: "If an applicant meets the qualifying hours and activities requirement at the time of application and thereafter, this demonstration provides a pathway to 'opt-in' to Medicaid coverage for an individual who, absent this demonstration, has no such pathway. This demonstration

offers potential coverage gains for individuals who otherwise would not have been eligible for Medicaid." Approval at 12.

54.     CMS also addressed comments regarding the potential for disparate impacts to individuals "with health issues and to other groups like low-income families and people who are lesbian, gay, bisexual, and transgender." *Id.* CMS addressed such concerns by noting that it "required the state to include specific assurances in STCs 29 and 38, which address the potential for disparate impact" by monitoring such impact and working "to identify any disparate impact" and report it to CMS as part of its ongoing monitoring activities. *Id.* CMS also specifically noted that it reserved the "right to require the state to submit a corrective action plan" to address disparate impacts. *Id.*

55.     CMS responded to comments attacking the premium requirement. CMS noted that the premiums were on a sliding scale and the neediest segment of participants would pay no premiums at all. *Id.* at 13. And for those who do have to pay, the STCs ensure that premiums cannot exceed two percent of household income. *Id.* Moreover, CMS highlighted the benefits of premium payments to preparation for private insurance by "provid[ing] beneficiaries with an experience similar to that of commercial insurance" and an experience that will "build personal responsibility through financial contributions to their health." *Id.*

56.     CMS also extensively addressed comments regarding COVID-19. CMS acknowledged the public health emergency and noted uncertainty about the future of the pandemic. *Id.* at 14. CMS explained that the demonstration specifically responds to COVID-19 by including it in the good cause exception for noncompliance with the qualifying hours requirement: "These circumstances include those that may be associated with future public health emergencies, as well as those related to beneficiaries who may be quarantining in response to having COVID-19 symptoms, a COVID-19 diagnosis, or exposure to COVID-19." *Id.* CMS also explained that Georgia will "also take into account the potential closure, related to COVID-19, of the place(s) where the beneficiary was meeting

the requirement and as a result, is unable to fulfill the hours and activities requirement." *Id.* Finally, CMS noted the obvious fact that "expanding Medicaid coverage to individuals not previously eligible will have significant positive impact on access to health care during and after a public health emergency." *Id.*

57.     Commenters also attacked the demonstration's reporting requirement. *Id.* at 15-16. CMS responded that these concerns were addressed in the STCs, which require Georgia to "provide beneficiaries with multiple avenues to report their qualifying hours and activities, including an online portal, mail in or in-person." *Id.* at 15. Moreover, CMS noted that Georgia "will also be required to accommodate beneficiaries who may have trouble reporting their hours due to a disability." *Id.* Additionally, CMS noted the requirement that participants be exempt from the monthly reporting requirement for the remainder of the benefit year after six consecutive months of reporting. *Id.* at 16. Finally, CMS explained that "[i]f a beneficiary has a disability affecting their ability to report their required hours, the state is required to provide the beneficiary reasonable accommodations." *Id.*

58.     CMS extensively responded to comments alleging that Georgia Pathways suffered similar alleged flaws as other State demonstration waivers. *Id.* at 17-19. CMS reiterated that Pathways "only offers coverage opportunities to individuals not currently eligible for Medicaid." *Id.* at 17. Thus "individuals who choose not to comply with the qualifying hours and activities requirement will be no worse off than they are without this demonstration." *Id.* at 18. Moreover, CMS responded to studies about Arkansas's Section 1115 demonstration, "but disagree[d] with commenters on its relevance to approval of the Georgia demonstration, which will test a completely different model and which will have its own robust monitoring and evaluation design." *Id.* at 19. CMS noted the fundamental difference between Pathways, which "offers a new pathway to coverage for individuals who otherwise would not have Medicaid or other health coverage, and therefore is, by design, a significant coverage

expansion" and programs that impose work or community engagement requirements on individuals already receiving Medicaid. *Id.*

59. The full parameters of the demonstration were enshrined in eighty Special Terms and Conditions signed by Georgia and CMS. In addition to the parameters discussed above, the STCs specify that "CMS reserves the right to withdraw expenditure authorities and end the demonstration at any time if it determines that continuing the expenditure authorities would no longer be in the public interest or promote the objectives of title XIX." STC 10.

60. On January 4, 2021, CMS and Georgia signed a supplemental agreement regarding termination or withdrawal of the demonstration. The agreement begins by emphasizing that "[b]y their nature, section 1115 demonstrations represent a contract between the state and federal government." In this agreement, CMS and Georgia agreed to a comprehensive process affording Georgia full notice and an opportunity to be heard in the event CMS seeks to withdraw the demonstration. Moreover, CMS promised that it "shall make the effective date for its determination no sooner than 9 months after the date on which CMS transmits its determination to the affected State."

## VI. Georgia Invests Significant Resources to Implement Georgia Pathways in Reliance on CMS's Approval.

61. In direct reliance on the Approval, Georgia made earnest and good faith efforts to implement Georgia Pathways.

62. The Georgia General Assembly appropriated $65,450,836 in the FY2021 Appropriations Act to cover benefits for projected enrollment for the first year of the demonstration.

63. Georgia conducted discussions and began program implementation activities with Managed Care Organizations, contracted vendors for eligibility and enrollment, contracted vendors for third-party liability, and contracted vendors for customer service support and general project management.

64.     Georgia budgeted $27,169,720 under the FY2021 appropriation for the development of the Georgia Gateway system components, improvements, and project management functions necessary for successful implementation of Pathways.

65.     Georgia hired and assigned 31 state employee personnel full-time equivalents to support Pathways implementation project activities. Georgia is also in the process of hiring up to 86 employees to implement Pathways.

66.     Georgia's Care Management Organizations (CMOs) implemented changes in order to receive Pathways assignments and made adjustments to receive the capitation payments for Pathways coverage. Moreover, CMOs had to make numerous updates in accordance with the Pathways readiness requirements.

67.     Since the Approval, Georgia has been submitting quarterly monitoring reports to CMS.

## VII.   CMS Preliminarily Reneges on its Approval of Georgia Pathways.

68.     In February 2021, as Georgia actively worked to implement Georgia Pathways, it received two letters from CMS.

69.     The first letter, on February 12, 2021, consisting of two pages, informed Georgia that CMS had "preliminarily determined that allowing work and other community engagement requirements to take effect in Georgia would not promote the objectives of the Medicaid program." The sole stated reason was COVID-19. After a one-paragraph discussion of COVID-19, CMS stated that it was "commencing a process of determining whether to withdraw the authorities approved in the Pathways to Coverage demonstration that permit the state to require work and other community engagement activities as a condition of Medicaid eligibility while leaving in place the demonstration's other provisions, including the extension of Medicaid eligibility to certain otherwise-ineligible individuals."

70.     The second letter, also sent on February 12, 2021, purported to withdraw the January 4, 2021, agreement between Georgia and CMS outlining the process for withdrawing authorization for Georgia Pathways. The letter cited "CMS's need for flexibility to make and effectuate determinations under 42 C.F.R. 431(d)(1)-(2)."

71.     On March 12, 2021, Georgia responded to these letters. Georgia explained that CMS's first letter fundamentally erred in equating Georgia's program—which would expand eligibility to individuals not currently eligible for coverage—with other States' work requirements for existing participants. Georgia also rebutted CMS's reliance on COVID-19: "If anything, the COVID-19 crisis makes the qualifying hours and activities—which include work, job training, education, or volunteering—more important, not less." Georgia went on to exhaustively detail why rescinding the demonstration in whole or part would be unlawful and arbitrary. Georgia also disputed CMS's authority to unilaterally rescind the January 4, 2021 Agreement—signed by both Georgia and CMS— because "CMS did not identify any 'changed circumstances' in the thirty-two days between January 4 to February 12, nor could it."

72.     Pathways was set to go into effect on July 1, 2021. On June 24, in light of the uncertainty created by the preliminary determination, and being concerned with the financial implication to the State by CMS's refusal to pay their portion of the FMAP for the Pathways beneficiaries, Georgia delayed the implementation of Pathways.

## VIII.   CMS Withdraws its Approval of Georgia Pathways' Qualifying Hours and Premium Payment Requirements.

73.     Without a public comment period, on December 23, 2021, CMS sent Georgia a letter purporting to rescind (hereinafter "the Recission") Georgia's authority to implement the qualifying activities and premium components of Georgia Pathways. The Recission, however, stated that it was leaving in place the part of Georgia Pathways expanding Medicaid coverage to certain able-bodied adults. The consequence of the letter: CMS would allow the Medicaid expansion to proceed while

stripping out the qualifying hours and premium requirements that were indispensable to the State's decision to participate in this demonstration program.

74.     Like the February 12 letter, CMS relied on COVID-19 as the reason to withdraw the premium and qualifying activities components.[4] Notably, CMS phrased the Recission as based on its "reevaluat[ion]" of the Approval.

75.     As discussed extensively below, the Recission is based on numerous errors of fact and law. For example, it makes the absurd conclusion that a program *expanding* Medicaid eligibility to an entirely new and currently ineligible population has the result of *contracting* Medicaid coverage. It also flagrantly errs by equating Georgia Pathways, which allows a new population to become eligible for Medicaid through various qualifying activities, with other State demonstrations that imposed work requirements upon *existing* beneficiaries. And CMS refused to engage with its previous extensive fact findings. Finally, CMS does not once mention the extensive funds and manhours expended by Georgia in reliance upon its prior Approval.

76.     More fundamentally, the Recission upends the core policy choices embodied in the agreement between CMS and Georgia. Georgia agreed to expand Medicaid eligibility *only if* expansion was conditioned on the community engagement and premium requirements. By selectively withdrawing those parts of the demonstration, CMS is effectively seeking to convert this Section 1115 demonstration into a full expansion of Medicaid coverage in Georgia—which in no way resembles the program that the State agreed to in its exhaustive negotiations with CMS.

## IX.    Consequences of CMS's Withdrawal.

77.     CMS's Withdrawal will have devastating consequences for Georgia and its citizens.

---

[4] CMS also stated that the Families First Coronavirus Relief Act would not allow Georgia to disenroll participants who were already enrolled in Medicaid. As discussed below however, FFCRA does not affect Georgia's ability to implement conditions on eligibility for *new* potential participants.

- 20 -

78.     All of the resources expended, legislation enacted, and policies established, will have been done in vain—a monumental waste of Georgia's resources over the past two years.

79.     It is impossible for Georgia to implement Pathways without the qualifying activities and premium requirements. Georgia projected that approximately 50,000 individuals would qualify under Pathways. Sheared of the qualifying activities and premium components, approximately 408,000 individuals would qualify. Georgia has hired enough staff for 50,000 new enrollees. It has budgeted for 50,000 new enrollees. It cannot handle 408,000 new enrollees. In the first year of the demonstration alone, Pathways, without the premium and qualifying activities requirement (i.e., full expansion) would cost Georgia approximately $237,288,581. The State has available only the $65,460,836 appropriated by the Georgia General Assembly.

80.     Accordingly, if the Recission stands, Georgia will have no choice but to terminate Pathways, depriving tens of thousands of Georgians of the opportunity to obtain Medicaid coverage in the midst of the COVID-19 pandemic.

## CLAIMS FOR RELIEF

### COUNT I
### Contrary to Law – No Voluntary Consent to Medicaid Expansion Absent Qualifying Hours and Premium Payment Requirements
### (5 U.S.C. §706)

81.     Georgia repeats and incorporates by reference each of the Complaint allegations stated above.

82.     The Recission of the qualifying activities and premium requirements is final agency action. By revoking Georgia's right to implement critical aspects of Georgia Pathways through a recission, CMS has altered the State's rights and obligations. *See, e.g.*, *Alabama v. Centers for Medicare & Medicaid Servs.*, 780 F. Supp. 2d 1219, 1228 (M.D. Ala. 2011), aff'd, 674 F.3d 1241 (11th Cir. 2012) ("[T]he terms of the SHO letter impose legal obligations on the states that neither the plain language of the Medicaid Act nor the regulations promulgated by CMS impose."); S*tate v. Centers For Medicare &*

*Medicaid Servs.*, 2010 WL 1268090, at *5 (M.D. Ala. Mar. 30, 2010) ("In its amended complaint, Plaintiff alleges that the SHO Letter has harmed Alabama because it has limited the state's ability to negotiate settlements in current Medicaid fraud and abuse litigation. ... Therefore, all counts alleged by Alabama that are also fit for judicial decision are ripe."). Accordingly, a recission or suspension is final agency action. *See Texas v. Brooks-LaSure*, 2021 WL 5154219, at *5 (E.D. Tex. Aug. 20, 2021) ("[T]he rescission letter determines rights and has legal and practical consequences."). And CMS itself has stated that the Recission is its final word on the qualifying hours and premium payment provisions of Georgia Pathways. *See* Recission at 36.

83.     Section 1115 demonstrations represent a contract between the State and the federal government.

84.     The "legitimacy" of any expansion of the Medicaid program requires that the State "voluntarily and knowingly accepts the terms of the contract." *NFIB*, 567 U.S. at 77 (Roberts, C.J., joined by Breyer & Kagan, JJ.). And "[r]especting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Id.*; *see also id.* at 675-79 (Scalia, Kennedy, Thomas, & Alito, JJ., dissenting) (same).

85.     CMS's attempt to excise the qualifying activities and premium components of Georgia Pathways contradicts the fundamental basis of the contract between Georgia and CMS embodied in the Special Terms and Conditions. Georgia would not have agreed to this partial expansion of Medicaid without the qualifying activities and premium requirements. Indeed, the demonstration is nonsensical without these requirements as they provide the "pathway" to obtain coverage in the first place. By removing the qualifying activities and premium components, the demonstration ceases to be a Section 1115 demonstration at all and effectively becomes a condition-free expansion of Medicaid up to 100% FPL. This is not what Georgia "voluntarily and knowingly" accepted when it signed the STCs.

## COUNT II
### Contrary to Law – Ultra Vires
### (5 U.S.C. §706)

86.     Georgia repeats and incorporates by reference each of the Complaint allegations stated above.

87.     CMS has only the powers conferred on it by *statute. La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it."). And CMS cannot expand those powers by *regulation. See, e.g., id.* ("An agency may not confer power upon itself."); *see also Civil Aeronautics Bd. v. Delta Airlines, Inc.*, 367 U.S. 316, 334 (1961). This rule applies with special force when an agency seeks to disrupt the balance between federal and State power. *See, e.g., La. Pub. Serv. Comm'n*, 476 U.S. at 368-70.

88.     Section 1115 authorizes CMS to "waive compliance with" Medicaid requirements, 42 U.S.C. §1315(a)(1), to promulgate regulations relating to demonstration projects, *id.* §1315(d)(1), (2), and to approve or disapprove extensions of demonstration projects, *id.* §1315(f).

89.     Section 1115 provides CMS with no authority whatsoever to rescind, withdraw, or reconsider an approved demonstration. Indeed, by giving CMS a single approve-or-deny decision regarding a demonstration, Section 1115 expressly requires finality. Because Section 1115 expressly authorizes approval or disapproval of a demonstration, but not the power to rescind or reconsider, CMS lacks such power. As the Fifth Circuit has observed, "[o]nce the [Administrator] authorizes a demonstration project, no take-backs." *Forrest Gen. Hosp.*, 926 F.3d at 233. This makes perfect sense— a demonstration project is typically a massive and expensive undertaking, and it would be profoundly inequitable to allow CMS to change the rules after a project has already been approved.

90.     By its own terms, the Recission is an attempt to reconsider CMS's prior Approval of Georgia Pathways. *See, e.g.*, Recission at 4 ("CMS has reevaluated both the risks posed by the pandemic

and its aftermath and the potential benefits of continuing the work requirement. Based on this reanalysis, CMS has determined that the earlier approval overweighed the potential benefits to Georgia's Medicaid program from the work requirement while under-weighing the requirement's potential negative effects, particularly in light of the ongoing pandemic."). Because Congress conferred no such reconsideration authority and expressly precludes CMS from reopening an already approved demonstration, CMS's Recission is beyond its statutory authority and contrary to law.

91.     By attempting to rescind its Approval of Georgia Pathways, CMS has acted beyond its statutory authority and in violation of Section 1115's express provisions. But even if CMS could rely upon nonstatutory inherent reconsideration authority, its Recission fails.

92.     Absent statutory authorization, CMS can rely only on its "inherent authority to reconsider its decisions." *Texas*, 2021 WL 5154219, at *8.[5] "Any such reconsideration must (1) be made within a reasonable time after the original decision; (2) be preceded by notice to the parties of the agency's intent to reconsider; and (3) not be arbitrary, capricious, or an abuse of discretion." *Id.* The Recission fails the first and third prong.

93.     *First*, the time lapse between the original decision (October 15, 2020) and the Recission (December 23, 2021) is significantly greater than a year—well beyond the reconsideration periods generally considered reasonable. *See id.* (collecting time lapse cases). Moreover, "the time lapse here is not short and reasonable from a functionalist perspective due to the intervening, reasonable reliance on the [October 2020] final approval" that "resulted from a complex negotiation process between CMS and [Georgia] and thus reasonably led [Georgia] to immediately begin intense preparation efforts for implementing the program." *Id.*

_____

[5] Because Section 1115 provides no authority for reconsideration and agencies "literally ha[ve] no power to act" absent congressional authorization, *La. Pub. Serv. Comm'n*, 476 U.S. at 374, Georgia does not concede that CMS has inherent authority to reconsider its Approval. This argument is presented in the alternative.

94.      *Second*, as discussed extensively below, *infra* ¶¶103-117, the Recission is arbitrary and capricious.

95.      Accordingly, CMS failed to carry its heavy burden of establishing its Recission is permissible under any inherent reconsideration power it may have.

## COUNT III
### Contrary to Law—Violation of Section 1115 and Social Security Act
### (5 U.S.C. §706)

96.      Georgia repeats and incorporates by reference each of the Complaint allegations stated above.

97.      The Recission is contrary to the text and express purposes of Section 1115 and the Social Security Act.

98.      Section 1115 authorizes the Secretary to approve "any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives" of Medicaid. *Id.* Congress enacted Section 1115 to ensure that Medicaid requirements do not "stand in the way of experimental projects designed to test out new ideas and ways of dealing with the problems of public welfare recipients." S. Rep. No. 87-1589, at 19 (1962), *reprinted in* 1962 U.S.C.C.A.N. 1943, 1961; *see also Crane*, 417 F. Supp. at 536.

99.      In the Recission, rather than employing a no-expansion baseline, CMS measured Georgia Pathways against a theoretical world in which Georgia has fully expanded Medicaid. Moreover, CMS measured Pathways against States that have fully expanded Medicaid. Under this methodology, no demonstration that did not expand Medicaid to the full eligible expansion population would ever pass muster. By definition, any such demonstration program would provide less coverage than a full expansion baseline. The Recission thus eviscerates Section 1115, which—particularly in the wake of the ACA and the Court's holding in *NFIB v. Sebelius*—is designed to allow States to experiment with expansion to less than the full possible eligible population. Because CMS's

interpretation imposes a full expansion or no expansion dichotomy, it is contrary to the text and purpose of Section 1115, which allows States to experiment with a middle ground such as the Georgia Pathways qualifying activities and premium requirements.

100. The Recission also conflicts with the text and any discernable purpose of the Social Security Act. Congress designed Medicaid to "subsidize[ ]" States in "funding ... medical services for the needy." *Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985). And the Medicaid program is designed "[t]o enable states to 'furnish ... medical assistance'—i.e., healthcare services—to certain vulnerable populations and to furnish those populations with rehabilitation and other services to help them 'attain or retain capability for independence or self-care.'" 42 U.S.C. §1396.

101. Additionally, Congress has specifically addressed COVID-19's effect on the healthcare market by enacting numerous laws expanding the availability of healthcare to Americans and mitigating the financial instability deriving from the pandemic. *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2, §§9811-19, 135 Stat. 4, 208-19; Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, §§ 3801-32, 134 Stat. 281, 427-34 (2020); Families First Coronavirus Response Act, Pub. L. No. 116-127, §§6008-09, 134 Stat. 178, 208-10 (2020) ("FFCPA"); *see also* Accord Paycheck Protection Program and Health Care Enhancement Act, Pub L. 116-139, tit. I (Apr. 24, 2020) (providing financial assistance to "eligible health care providers" including "Medicaid enrolled suppliers and providers"); Coronavirus Preparedness and Response Supplemental Appropriations Act of 2020, Pub. L. 116-123 (Mar. 6, 2020) (permitting Secretary to waive certain Medicare requirements in order to expand access to telemedicine). These laws buttress CMS's limited discretion here—when Congress legislates repeatedly on a subject, it prohibits administrative agencies from acting contrary to that legislation, even if it does not amend an agency's organic statute. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 157-59 (2000). In light of Congress's repeated

emphasis on mitigating the harms of the pandemic, CMS's Recission, which will deprive currently ineligible Georgians of the opportunity to obtain Medicaid coverage, is unlawful.

102.     The bottom line is that, far from promoting the purposes of the Medicaid statutes, the Recission will ultimately result in *less* coverage. Tens of thousands of Georgians who would be eligible under Georgia Pathways will not be eligible for Medicaid due to the Recission. As discussed above, Georgia does not have the resources in its budget to implement full expansion without the qualifying hours requirements. Accordingly, the Recission will directly result in fewer Georgians receiving medical assistance under Medicaid. Moreover, the Recission undermines Georgia's efforts through the qualifying activities and premium requirements to help its citizens "attain' and "retain capability for independence [and] self-care." 42 U.S.C. §1396. Accordingly, the Recission is contrary to the text and purpose of the Social Security Act.

## COUNT IV
### Arbitrary and Capricious
### (5 U.S.C. §706)

103.     Georgia repeats and incorporates by reference each of the Complaint allegations stated above.

104.     The Recission is arbitrary and capricious for several reasons. Each is an independently sufficient ground to vacate the Recission.

105.     *First*, the Recission will ultimately result in less Medicaid coverage for Georgians. In the absence of the qualifying hours and premium requirements, Georgia is unable and unwilling to implement the expansion contained in Pathways. That means that tens of thousands of Georgians would be deprived of health insurance due to the Recission. The Recission never even considers this obvious and predictable result of revoking the key components of Pathways. Because the Recission results in less Medicaid coverage in Georgia and deprives tens of thousands of individuals of potential coverage, it is arbitrary and capricious.

106.    *Second*, the Recission is arbitrary because it renders the demonstration nonsensical and un-administrable. The revocation of the qualifying activities component makes it impossible to effectuate the expansion because the qualifying activities are the core of the waiver—it is the "pathway" to coverage. Implementing Pathways absent qualifying hours and activities would eliminate the mechanism for enrolling individuals in Medicaid and, ultimately, defeats the purpose of the demonstration waiver. Simply put, without the qualifying hours and activities, no one currently ineligible for Medicaid would be able to enroll in Medicaid in Georgia.

107.    *Third*, the Recission relies upon factors not authorized by the Social Security Act. As noted above, the Act directs the Secretary to consider whether a demonstration would expand coverage and increase self-sufficiency and whether the demonstration would be a useful experiment in testing innovative ways to provide health insurance. But the Recission elevates a myriad of nonstatutory factors. For example, CMS stated that the premium requirement conflicted with its "priority in advancing health equity." Approval at 11-12. But health equity is not a statutory factor. By elevating the nonstatutory health equity concern above the statutory concern of facilitating independence—which CMS does not contest is furthered by the premium requirement—CMS has arbitrarily ignored statutory factors to further nonstatutory policy interests.

108.    *Fourth*, CMS's removal of the qualifying hours and premium requirement is an arbitrary bait-and-switch. Under *NFIB*, Georgia had *no obligation* to expand Medicaid to individuals with incomes below 133% of the poverty line. Nonetheless, Georgia worked closely with CMS and relevant stakeholders to develop an innovative program to voluntarily expand coverage to tens of thousands of otherwise-ineligible, low-income Georgians while ensuring that those individuals were taking steps to build skills, find work, complete additional education, or volunteer in their communities. Any attempt to excise the qualifying hours would arbitrarily upend the policy choices at the heart of this program. As the Supreme Court explained in *NFIB*, the "legitimacy" of any expansion of the Medicaid

program requires that the State "voluntarily and knowingly accepts the terms of the contract." 567 U.S. at 77 (Roberts, C.J., joined by Breyer & Kagan, JJ.). And "[r]especting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Id.*; *see also id.* at 675-79 (Scalia, Kennedy, Thomas, & Alito, JJ., dissenting) (same). Here, Georgia unequivocally did not "voluntarily and knowingly" agree to expand coverage absent the qualifying hours and activities and premium requirements.

109. *Fifth*, CMS's references to the COVID-19 pandemic provide no basis to excise the qualifying hours and activities. Unlike programs in some other states, Georgia's waiver is unique and the first of its kind, as it does not impose any requirements on *existing* Medicaid recipients. Rather, Georgia provides a pathway for otherwise-ineligible individuals to obtain Medicaid coverage through participation in a wide range of possible activities. Thus, as CMS previously recognized, "expanding Medicaid coverage to individuals not previously eligible will have a significant positive impact on access to health care during and after a public health emergency." Approval at 14.

110. CMS makes no attempt to explain in its latest letter how *expanding* coverage in a pandemic would fail to "promote the objectives of the Medicaid program." Moreover, the COVID-19 pandemic was ongoing when CMS approved Georgia Pathways in October 2020. CMS raised specific concerns about the pandemic's impact on potential participants throughout the waiver negotiations, and Georgia specifically addressed those concerns to CMS's satisfaction in the STCs. CMS fails to explain why it has suddenly changed its position about the adequacy of these measures.

111. If anything, the COVID-19 pandemic makes the qualifying hours and activities more important, not less. In approving the Georgia Pathways program, CMS highlighted that "recent research during the COVID-19 pandemic indicates that factors such as a lack of economic participation, social isolation, and other economic stressors have negative impacts on mental and physical health" Approval at 1 n.1. Therefore, "incentives and requirements that increase such

participation may have a positive effect on beneficiary health and economic mobility." *Id.* Even for individuals facing economic disruption or job losses, the qualifying hours and activities contains significant flexibility for participants to choose activities that will help them learn new skills and move toward independence and self-sufficiency. See STC ¶33 (documenting seven different categories of qualifying activities). Of course, new participants can qualify through public or private employment, including self-employment and employment as an independent contractor. They can also qualify for Medicaid coverage with a variety of other pursuits. On-the-job training counts. So does participation in job readiness activities related to the preparation for employment, including GED programs, rehabilitation activities, or vocational educational training. Enrollment in an institution of higher education qualifies as well. Participants can also volunteer with "public or non-profit organizations participating in projects that serve the community." Additionally, a participant does not even need to do any of these activities full time. Georgia Pathways requires only eighty hours per month. See STC ¶32.

112.     The program also contains a "good cause" exception for individuals already enrolled in Georgia Pathways who subsequently become unable to meet their qualifying hours due to injury or illness, including illness of a family member; the birth or adoption of a child; a family emergency, such as domestic violence; the loss of housing; and several other reasons. *See* STC ¶36. Moreover, the "good cause" exception expressly covers Georgia Pathways participants who are quarantining due to COVID-19 exposure or unable to meet the qualifying hours and activities due to a public health emergency. *See* STC ¶36(h). This robust "good cause" exception directly refutes the suggestion in CMS's February 12, 2021 letter that COVID-19 has made it "infeasible" to implement the qualifying hours and activities. The program's current terms—adopted in close coordination with CMS officials—contain more than ample flexibility for individuals affected by the pandemic.

113.   *Sixth*, CMS ignored the specific factual finding in the Approval and the State's massive reliance interests. Because the Recission "rests upon factual findings that contradict those which underlay its prior policy," and destroys the State's reliance interests in implementing the approved program, CMS was required to provide a "more detailed justification" than the initial finding. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But CMS does not engage with its prior findings of fact at all. Indeed, CMS identifies no intervening change in the relevant facts that could justify so extreme a change in position. Its sole reliance is on COVID-19. But the pandemic was at its height when the demonstration project was approved. The proliferation of vaccines and a general decline in deaths and serious complications seriously undermines any COVID-19 rationale. Moreover, it is flagrantly arbitrary to state that *expanding* healthcare coverage would be harmful in the midst of a pandemic. And, as noted, there is significant flexibility in meeting the qualifying hours requirements and a number of exceptions for individuals who cannot meet the requirement due to extenuating circumstances. Given these facts, there is a "significant mismatch" between the rationale CMS would likely rely upon and the administrative record. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019).

114.   *Seventh*, CMS used the wrong baseline in evaluating Pathways. Because Pathways applied only to an entirely new population, the appropriate point of comparison to determine if it further the objectives of Medicaid was a world without Pathways (i.e., no expansion at all)—not a hypothetical world in which Georgia had enacted a condition-free expansion. This error infects each of CMS's findings. Georgia Pathways obviously expands coverage—that is its very purpose. It was only by drawing a false comparison with a world that does not exist—full expansion in Georgia—that CMS determined that Pathways would somehow contract coverage.

115.   *Eighth*, CMS draws a false equivalence between Georgia Pathways and State demonstrations that attempted to impose work requirements on existing Medicaid beneficiaries. Unlike demonstrations in the States cited by CMS,  Georgia's waiver is unique and the first of its kind,

as it does not impose any requirements on existing Medicaid recipients. Rather, Georgia provides a pathway for individuals to newly obtain Medicaid coverage through participation in a wide range of possible activities. CMS arbitrarily ignores the fundamental difference between Pathways and the other demonstrations.

116.     *Ninth*, the Recission fails to once mention the significant resources Georgia expended and actions it took in reliance upon the Approval. Georgia's reliance interests are significant. The State has reasonably relied upon CMS's final approval to make substantial investments of time, money, and manpower in preparation to implement Georgia Pathways—all of which will be unrecoverable if the Recission is allowed to stand. Far from meeting its duty to thoroughly consider and explain why these reliance interests should be brushed aside, CMS just ignored them. *See Texas*, 2021 WL 5154219, at *8 ("In short, given the complex nature of a Medicaid plan, the State's and third parties' reliance on the January final approval was immediate, extensive, and reasonably so."). Moreover, CMS failed to demonstrate that it explored alternatives to revocation or suspension that could balance its concerns with Georgia's legitimate reliance interests. *See id.* at *11. Ignoring such reliance interests is a hallmark of arbitrary agency action.

117.     *Finally*, the Recission is arbitrary and capricious because its discussion of the Social Security Act serves as mere pretext for achieving the Administration's policy goal of full, unconditional Medicaid expansion. As described above, there is a "significant mismatch" between CMS's stated reason for rescinding the Approval—expanding Medicaid coverage—and the record, which demonstrates beyond a shadow of a doubt that it was the Approval that would expand coverage and the Recission that contracts coverage. Courts "cannot ignore the disconnect between the decision made and the explanation given." *New York*, 139 S. Ct. at 2575. Accepting CMS's flagrantly "contrived reasons would defeat the purpose" of judicial review. *Id.*

## COUNT V
### Violation of Notice and Comment Obligation
### (5 U.S.C. §706)

118.     Georgia repeats and incorporates by reference each of the Complaint allegations stated above.

119.     Agencies must use the same process to rescind an action as it employed to enact it in the first place. *See, e.g., Clean Water Action v. United States Envtl. Prot. Agency*, 936 F.3d 308, 312 (5th Cir. 2019) (an agency must "follow the same process to revise a rule as it used to promulgate it") (citing *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015)); *see also Motor Vehicle Mfr's Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 41, 46-47 (1983). Indeed, where—as here, *see supra*—significant reliance interests are implicated, notice and comment is required even where an initial action was not taken with notice-and-comment procedures. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-14 (2020).

120.     CMS's approval of Georgia Pathways came after two full public comment periods. The Recission received no public comment whatsoever. The failure to provide public notice and comment is even more harmful for a Recission than Approval because both Georgia and private entities have already expended considerable time and resources in reliance on the Approval. Although Georgia was given a chance to respond to the preliminary recission determination, private parties were not. Accordingly, the Recission was taken without the process required by law. *See* 5 U.S.C. §706(2)(D).

## COUNT VI
### Violation of the Agreement of January 4, 2021
### (5 U.S.C. §706)

121.     Georgia repeats and incorporates by reference each of the Complaint allegations stated above.

122.     In a letter dated January 4, 2021, CMS reaffirmed its commitment to Georgia Pathways. That letter noted that programs like Georgia Pathways "have proven to be a cornerstone

of state innovation from which new best practices can emerge and next generation program design be fostered." CMS Ltr. 1 (Jan. 4, 2021). And the letter further affirmed that "[b]y their nature, section 1115 demonstrations represent a contract between state and federal government." *Id.* For that reason, the letter outlined the terms and conditions through which CMS could withdraw approval of the Georgia Pathways waiver. Among other provisions, those terms outlined that "CMS shall make the effective date for its determination no sooner than 9 months after the date on which CMS transmits its determination." *Id.* at 2. Georgia agreed to CMS's terms shortly thereafter.

123.    Because agreements between States and CMS in the Section 1115 context are contractual in nature, CMS lacked unilateral authority to rescind the January 4 Agreement. CMS's proffered reason for that attempt is no different than its proffered reason for eliminating the qualifying activities requirement: "The current COVID-19 pandemic and economic environment … necessitate that CMS maintain the regulatory flexibility to respond appropriately to the current or changed circumstances … ." Yet, CMS did not identify any "changed circumstances" in the thirty-two days between January 4 to February 12, nor could it for the reasons discussed above.

124.    Because the January 4 Agreement is still in force, CMS's Recission is unlawful because it explicitly failed to follow the processes set out in the Agreement.

## COUNT VII
### Estoppel

125.    Georgia repeats and incorporates by reference each of the Complaint allegations stated above.

126.    CMS is estopped from rescinding its approval of Georgia Pathways.

127.    Although a "private litigant who would estop the government bears a very heavy burden," *Ingalls Shipbuilding, Inc. v. Dir., Office of Workers' Comp. Programs*, 976 F.2d 934, 937 (5th Cir. 1992), where a party gives up valuable rights based on the conduct of a government official, courts will estop the government from denying those actions "to prevent manifest injustice," *Walsonavich v.*

*United States*, 335 F.2d 96, 101 (3d Cir. 1964) (finding estoppel when a "taxpayer was lulled into a sense of security" by a written agreement with the Commissioner of Internal Revenue); *id.* ("[T]here are circumstances where the Government should be required by our law to stand behind written agreements of a high public official like the Commissioner.") (citing *Routzahn v. Brown*, 95 F.2d 766, 771 (6th Cir. 1938); *Schuster v. Commissioner*, 413 F.2d 311, 317 (9th Cir. 1962)). Because CMS induced Georgia's reliance on contractual promises, it should now be estopped from rescinding critical provisions at the core of this contractual agreement. At the very least, because CMS induced Georgia to agree to a specific withdrawal process, it should be bound to follow that process.

## COUNT VIII
### The Recission Violates the Spending Clause
### (U.S. Const. art. I, §8, cl. 1)

128.    Georgia repeats and incorporates by reference each of the Complaint allegations stated above.

129.    The Spending Clause requires that States "voluntarily and knowingly accepts the terms of the contract." *NFIB*, 567 U.S. at 77.

130.    When it signed the STCs Georgia had no reason to believe that this demonstration would morph into unconditional Medicaid expansion.

131.    Moreover, CMS is attempting to coerce Georgia into expanding Medicaid. If Georgia fails to do so, it will have expended significant resources, in reasonable reliance on the Approval, for naught.

132.    CMS's bait and switch to achieve unconditional Medicaid expansion in Georgia thus violates the Spending Clause.

**WHEREFORE**, Georgia asks this Court to enter judgment in its favor and to provide the following relief:

a.   Hold unlawful and set aside the Recission;

b.  Issue preliminary and permanent injunctive relief enjoining Defendants from enforcing the

Recission;

c.  Issue declaratory relief declaring the Recission unlawful;

d.  All other relief to which Georgia is entitled, including but not limited to attorneys' fees and

costs.

Respectfully submitted,

Chris Carr                                          /s/ G. Todd Carter
  *Attorney General of Georgia*                     G. Todd Carter, Esq.
Stephen Petrany                                       Georgia Bar No: 113601
  *Solicitor General*                               Paul M. Scott, Esq.
Office of the Georgia Attorney General                Georgia Bar No: 140960
40 Capitol Square SW                                  *Special Assistant Attorneys General*
Atlanta, GA 30334                                   Brown, Readdick, Bumgartner,
(404) 458-3409                                      Carter, Strickland & Watkins, LLP
                                                    5 Glynn Avenue
Jeffrey M. Harris*                                  P. O. Box 220
Daniel Shapiro*                                     Brunswick, GA 31521-0220
  *Special Assistant Attorneys General*             Tel:  912-264-8544
Consovoy McCarthy PLLC                              Fax: 912-264-9667
1600 Wilson Blvd., Ste. 700                         tcarter@brbcsw.com
Arlington, VA 22209                                 pscott@brbcsw.com
(703) 243-9423
jeff@consovoymccarthy.com
daniel@consovoymccarthy.com

*pro hac vice motion forthcoming

Dated: January 21, 2022