# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

| | |
|---|---|
| THE STATE OF GEORGIA; GEORGIA DEPARTMENT OF COMMUNITY HEALTH, <br><br> PLAINTIFFS, <br><br> v. <br><br> CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; et al., <br> DEFENDANTS. | CIVIL ACTION NO. 2:22-cv-6-LGW-BWC <br><br> **ORAL HEARING REQUESTED** |

### Plaintiffs' Motion for Summary Judgment and Memorandum in Support

The Centers for Medicare and Medicaid Services (CMS) has attempted a bait and switch of unprecedented magnitude on the State of Georgia that would eviscerate the terms at the heart of a carefully negotiated federal-state program. In the wake of the enactment of the Patient Protection and Affordable Care Act (ACA) and the Supreme Court's holding in *NFIB v. Sebelius*, States have a choice whether to expand their Medicaid programs to "low-income adults who did not previously qualify." *Gresham v. Azar*, 950 F.3d 93, 96 (D.C. Cir. 2020) (citing 42 U.S.C. §1396a(a)(10)(A)(i)(VIII); *NFIB v. Sebelius*, 567 U.S. 519, 583 (2012)). Georgia has not fully expanded Medicaid.

In 2019, however, Georgia decided to pursue a first-of-its-kind demonstration project under Section 1115 of the Social Security Act. After exhaustive negotiations with the federal government and multiple public comment periods, Georgia and CMS agreed to launch Georgia Pathways to Coverage. Pathways is an innovative program to provide Medicaid coverage to tens of thousands of otherwise-ineligible, low-income Georgians while also ensuring that those individuals take steps to benefit themselves and their communities through a minimum number of "qualifying hours" that can include work, job training, education, volunteering, or other similar activities. In short, Georgia agreed to a limited expansion of Medicaid coverage *only upon the express condition* that it could use qualifying

hours and activities, and a nominal premium requirement, as the pathway to coverage for the newly eligible population. CMS fully agreed with this approach in a comprehensive approval letter and the Special Terms and Conditions that govern the program.

Then CMS pulled the rug out. After the change of administration in 2021, CMS informed Georgia that it was rescinding its approval of the terms at the heart of the demonstration project, including the qualifying hours and activities requirement and a requirement that beneficiaries pay a small premium. But CMS said that the remaining part of the demonstration expanding coverage was still in place. In other words, CMS has tried to foist on Georgia unconditional Medicaid expansion.

CMS's actions flout bedrock principles of administrative law and should be set aside as arbitrary and capricious and contrary to law. CMS's actions violate *NFIB* because Georgia never voluntarily agreed to unconditional Medicaid expansion without the qualifying hours and premium payment requirements. CMS violated multiple provisions of the Social Security Act that carefully define the parameters of a Section 1115 demonstration program. And CMS's attempted bait-and-switch reflects paradigmatic arbitrary and capricious decisionmaking: it eviscerates the agreement at the core of a carefully negotiated federal-state program; uses the wrong baseline to measure the impact of the recission; wastes years of work and millions of dollars that Georgia invested in reliance on CMS's approval; and relies on factual findings that directly contradict CMS's prior findings. The Court should enter judgment for Georgia and set aside CMS's attempted recission.

**STATEMENT**

## I.     Overview of Medicaid.

Since 1965, the federal government and the States have worked together to provide medical assistance to certain vulnerable populations under Title XIX of the Social Security Act, commonly known as Medicaid. *See* 42 U.S.C. §1396a et seq.; *see also Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985) (Congress designed Medicaid to "subsidize [ ]" States in "funding ... medical services for the

needy"). Medicaid is the quintessential "cooperative federalism" program. *King v. Smith*, 392 U.S. 309, 316 (1968). It is "financed largely by the federal government" but "administered by the States." *Id.*; *see also Georgia Hosp. Ass'n v. Dep't of Med. Assistance*, 528 F. Supp. 1348, 1351 n.1 (N.D. Ga. 1982) ("Title XIX … provides for the establishment of cooperative Federal-State programs, commonly called 'Medicaid,' to provide payments for "necessary medical services" rendered to qualified 'needy individuals whose income and resources are insufficient to meet the costs of these services."").

The Social Security Act charges the Secretary of Health and Human Services with administering the Medicaid program. *See* 42 U.S.C. §301 et seq. States that elect to participate in Medicaid must propose comprehensive State plans that meet federal requirements. *See* 42 U.S.C. §1396a; 42 C.F.R. §§430.10-25. "Once each plan is approved, the States 'administer Medicaid with little to no oversight, but the federal government pays a large portion of state administrative expenses.'" *Texas v. Brooks-LaSure*, 2021 WL 5154219, at *1 (E.D. Tex. Aug. 20, 2021); *see also Georgia Hosp. Ass'n*, 528 F. Supp. at 1351 ("The various Medicaid programs, once approved, are administered by the respective States.").

"The current Medicaid program requires States to cover only certain discrete categories of needy individuals—pregnant women, children, needy families, the blind, the elderly, and the disabled." *NFIB*, 567 U.S. at 575. In the Patient Protection and Affordable Care Act, Congress authorized the expansion of Medicaid beyond the discrete categories originally authorized by the Social Security Act. Although expansion was mandatory under the ACA, in *NFIB v. Sebelius*, the Supreme Court held that States must have a voluntary choice whether to "expand medical coverage to low-income adults who did not previously qualify" for Medicaid. *Gresham v. Azar*, 950 F.3d 93, 96 (D.C. Cir. 2020) (citing §1396a(a)(10)(A)(i)(VIII); *NFIB*, 567 U.S. at 583).

## II.   Section 1115 Demonstration Projects.

Section 1115 of the Social Security Act allows States and the federal government to work collaboratively to implement innovative Medicaid programs. Although Medicaid establishes certain minimum requirements, Section 1115 allows States to deviate from them in the form of "experimental, pilot, or demonstration project[s]." 42 U.S.C. §1315(a). Section 1115 promotes the development of "experimental projects designed to test out new ideas and ways of dealing with the problems of public welfare recipients." S. Rep. No. 87-1589, at 19 (1962), *reprinted in* 1962 U.S.C.C.A.N. 1943, 1961. To this end, Section 1115 authorizes the Secretary to approve a demonstration project "which, in the judgment of the Secretary, is likely to assist in promoting the objectives" of Medicaid. *Id.*; *see also Crane v. Mathews*, 417 F. Supp. 532, 536 (N.D. Ga. 1976). The Secretary has largely delegated this authority to CMS's Administrator. 42 C.F.R. §430.25(f)(2).

The Section 1115 application process is collaborative, exhaustive, and transparent. Section 1115 allows a State to propose an alternative plan that varies from the Social Security Act's default requirements and serves the goals of Medicaid beneficiaries within the State. *See Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 224 (5th Cir. 2019). Such demonstration projects "provide benefits to people who wouldn't otherwise be eligible for Medicaid benefits; and the costs of these benefits are treated as if they are matchable Medicaid expenditures." *Id.* The application process includes separate state- and federal-level public comment periods. *Texas*, 2021 WL 5154219, at *1 (citing 42 C.F.R. §§431.408, 431.416). The Secretary must then approve or deny the demonstration application. 42 U.S.C. §1315(d); 42 C.F.R. §431.412. Only after this exhaustive process—often including extensive negotiation and compromise between CMS and the State—can a State implement a Section 1115 demonstration project.

III.    **Negotiation of Georgia Pathways.**

Under the Supreme Court's ruling in *NFIB*, States may choose to expand Medicaid, reject expansion altogether, or implement hybrid expansion through Section 1115 programs. Georgia has not fully expanded Medicaid. In 2019, however, Georgia decided to pursue a Section 1115 waiver for an innovative new program that would deliver coverage to tens of thousands of additional participants while also ensuring that the participants were taking steps to better themselves and their communities. *See* O.C.G.A. §49-4-142.3 (authorizing Section 1115 waiver request).

Georgia officials held meetings with CMS officials beginning in late 2019 to develop the waiver, which would include a requirement that newly eligible participants complete a minimum number of qualifying hours of work, education, job training, community service, or other similar activities to receive and maintain coverage. Starting in February 2020, CMS and the State began engaging in weekly negotiation calls to discuss various elements of Georgia's application. Ex. 10.[1] In these exhaustive give-and-take negotiations, CMS made several recommendations to improve Georgia's proposal. For example, CMS asked Georgia to modify its proposal to ensure that there would be coverage for participants affected by COVID-19. *Id.* at 38. Georgia responded by agreeing to excuse compliance with the qualifying hours requirement for "good cause" when a "beneficiary is quarantining in response to having COVID-19 symptoms, a COVID-19 diagnosis, exposure to COVID-19, or because of a closure of the place(s) where the beneficiary was meeting the hours requirement related to COVID-19 and as a result, is unable to fulfill the hours and activities requirement." Ex. 1 at 17-18.

These exhaustive negotiations resulted in a comprehensive plan that benefitted all stakeholders. CMS advanced its goal of expanding Medicaid coverage to individuals in Georgia who were not otherwise eligible, as Georgians with income up to 100% of the federal poverty level became

---

[1] All Exhibits cited in this motion are Exhibits to the declaration of Attorney Daniel Shapiro.

eligible for Medicaid benefits for the first time. And Georgia advanced its goal of sustainably increasing coverage while promoting activities to help individuals attain independence and self-reliance. In short, even though Georgia had no obligation to expand eligibility, the State worked with CMS in good faith to adopt an innovative program—including qualifying activities and a small premium payment—to deliver coverage to a new category of individuals while helping them build important skills and become more independent and self-reliant. As required by Section 1115, Georgia Pathways was subjected to two public comment periods at both the federal and state levels. Ex. 2 at 11-12.

**IV.    Georgia Pathways.**

The compromise plan that emerged from this exhaustive negotiation, analysis, and public input is called "Georgia Pathways to Coverage." Pathways provides Medicaid coverage to low-income adults ages 19-64 with incomes up to 95 percent of the federal poverty line (FPL) (effectively 100 percent with the 5 percent income disregard), who are not otherwise eligible for Medicaid coverage. Ex. 1 at 4.

The central component of Pathways is its pathway to Medicaid coverage for those otherwise ineligible. This pathway—the eligibility mechanism—requires that to qualify for coverage, applicants must complete a minimum of 80 hours of qualifying activities in the month prior to approval. *Id.* at 15-16. Pathways participants must then complete 80 hours of qualifying activities per month to maintain eligibility. *Id.* A wide range of activities can be used to satisfy the 80-hour requirement including: unsubsidized employment, subsidized private sector employment (including self-employment), on-the-job training, specified job readiness activities, certain community service activities, specified vocational educational training, and enrollment in an institution of higher education. *Id.* at 16.

Georgia agreed to provide reasonable accommodations to enable individuals with disabilities (who are not otherwise eligible for Medicaid on the basis of disability) to meet the qualifying hours

requirement. *Id.* at 18-19. Such reasonable accommodations may include an assessment to determine eligibility for another category of Medicaid assistance; referral to a State vocational rehabilitation program for assessment to determine the appropriate accommodation, which may include a reduction in the number of hours required to participate in a qualifying activity; or an alternate way to report compliance with the qualifying activities requirement. *Id.*

Georgia further agreed to allow participants who had been compliant with the qualifying hours requirement but become unable to comply for good cause to have a maximum of 120 hours of noncompliance during the benefit year. *Id.* at 17-18. Good cause includes, but is not limited to: the participant or an immediate family member is hospitalized; the participant or an immediate family member experiences a serious illness; the participant experiences a short-term injury or illness; the participant experiences the birth, adoption, or death, of an immediate family member; the participant accepts a foster child or kin-ship care placement; the participant experiences a natural or human-caused disaster (including a public health emergency); the participant has a family emergency or other life event (*e.g.*, divorce, civil legal matter, or is a victim of domestic violence); the participant is temporarily homeless; or other good cause reasons as defined and approved by the State. *Id.*

Individuals admitted to Pathways must report compliance with the qualifying hours requirement through methods including in-person confirmation, online reporting, or reporting by mail. *Id.* at 9. Georgia agreed that participants who have reported compliance for six consecutive months will be exempt from monthly reporting until they are reevaluated for eligibility during the annual redetermination period. *Id.* at 16.

Another component of the pathway to coverage is the premium payment. Most applicants with incomes between 50 and 95 percent of the FPL are required to make small initial and ongoing premium payments of up to $11 per month. *Id.* at 12. Such applicants will have 90 days following their eligibility determination to make the initial monthly payment before their coverage begins. *Id.* at 12-

13. The premium payment helps participants build personal responsibility through contributions to their health and prepares them for transition into commercial insurance. Failure to make the initial payment results in closure of the individual's application, but the individual may reapply at any time. *Id.* at 13. The premium is on a sliding scale based on family income and is calculated to not exceed two percent of household income. *Id.* at 12. Not all Pathways participants must pay a premium, as participants with incomes below 50 percent of the FPL are exempt from this requirement. *Id.*

## V.     CMS's Approval of Georgia Pathways.

On October 15, 2020, CMS formally approved Pathways as a Section 1115 demonstration project. The approval letter (hereinafter "Approval") provides a comprehensive analysis of Pathways with several express factual findings explaining why the demonstration will further the objectives of the Medicaid program. Ex. 2. CMS began by identifying the objectives of the Medicaid program: "[t]o enable states to 'furnish ... medical assistance'—i.e., healthcare services—to certain vulnerable populations and to furnish those populations with rehabilitation and other services to help them 'attain or retain capability for independence or self-care.'" *Id.* at 2 (quoting 42 U.S.C. §1396-1).

CMS made several specific findings that Pathways would further the objectives of Medicaid. *First*, CMS found that "the only impacts on eligibility or enrollment will be to expand" Medicaid eligibility and coverage because Pathways "applies only to beneficiaries who previously were not eligible for Medicaid." *Id.* at 3. Thus, the demonstration "expands the Medicaid eligible population in Georgia" and "is expected to result in a significant coverage expansion in Georgia" with estimates that "approximately 64,336 individuals will enroll in Medicaid throughout the life of this demonstration." *Id.* at 8. *Second*, CMS found that the demonstration "would promote the sustainability of Georgia's Medicaid program." *Id.* at 9. By promoting such fiscal sustainability, Pathways "will provide greater access to coverage for low-income beneficiaries than would be available absent the demonstration." *Id. Third*, CMS found that Pathways would further Medicaid's objective of "attain[ing] or reatain[ing]

capability for independence or self-care." *Id.* at 2, 10-11 (quoting 42 U.S.C. §1396-1). CMS also found that it expects the demonstration "will result in greater financial independence for the demonstration population as well as improved health status." *Id.* at 10.

CMS directly responded to comments asserting that participants would lose coverage, emphasizing that the demonstration's only effect is to expand coverage and will not affect current beneficiaries: "If an applicant meets the qualifying hours and activities requirement at the time of application and thereafter, this demonstration provides a pathway to 'opt-in' to Medicaid coverage for an individual who, absent this demonstration, has no such pathway." *Id.* at 12. CMS also addressed comments regarding the potential for disparate impacts by noting that the State must "identify any disparate impact" and report it to CMS as part of its ongoing monitoring activities. *Id.*

CMS responded to comments attacking the premium requirement by noting that the premiums were on a sliding scale (up to $11 per month) and the neediest segment of participants would pay no premiums at all. *Id.* at 13. Moreover, CMS highlighted the benefits of premium payments by "provid[ing] beneficiaries with an experience similar to that of commercial insurance," which will "build personal responsibility through financial contributions to their health." *Id.*

CMS extensively addressed comments regarding COVID-19. CMS acknowledged the public health emergency and noted uncertainty about the future of the pandemic.  *Id.* at 14. CMS explained that the demonstration specifically addresses COVID-19 by including it in the good cause exception for noncompliance with the qualifying hours requirement: "These circumstances include those that may be associated with future public health emergencies, as well as those related to beneficiaries who may be quarantining in response to having COVID-19 symptoms, a COVID-19 diagnosis, or exposure to COVID-19." *Id.* CMS also explained that Georgia will "take into account the potential closure, related to COVID-19, of the place(s) where the beneficiary was meeting the requirement and as a result, is unable to fulfill the hours and activities requirement." *Id.* Finally, CMS noted the obvious

fact that "expanding Medicaid coverage to individuals not previously eligible will have significant positive impact on access to health care during and after a public health emergency." *Id.*

CMS also addressed concerns regarding the reporting requirement, explaining that Pathways "provide[s] beneficiaries with multiple avenues to report their qualifying hours and activities, including an online portal, mail in or in-person." *Id.* at 15. Moreover, CMS noted that Georgia "will also be required to accommodate beneficiaries who may have trouble reporting their hours due to a disability." *Id.* Finally, CMS explained that "[i]f a beneficiary has a disability affecting their ability to report their required hours, the state is required to provide the beneficiary reasonable accommodations." *Id.*

CMS extensively responded to comments alleging that Pathways suffered similar alleged flaws as other state demonstration waivers by reiterating that Pathways "only offers coverage opportunities to individuals not currently eligible for Medicaid." *Id.* at 17. Thus "individuals who choose not to comply with the qualifying hours and activities requirement will be no worse off than they are without this demonstration." *Id.* at 18. CMS noted the fundamental difference between Pathways, which "offers a new pathway to coverage for individuals who otherwise would not have Medicaid or other health coverage, and therefore is, by design, a significant coverage expansion" and other programs that impose work or other requirements on individuals already receiving Medicaid. *Id.*

The full parameters of the demonstration were enshrined in eighty Special Terms and Conditions (STCs) signed by Georgia and CMS. Ex. 1. On January 4, 2021, CMS and Georgia signed a supplemental agreement regarding termination or withdrawal of the demonstration. Ex. 3. The agreement begins by emphasizing that "[b]y their nature, section 1115 demonstrations represent a contract between the state and federal government." *Id.* In this agreement, CMS and Georgia agreed to a comprehensive process affording Georgia full notice and an opportunity to be heard in the event CMS seeks to withdraw the demonstration. *Id.* Moreover, CMS promised that it "shall make the

effective date for its determination no sooner than 9 months after the date on which CMS transmits its determination to the affected State." *Id.*

## VI.     Georgia's Reliance on CMS's Approval of Pathways.

Georgia has made earnest and good faith efforts to implement Pathways and has taken several steps in direct reliance on the Approval. *First*, the General Assembly appropriated $65,450,836 to cover benefits for projected enrollment for the first year of the demonstration. H.B. 81 §91.9. *Second*, Georgia budgeted $27,169,720 for fiscal year 2021 through the first quarter of 2023 for the development of the Georgia Gateway system components, improvements, and project management functions necessary for successful implementation of Pathways. Ex. 9 at 92. *Third*, Georgia hired and assigned 31 state employee personnel full-time equivalents to support Pathways implementation project activities. *Id.* at 39. *Fourth*, both before and after the Approval, Georgia had been working closely with care management organizations and vendors on program implementation activities regarding eligibility and enrollment, customer service, and general project management. *Id.* at 51.

## VII.    CMS's Recission of the Pathways Approval.

In February 2021, as Georgia actively worked to implement Pathways, it received two letters from CMS. The first, on February 12, 2021, informed Georgia that CMS had "preliminarily determined that allowing work and other community engagement requirements to take effect in Georgia would not promote the objectives of the Medicaid program." Ex. 4. The sole stated reason was COVID-19. After a one-paragraph discussion of COVID-19, CMS stated that it was "commencing a process of determining whether to withdraw the authorities approved in the Pathways to Coverage demonstration that permit the state to require work and other community engagement activities as a condition of Medicaid eligibility while leaving in place the demonstration's ... extension of Medicaid eligibility to certain otherwise-ineligible individuals." *Id.* The second letter, also sent on

February 12, 2021, purported to withdraw the January 4, 2021, agreement between Georgia and CMS citing "CMS's need for flexibility to make and effectuate determinations." Ex. 5.

On March 12, 2021, Georgia responded to these letters. Ex. 6. Georgia explained that CMS's first letter fundamentally erred in equating Georgia's program—which would expand eligibility to individuals not currently eligible for coverage—with other States' work requirements for existing participants. Georgia also rebutted CMS's reliance on COVID-19: "If anything, the COVID-19 crisis makes the qualifying hours and activities—which include work, job training, education, or volunteering—more important, not less." *Id.* Georgia also disputed CMS's authority to unilaterally rescind the January 4, 2021 Agreement—signed by both Georgia and CMS—because "CMS did not identify any 'changed circumstances' in the thirty-two days between January 4 to February 12, nor could it." *Id.*

Pathways was set to go into effect on July 1, 2021. On June 24, in light of the uncertainty created by the preliminary determination and being concerned with the financial implication to the State by CMS's refusal to pay its portion of the FMAP for the Pathways beneficiaries, Georgia delayed the implementation of the program. Ex. 7.

On December 23, 2021, without a public comment period, CMS sent Georgia a letter purporting to rescind Georgia's authority to implement the qualifying activities and premium components of Pathways. Ex. 8 ("Recission"). The Recission, however, stated that it was leaving in place the part of Pathways expanding Medicaid coverage to certain able-bodied adults. Ex. 8 at 35-36. The consequence of the letter is that CMS would allow the Medicaid expansion to proceed while stripping out the qualifying hours and premium requirements that were indispensable to the State's decision to participate in this demonstration program in the first place. The Recission cited COVID-19 as the primary reason to withdraw the premium and qualifying activities components, based on conclusions and findings that were the exact opposite of the agency's exhaustive findings in the

Approval. *Id.* at 2-3. Notably, CMS phrased the Recission as based on its "reevaluat[ion]" of the Approval. *Id.* at 4.

## VIII.   Consequences of the Recission.

CMS's Recission will have devastating consequences for Georgia and its citizens. All of the resources expended, legislation enacted, and policies established, will have been done in vain—a monumental waste of Georgia's resources over the past three years. It is simply impossible for Georgia to implement Pathways without the qualifying activities and premium requirements. Georgia projected when it applied for the waiver that approximately 64,336 individuals would enroll in Medicaid throughout the duration of the Pathways program. Ex. 2 at 8. Sheared of the qualifying activities and premium components, however, CMS has estimated that approximately 269,000 individuals would qualify in the first year alone. Ex. 8 at 12. That is, CMS itself has estimated that its actions in the Recission would *more than quadruple* the number of individuals likely to receive coverage under Pathways. And CMS has further acknowledged that the Recission would likely "cost the state about $650 million in the first year, higher than the $76 million proposed in the fiscal year 2022 budget under the demonstration. *Id.* at 12 n.31. As noted above, the Georgia General Assembly has appropriated only $65,460,836 for the implementation of Pathways. H.B. 81 §91.9. Given that the Recission dramatically expands both the enrollment and cost of Pathways by multiples of the initial projections—and far in excess of the existing appropriations—Georgia would have no choice but to terminate the program altogether if the Recission is allowed to stand.

## ARGUMENT

In a challenge to agency action under the APA, the question for the court on summary judgment is whether the challenging party has established that the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A); *see Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir.

1996); 10B Charles Alan Wright et al., Federal Practice and Procedure 2733 (4th ed. 2013) ("Summary judgment is particularly appropriate in cases in which the court is asked to review or enforce a decision of a federal administrative agency.").

## I.    The Recission Is Contrary To Law.

### A.    Georgia Did Not Voluntarily Consent to Medicaid Expansion Absent the Qualifying Activities and Premium Payment Requirements.

Under *NFIB*, the "legitimacy" of any Medicaid expansion program requires that Georgia "voluntarily and knowingly accepts the terms of the contract." *NFIB*, 567 U.S. at 77 (Roberts, C.J., joined by Breyer & Kagan, JJ.). "Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Id.*; *accord id.* at 675-79 (Scalia, Kennedy, Thomas, & Alito, JJ., dissenting).

CMS's attempt to excise the qualifying activities and premium components of Pathways flouts the holding of *NFIB*. Georgia agreed to expand coverage to a new category of individuals *only* under the carefully negotiated terms set forth in the Special Terms and Conditions. Georgia would never have agreed to unconditional expansion of Medicaid without the qualifying activities and premium requirements, and Georgia has neither the appropriations nor the staff necessary to effectuate such an expansion. *See supra* at 13. Indeed, the demonstration is nonsensical without the qualifying hours requirement as it provides the "pathway" to obtain coverage in the first place. By removing the qualifying activities and premium components, the demonstration ceases to be a Section 1115 demonstration at all and effectively becomes a condition-free expansion of Medicaid up to 100% FPL. This is not what Georgia "voluntarily and knowingly" accepted when it signed the STCs. *NFIB*, 567 U.S. at 77. Because the Recission transforms the Pathways program into an entirely different form of expansion that Georgia did not voluntarily accept, it is contrary to law and must be vacated.

**B.      The Act Does Not Authorize CMS to Reconsider and Rescind Approved Waivers.**

CMS has only the powers conferred on it by *statute. La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act … unless and until Congress confers power upon it."). And CMS cannot expand those powers by *regulation. See, e.g., id.* ("An agency may not confer power upon itself."); *see also Civil Aeronautics Bd. v. Delta Airlines, Inc.*, 367 U.S. 316, 334 (1961). This rule applies with special force when an agency seeks to disrupt the balance between federal and State power. *See, e.g., La. Pub. Serv. Comm'n*, 476 U.S. at 368-67. Section 1115 provides CMS with no authority whatsoever to rescind, withdraw, or reconsider an approved demonstration. It only authorizes CMS to "waive compliance with" Medicaid requirements, 42 U.S.C. §1315(a)(1), to promulgate regulations relating to demonstration projects, *id.* §1315(d)(1), (2), and to approve or disapprove extensions of demonstration projects, *id.* §1315(f). Because Section 1115 expressly authorizes approval or disapproval of a demonstration, but not the power to rescind or reconsider an existing approval, CMS lacks such power. As the Fifth Circuit has observed, "[o]nce the [Administrator] authorizes a demonstration project, no take-backs." *Forrest Gen. Hosp.*, 926 F.3d at 233. This makes perfect sense— a demonstration project is typically a massive and expensive undertaking in the nature of a contract, and it would be profoundly inequitable to allow CMS to change the rules of a carefully negotiated program after it has already been approved.

By its own terms, the Recission is an attempt to reconsider CMS's prior approval of Pathways. *See, e.g.*, Ex. 8 at 4 ("CMS has reevaluated both the risks posed by the pandemic and its aftermath and the potential benefits of continuing the work requirement. Based on this reanalysis, CMS has determined that the earlier approval overweighed the potential benefits to Georgia's Medicaid program from the work requirement while under-weighing the requirement's potential negative effects, particularly in light of the ongoing pandemic."). Because Congress conferred no such

reconsideration authority and precludes CMS from reopening an already approved demonstration, the Recission is beyond its statutory authority and contrary to law.

Absent statutory authorization, CMS could rely only on its "inherent authority to reconsider its decisions." *Texas*, 2021 WL 5154219, at *8.[2] "Any such reconsideration must (1) be made within a reasonable time after the original decision; (2) be preceded by notice to the parties of the agency's intent to reconsider; and (3) not be arbitrary, capricious, or an abuse of discretion." *Id.* The Recission fails the first and third prong. *First*, the time lapse between the Approval (October 15, 2020) and the Recission (December 23, 2021) is significantly greater than a year—well beyond the reconsideration periods generally considered reasonable. *See id.* (collecting time lapse cases). Moreover, "the time lapse here is not short and reasonable from a functionalist perspective due to the intervening, reasonable reliance on the [October 2020] final approval" that "resulted from a complex negotiation process between CMS and [Georgia] and thus reasonably led [Georgia] to immediately begin intense preparation efforts for implementing the program." *Id. Second*, as discussed extensively below, *infra* Sec. II, the Recission is arbitrary and capricious. Accordingly, CMS failed to carry its heavy burden of establishing the Recission is permissible under any inherent reconsideration power it may have.

## C.    The Recission Is Contrary To Law Because It Violates Section 1115 of the Act.

The Recission is also contrary to the text and express purposes of Section 1115 and the Social Security Act. Section 1115 authorizes the Secretary to approve "any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives" of Medicaid. *Id.* Congress enacted Section 1115 to ensure that Medicaid requirements do not "stand in the way of experimental projects designed to test out new ideas and ways of dealing with

---

[2] Because Section 1115 provides no authority for reconsideration, Georgia does not concede that CMS has inherent authority to reconsider its Approval. This argument is presented in the alternative.

the problems of public welfare recipients." S. Rep. No. 87-1589, at 19 (1962), *reprinted in* 1962 U.S.C.C.A.N. 1943, 1961; *see also Crane*, 417 F. Supp. at 536.

In the Recission, rather than employing a no-expansion baseline, CMS analyzed Pathways against a theoretical world in which Georgia had fully expanded Medicaid. *See, e.g.*, Ex. 8 at 16. Moreover, CMS measured the impact of the qualifying hours requirement in Pathways against States that have fully expanded Medicaid. *Id.* at 14-16. Under that methodology, no demonstration that did not unconditionally expand Medicaid to the full eligible expansion population would *ever* pass muster because, by definition, any such demonstration program would provide less coverage than a full expansion baseline. The Recission thus eviscerates Section 1115, which—particularly in the wake of the Supreme Court's holding in *NFIB v. Sebelius*—is designed to allow States to experiment with expansion to less than the full possible eligible population. Because CMS's analysis in the Recission effectively imposes a full-expansion-or-no-expansion dichotomy, it is contrary to the text and purpose of Section 1115, which allows States to experiment with a middle ground such as the Pathways program.

The Recission also conflicts with any discernable purpose of the Social Security Act. Congress designed Medicaid to "subsidize[]" States in "funding ... medical services for the needy." *Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985). And the Medicaid program is designed "[t]o enable states to 'furnish ... medical assistance'—i.e., healthcare services—to certain vulnerable populations and to furnish those populations with rehabilitation and other services to help them 'attain or retain capability for independence or self-care.'" Approval at 2 (quoting 42 U.S.C. §1396-1). Georgia's decision to *expand* coverage to previously ineligible populations obviously furthers these purposes.

At bottom, far from promoting the purposes of the Medicaid statutes, the Recission will ultimately result in *less* coverage. Tens of thousands of Georgians who would have become eligible under Pathways will now lose their pathway to coverage due to the Recission. And, as discussed above,

*supra* at 13, Georgia does not have anywhere close to the resources in its budget to implement full expansion without the qualifying hours requirement. Accordingly, the Recission will directly result in fewer Georgians receiving medical assistance under Medicaid. Moreover, the Recission undermines Georgia's efforts through the qualifying activities and premium requirements to help its citizens "attain" and "retain capability for independence [and] self-care." 42 U.S.C. §1396-1. Accordingly, the Recission is contrary to the text and purpose of the Social Security Act and Section 1115.

Finally, CMS asserted in the Recission that the Families First Coronavirus Response Act (FFCRA), Pub. L. 116-127, somehow mandates the elimination of the qualifying hours requirement. Ex. 8 at 2-3. But that argument misreads the FFCRA. That statute imposes two relevant limitations on States that accepted a temporary increase in Medicaid funding during the COVID-19 pandemic. First, the State cannot impose "more restrictive" "eligibility standards, methodologies, or procedures" than it had in place on January 1, 2020, during a quarter it receives the additional funding. *Id.* §6008(b)(1). Pathways does no such thing. As of January 1, 2020, the individuals who became eligible for coverage under Pathways were not entitled to Medicaid benefits *at all*. Thus, far from imposing "more restrictive" eligibility standards compared to January 1, 2020, Pathways would only serve to *expand* coverage to individuals not currently eligible. Second, the FFCRA requires States to ensure that a person who enrolls during the "emergency period" "shall be treated as eligible" for Medicaid "through the end of the month in which such emergency period ends." *Id.* §6008(b)(3). This provision may temporarily limit the State's ability to disenroll existing beneficiaries but imposes no limitations whatsoever on the use of a qualifying hours requirement as the pathway to initial coverage. The FFCRA is irrelevant here.

## II.    The Recission is Arbitrary and Capricious.

Although arbitrary and capricious review is deferential, courts are "not a rubber stamp," *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1263 (11th Cir. 2020), and are "'not required to

exhibit a naiveté from which ordinary citizens are free," *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019). The Recission is arbitrary and capricious for several independent reasons.

*First*, the Recission will ultimately result in less Medicaid coverage for Georgians. In the absence of the qualifying hours and premium requirements, Georgia has neither the appropriations nor the staff to implement the expansion contained in Pathways. That means that tens of thousands of Georgians would be deprived of coverage due to the Recission. The Recission never even considers this obvious and predictable result of revoking the core components of Pathways. Because the Recission never grapples with the fact that it will ultimately result in less Medicaid coverage in Georgia and deprive tens of thousands of individuals of potential coverage, it is arbitrary and capricious. *Georgia Dep't of Educ. v. United States Dep't of Educ.*, 883 F.3d 1311, 1314 (11th Cir. 2018) (agency action arbitrary and capricious when it "entirely failed to consider an important aspect of the problem").

*Second*, the Recission is arbitrary because it renders the demonstration nonsensical and un-administrable. The revocation of the qualifying activities component makes it impossible to effectuate the expansion because the qualifying activities requirement is the core of the waiver—it is the "pathway" to coverage in the first place. Implementing Pathways absent this requirement would eliminate the mechanism for enrolling individuals in Medicaid and, ultimately, defeat the purpose of the demonstration waiver. Simply put, without the qualifying hours and activities requirement, no one currently ineligible for Medicaid would be able to enroll in Medicaid in Georgia. *See* Ex. 6 at 3 (Georgia informing CMS that "any attempt to excise the qualifying hours and activities would make it impossible to effectuate the expansion").

*Third*, the Recission relies upon factors not authorized by the Social Security Act. As noted above, the Act directs the Secretary to consider whether a demonstration would expand coverage and increase self-sufficiency and whether the demonstration would be a useful experiment in testing innovative ways to provide health insurance. But the Recission elevates a myriad of nonstatutory

factors. For example, CMS stated that the premium requirement conflicted with its "priority in advancing health equity." Ex. 2 at 11-12. But health equity is not a statutory factor. By elevating the nonstatutory health equity concern above the statutory concern of facilitating independence—which CMS does not contest is furthered by the premium requirement—CMS has arbitrarily ignored statutory factors to further nonstatutory policy interests. *See Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007) (action arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider"); *see also Qwest Corp. v. F.C.C.*, 258 F.3d 1191, 1200 (10th Cir. 2001) (agency may not "depart from" statutory principles "altogether to achieve some other goal").

*Fourth*, CMS's removal of the qualifying hours and premium requirements is an arbitrary bait-and-switch. Under *NFIB*, Georgia had *no obligation* to expand Medicaid to individuals with incomes below 133% of the poverty line. Nonetheless, Georgia worked closely with CMS and relevant stakeholders to develop an innovative program to voluntarily expand coverage to tens of thousands of otherwise-ineligible, low-income Georgians while ensuring that those individuals were taking steps to build skills, find work, complete additional education, or volunteer in their communities. Any attempt to excise the qualifying hours requirement would arbitrarily upend the policy choices at the heart of this program. As the Supreme Court explained in *NFIB*, the "legitimacy" of any expansion of the Medicaid program requires that the State "voluntarily and knowingly accepts the terms of the contract." 567 U.S. at 77 (Roberts, C.J., joined by Breyer & Kagan, JJ.). And "[r]especting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Id.*; *see also id.* at 675-79 (Scalia, Kennedy, Thomas, & Alito, JJ., dissenting) (same). Georgia unequivocally did not "voluntarily and knowingly" agree to expand coverage absent the qualifying hours and activities and premium requirements.

*Fifth*, CMS's references to the COVID-19 pandemic provide no basis to excise the qualifying hours and activities and premium requirements. Unlike programs in some other states, Georgia's waiver does not impose any requirements on *existing* Medicaid recipients. Rather, Georgia provides a pathway for otherwise-ineligible individuals to obtain Medicaid coverage through participation in a wide range of possible activities. Thus, as CMS itself previously recognized, "expanding Medicaid coverage to individuals not previously eligible will have a significant positive impact on access to health care during and after a public health emergency." Ex. 2 at 14.

CMS makes no attempt to explain in the Recission how *expanding* coverage in a pandemic would fail to "promote the objectives of the Medicaid program." Ex. 8 at 7. Moreover, the COVID-19 pandemic was ongoing when CMS approved Pathways in October 2020. CMS raised specific concerns about the pandemic's impact on potential participants throughout the waiver negotiations, and Georgia specifically addressed those concerns to CMS' satisfaction in the STCs (by, for example, confirming that quarantining due to a COVID diagnosis or exposure would qualify as good cause for noncompliance with the qualifying hours requirement). *See* Ex. 2 at 14. CMS fails to explain why it has suddenly changed its position about the adequacy of these measures.

If anything, the COVID-19 pandemic makes the qualifying hours and activities more important, not less. In approving Pathways, CMS highlighted that "recent research during the COVID-19 pandemic indicates that factors such as a lack of economic participation, social isolation, and other economic stressors have negative impacts on mental and physical health" Ex. 2 at 1 n.1. Therefore, "incentives and requirements that increase such participation may have a positive effect on beneficiary health and economic mobility." *Id.* Even for individuals facing economic disruption or job losses, the qualifying hours and activities requirement contains significant flexibility for participants to choose activities that will help them learn new skills and move toward independence and self-sufficiency. *See* Ex. 1, STC ¶33 (documenting seven different categories of qualifying activities). New

participants can qualify through public or private employment, including self-employment and employment as an independent contractor. They can also qualify for coverage with a variety of other pursuits. On-the-job training counts. So does participation in job readiness activities related to the preparation for employment, including GED programs, rehabilitation activities, or vocational educational training. Ex. 1 at 16. Enrollment in an institution of higher education qualifies as well. Participants can also volunteer with "public or non-profit organizations participating in projects that serve the community." *Id.* Additionally, a participant does not even need to do any of these activities full time. Pathways requires only eighty hours per month. *See id.* at 16-17.

The program also contains a "good cause" exception for individuals enrolled in Pathways who subsequently become unable to meet their qualifying hours due to injury or illness, including illness of a family member; the birth or adoption of a child; a family emergency, such as domestic violence; the loss of housing; and several other reasons. *See id.* STC ¶36. Moreover, the "good cause" exception expressly covers Pathways participants who are quarantining due to COVID-19 exposure or unable to meet the qualifying hours and activities due to a public health emergency. *See id.* STC ¶36(h). This robust "good cause" exception directly refutes CMS's suggestion that COVID-19 has somehow made it "infeasible" to implement the qualifying hours and activities requirement. The program's current terms—adopted in close coordination with CMS officials—contain more than ample flexibility for individuals affected by the pandemic.

*Sixth*, CMS ignored the specific factual findings in the Approval and the State's massive reliance interests. Because the Recission "rests upon factual findings that contradict those which underlay its prior policy," and destroys the State's reliance interests in implementing the approved program, CMS was required to provide a "more detailed justification" than the initial finding. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But CMS does not engage with its prior factual findings at all. Indeed, CMS identifies no intervening change in the relevant facts that could justify so

extreme a change in position. Its sole reliance is on COVID-19. *See, e.g.*, Ex. 8 at 2. But the pandemic was at its height when the demonstration project was developed, negotiated, and approved. Moreover, it is flagrantly arbitrary to suggest that *expanding* healthcare coverage would be harmful in the midst of a pandemic. And, as noted, there is significant flexibility in meeting the qualifying hours requirement and numerous exceptions for individuals who cannot meet the requirement due to extenuating circumstances. Given these facts, there is a "significant mismatch" between CMS's stated rationale and the administrative record. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019).

*Seventh*, CMS used an arbitrary and capricious baseline in evaluating the qualifying hours requirement. Because Pathways applies only to a new population not currently eligible for coverage, the appropriate point of comparison to determine if it furthered the objectives of Medicaid was a world without Pathways (*i.e.*, no expansion at all), not a hypothetical world of condition-free expansion. This error infects each of CMS's findings in the Recission. Pathways obviously *expands* coverage to tens of thousands of otherwise-ineligible individuals—that is its very purpose. It was only by drawing a false comparison with a world that does not exist—full expansion in Georgia—that CMS could reach the counterintuitive conclusion that the qualifying hours requirement would somehow contract coverage. *Cf. Leather Indus. of Am., Inc. v. EPA*, 40 F.3d 392, 405 (D.C. Cir. 1994) (decision based on erroneous baseline arbitrary and capricious).

*Eighth*, and relatedly, the Recission draws a false equivalence between Pathways and other demonstration programs that attempted to impose work requirements on existing Medicaid beneficiaries. Ex. 8 at 14-16. Unlike demonstrations in the States cited by CMS, Georgia's waiver does not impose any requirements on existing Medicaid recipients. Rather, Georgia provides a pathway for individuals to newly obtain Medicaid coverage through participation in a wide range of possible activities. CMS arbitrarily ignores the fundamental difference between Pathways and the other demonstrations.

*Ninth*, the Recission fails to once mention the significant resources Georgia expended and actions it took in reliance upon the Approval. Georgia's reliance interests are significant. The State has reasonably relied upon CMS's final approval to make substantial investments of time, money, and manpower in preparation to implement Pathways—all of which will be unrecoverable if the Recission is allowed to stand. *See supra* Sec.VI. Far from meeting its duty to thoroughly consider and explain why these reliance interests should be brushed aside, CMS just ignored them. *See Texas*, 2021 WL 5154219, at *8 ("In short, given the complex nature of a Medicaid plan, the State's and third parties' reliance on the January final approval was immediate, extensive, and reasonably so.").

*Finally*, the Recission is arbitrary and capricious because its discussion of the Social Security Act serves as mere pretext for achieving the Administration's policy goal of full, unconditional Medicaid expansion. As described above, there is a "significant mismatch" between CMS's stated reason for rescinding the Approval—expanding Medicaid coverage—and the record, which demonstrates beyond a shadow of a doubt that it was the Approval that would expand coverage and the Recission that contracts coverage. Courts "cannot ignore the disconnect between the decision made and the explanation given." *New York*, 139 S. Ct. at 2575. Accepting CMS's flagrantly "contrived reasons would defeat the purpose" of judicial review. *Id.*

## III.   The Recission Violates the APA's Notice and Comment Requirement.

An agency must use the same process to rescind an action as it employed to enact it in the first place. *See, e.g., Clean Water Action v. United States Envtl. Prot. Agency*, 936 F.3d 308, 312 (5th Cir. 2019) (agency must "follow the same process to revise a rule as it used to promulgate it") (citing *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015)). Indeed, where—as here, *see supra*—significant reliance interests are implicated, notice and comment is required even where an initial action was not taken with notice-and-comment procedures. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-14 (2020).

- 24 -

CMS's approval of Pathways came after two full public comment periods. Ex. 2 at 11-12. The Recission received no public comment whatsoever. The failure to provide public notice and comment is even more harmful for a Recission than Approval because both Georgia and private entities have already expended considerable time and resources in reliance on the Approval. Although Georgia was given a chance to respond to the preliminary recission determination, private parties were not. Accordingly, the Recission was made without the process required by law. *See* 5 U.S.C. §706(2)(D).

## IV. The Recission Is Arbitrary and Capricious and Contrary To Law Because It Violates the Agreement of January 4, 2021, Between Georgia and CMS.

In a letter dated January 4, 2021, CMS reaffirmed its commitment to Georgia Pathways. That letter emphasized that programs like Georgia Pathways "have proven to be a cornerstone of state innovation from which new best practices can emerge and next generation program design be fostered." Ex. 3 at 1. And the letter further affirmed that "[b]y their nature, section 1115 demonstrations represent a contract between state and federal government." *Id.* For that reason, the letter outlined the terms and conditions through which CMS could withdraw approval of the Georgia Pathways waiver. Among other provisions, those terms outlined that "CMS shall make the effective date for its determination no sooner than 9 months after the date on which CMS transmits its determination." *Id.* at 2. Georgia agreed to CMS's terms shortly thereafter**.**

Because agreements between States and CMS in the Section 1115 context are contractual in nature, CMS lacked unilateral authority to rescind the January 4 Agreement. CMS's proffered reason for that attempt is no different than its proffered reason for eliminating the qualifying activities requirement: "The current COVID-19 pandemic and economic environment … necessitate that CMS maintain the regulatory flexibility to respond appropriately to the current or changed circumstances." Ex. 5 at 1. Yet, CMS did not identify any "changed circumstances" in the thirty-two days between January 4 to February 12, nor could it for the reasons discussed above. Because CMS's Recission flouts the January 4 Agreement, it is contrary to law and must be set aside.

## CONCLUSION

For the foregoing reasons, the Court should grant Georgia's Motion for Summary Judgment

and set aside the Recission as arbitrary and capricious and contrary to law.

Respectfully submitted,
/s/ Jeffrey M. Harris

Chris Carr
 *Attorney General of Georgia*
Stephen Petrany
 *Solicitor General*
Office of the Georgia Attorney General
40 Capitol Square SW
Atlanta, GA 30334
(404) 458-3409

Jeffrey M. Harris*
Daniel Shapiro*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
daniel@consovoymccarthy.com
*Special Assistant Attorneys General*
* admitted pro hac vice

G. Todd Carter, Esq.
Georgia Bar No: 113601

Paul M. Scott, Esq.
Georgia Bar No: 140960
BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue
P. O. Box 220
Brunswick, GA 31521-0220
Tel:  912-264-8544
Fax: 912-264-9667
Email:  tcarter@brbcsw.com
pscott@brbcsw.com
*Local Counsel*

Dated: March 16, 2022

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing motion was electronically filed with the Clerk of Court using

the CM/ECF system on March 16, 2022. This motion has also been sent by electronic mail to Vinita

Andrapalliyal (vinita.b.andrapalliyal@usdoj.gov) and Hannah Solomon-Strauss (Hannah.m.solomon-

strauss@usdoj.gov) who have notified Plaintiffs' counsel that they will be representing Defendants.

*/s/ Jeffrey M. Harris*
Jeffrey M. Harris