UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| THE STATE OF GEORGIA, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 2:22-cv-00006-LGW-BWC |
| CHIQUITA BROOKS-LASURE in her | ) | |
| official capacity as Administrator of the | ) | |
| Centers for Medicare and Medicaid | ) | |
| Services; et al. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE,
CROSS-MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT**

### INTRODUCTION

Congress has granted the Secretary of Health and Human Services wide latitude to approve a state-proposed "experimental, pilot, or demonstration project" that, "in the judgment of the Secretary, is likely to assist in promoting the objectives" of the Medicaid statute. 42 U.S.C. § 1315(a) (also known as Section 1115 of the Social Security Act). That grant of the authority to the Secretary—who exercises his authority through the Administrator of the Centers for Medicare & Medicaid Services (CMS)—is necessarily accompanied by responsibility to monitor an approved project and, when his "judgment" so requires, to withdraw authority for the project's continuation. Indeed, the regulations implementing Section 1115 authorize the Secretary to withdraw the waiver if the demonstration project "is not likely to achieve the statutory purposes." 42 C.F.R. § 431.420(d)(2).

CMS approved a demonstration project proposed by the State of Georgia, known as the Pathways project, in October 2020. The project, which was not scheduled to take effect until July 2021, purported to expand Medicaid eligibility in Georgia but added conditions on enrollment and

1

coverage, notably, by imposing work and community engagement requirements and premium payment requirements as a condition of Medicaid eligibility for a subset of Georgia's low-income population. In the intervening months, additional data about the COVID-19 pandemic's effects on low-income populations led the agency to reevaluate the merits of Georgia's work and premium requirements and ultimately to decide that those requirements did not further the objectives of Medicaid. CMS issued to Georgia a preliminary determination of its determination and allowed the State an opportunity to respond, all before the project was scheduled to go into effect. Georgia delayed implementing the project to "assess its options," and CMS ultimately withdrew its approval of the work and premium components of the project in December 2021, while the project remained stayed.

Georgia filed this action to challenge CMS's withdrawal of its authorization of the work and premium requirements, but the State's contentions lack merit. As an initial matter, the Secretary's authority to approve and, correspondingly, to withdraw authority for, Medicaid demonstration projects is a classically discretionary decision that is shielded from judicial review. Further, CMS had specific regulatory power to withdraw authority for the project or any of its components under the circumstances, 42 C.F.R. § 431.420, and, in general, the agency "has significant discretion to weigh the statutory factors and re-evaluate the policy arguments supporting" a particular policy or decision, *Clean Water Action v. EPA*, 936 F.3d 308, 315 (5th Cir. 2019).

As a result, Plaintiffs' challenges to the agency's withdrawal are without merit. Not only did the agency have ample discretionary authority to withdraw authority for the work and premium requirements, but the withdrawal was reasonable, followed the applicable process, and violated no applicable common-law, contract, or constitutional principles. Nor did the withdrawal unreasonably impair Georgia's potential reliance interests, since it occurred before the time-limited, experimental project ever went into effect. Moreover, the withdrawal did not amount to an unconditional expansion of Medicaid in Georgia against the State's will. Georgia is free to walk away from its demonstration

project in its current state or to work with the agency to provide low-income Georgians with Medicaid coverage in a manner that advances Medicaid's statutory objectives.

For these reasons, as explained further below, Plaintiffs' Complaint should be dismissed or, in the alternative, summary judgment should be granted to Defendants and denied to Plaintiffs.

## LEGAL BACKGROUND AND PROCEDURAL HISTORY

### I.     Legal Background

The Medicaid program authorizes federal funding to States to assist certain individuals in obtaining medical care. 42 U.S.C. § 1396a(a)(10). To participate in the Medicaid program, a State must submit a plan for medical assistance (a "State plan") for approval by the Secretary. *Id.* § 1396a(b). A State plan defines the categories of individuals eligible for benefits and the specific kinds of medical services the State covers. *Id.* § 1396a(10)(a), (a)(17).

Congress has separately given the Secretary the authority to approve "any experimental, pilot, or demonstration project" proposed by a State that, "in the judgment of the Secretary, is likely to assist in promoting the objectives" of the Medicaid statute. 42 U.S.C. § 1315(a). For such projects, the Secretary may waive "compliance with any of the requirements of section … 1396a" in the Medicaid statute, and may approve waivers "to the extent and for the period he finds necessary to enable such State or States to carry out [the demonstration] project." *Id.* § 1315(a)(1). The Secretary may treat a State's expenditures for an approved demonstration project that otherwise would not qualify for federal matching funds, *see id.* § 1396b, as expenditures under the State plan that are eligible for federal financial assistance to the "extent and for the period prescribed by the Secretary." *See id.* § 1315(a)(2)(A). Congress enacted Section 1315 to ensure that federal requirements did not "stand in the way of experimental projects designed to test out new ideas and ways of dealing with the problems of public welfare recipients." S. Rep. No. 87-1589, at 1961 (1962) (Conf. Rep.).

3

In addition to determining whether a State's proposed demonstration project should be approved, the Secretary has authority to monitor implementation of the project, 42 U.S.C. § 1315(d)(2)(D), and to withdraw approval for a project "based on a finding that the demonstration project is not likely to achieve the statutory purposes," 42 C.F.R. § 431.420(d)(2)(D).

## II. Procedural History

### A. Application and Initial Approval of Georgia's Demonstration Project

On December 23, 2019, the State of Georgia applied for the Secretary's approval of a Medicaid demonstration project entitled "Pathways to Coverage." Letter from Frank W. Berry and Blake T. Fulenwider to Alex M. Azar II, Seema Verma, and Calder Lynch (Dec. 23, 2019) at 1, AR 9365. The project sought to conditionally expand coverage to certain low-income Georgia residents between the ages of 19 and 64 who did not otherwise qualify for Medicaid coverage in the State. *Id.* To qualify for benefits under Georgia's proposed project, an individual had to (1) annually earn less than 100% of the federal poverty line (FPL) (including a statutory 5% household income disregard), Project Application at 6, AR 9375; (2) complete a work or community engagement requirement of 80 hours per month, *id.* at 10, AR 9379, and document compliance monthly via self-attestation and supporting documentation, *id.* at 9, AR 9378; and (3) if earning income between 50% and up to 100% of the FPL, timely pay a monthly premium (with certain exceptions), *id.* at 18, AR 9387. Additionally, those individuals subject to a premium requirement would also be obligated to pay a copayment for certain services, which Georgia would collect after services were rendered. *Id.* at 19, AR 9388. Finally, Georgia sought to waive other Medicaid requirements such as retroactive eligibility for coverage, hospital presumptive eligibility, and non-emergency medical transport for Medicaid coverage for individuals covered by the demonstration. *Id.* at 15–16, AR 9384–85.

4

On October 25, 2020, the Secretary, acting through the Administrator of CMS, approved Georgia's project in large part,[1] to be implemented starting July 1, 2021.  Letter from Seema Verma to Frank W. Berry (Oct. 15, 2020), AR 4167. The Administrator indicated that the project was likely to promote the objectives of Medicaid because it was "expected to result in significant coverage expansion in Georgia." *Id.* at 8, AR 4174. The Administrator stated that the project: was "designed to make compliance with the qualifying hours and activities requirement attainable," *id.*; "would promote the sustainability of Georgia's Medicaid program," *id.* at 9, AR 4175; and would test reforms designed to promote financial independence for Medicaid beneficiaries, which the Administrator expected to improve continuity of coverage and lead to better health outcomes, *id.* at 10, AR 4176.

The approved project contained several "special terms and conditions" (STCs). Among them was the condition that "CMS reserves the right to withdraw expenditure authorities and end the demonstration at any time it determines that continuing the expenditure authorities would no longer be in the public interest or promote the objectives of" the Medicaid program. STC 10, AR 4177.

In her approval letter, the Administrator noted that the "majority of comments . . . received" about the project "opposed the qualifying hours and activities requirement" on the basis that "the requirements may result in beneficiaries losing access to healthcare." *Id.* at 12, AR 4178. In response, the Administrator stated that the agency believed the project "is likely to promote the objectives of Medicaid by providing an opportunity for uninsured Georgians  . . . to gain healthcare coverage" and that the agency "believe[d] the state will implement sufficient guardrails to address [the] concerns raised." *Id.*; *see also id.* at 14–16, AR 4180–82. The Administrator further acknowledged that the ongoing COVID-19 public health emergency "may add to the concern among stakeholders" and noted that "[i]t is unknown whether the public health emergency will still be in effect" on July 1, 2021,

---

[1] The Secretary declined to approve two aspects of Georgia's proposed project not at issue here. *See* Letter from Seema Verma to Frank W. Berry (Oct. 25, 2020) at 7–8, AR 4173–74.

the project's approved implementation date, "and how state and individual circumstances will change between now and [that] time." *Id.* at 14, AR 4180.

### B. *Letter of Agreement and Rescission*

On January 4, 2021, less than three weeks before the end of the prior Administration, the Administrator issued a "letter of agreement" to Georgia, which purported to "provide additional details" about the process by which CMS would "terminate, amend, or withdraw waiver authority" for Georgia's demonstration project. Letter from Seema Verma to Lynnette Rhodes (Jan. 4, 2021), AR 4161, 4164. Georgia signed the agreement on January 5. AR 4163. On January 20, 2021, with the change in Administrations, Administrator Verma resigned from CMS and was replaced by Acting Administrator Elizabeth Richter. On February 12, 2021, CMS rescinded the letter of agreement. Letter from Elizabeth Richter to Lynette Rhodes (Feb. 12, 2021), AR 4154–55.

### C. *Preliminary Determination, Notice to Georgia, and Partial Withdrawal of Approval*

Also on February 12, 2021, the Acting Administrator informed Georgia that CMS "has preliminarily determined that allowing work and other community engagement requirements to take effect in Georgia would not promote the objectives of the Medicaid program." Letter from Elizabeth Richter to Frank W. Berry (Feb. 12, 2021) at 2, AR 4157. The Acting Administrator provided Georgia the opportunity to "submit . . . any additional information that in the state's view may warrant not withdrawing those authorities" before the agency decided whether to withdraw the authorities permitting Georgia to impose a work and community engagement requirement as a condition of Medicaid eligibility in its demonstration project. *Id.*

Georgia responded to the Acting Administrator's preliminary determination letter on March 12, 2021 and opposed withdrawing the authorities for its work and community engagement requirement. Letter from Frank W. Berry to Elizabeth Richter and Judith Cash (March 12, 2021), AR 4148. On May 27, 2021, upon nomination by the President and confirmation by the Senate, Chiquita

6

Brooks-LaSure assumed the office of Administrator. On July 27, Georgia indicated that it anticipated delaying implementation of the demonstration until the end of 2021 to assess its options to resolve the issues the then-Acting Administrator identified in her February 12 letter. AR 2.

On December 23, 2021, Administrator Brooks-LaSure withdrew the agency's approval for the work and community-engagement requirement and premium requirement in Georgia's demonstration project. Letter from Chiquita Brooks-LaSure to Caylee Noggle (Dec. 23, 2021). The Administrator explained that "in light of how the pandemic has progressed since the date of CMS's initial approval, CMS has reevaluated both the risks posed by the pandemic and its aftermath and the potential benefits of continuing the work requirement." *Id.* at 4, AR 5. She concluded that withdrawing authority to implement the work requirement was warranted in light of the ongoing COVID-19 pandemic and its aftermath. That is because the agency believed at the time that the pandemic had continued to significantly depress employment rates for low-wage earners both nationally and in Georgia as of the most recently available data, rendering the work requirement "infeasible." *Id.* at 2, AR 3; *see also id.* at 3, AR 4 (comparing Bureau of Labor Statistics data between February 2020 and November 2021 and citing Georgia-specific economic recovery data); *id.* at 19–27, AR 20–28.

The Administrator also concluded that evidence from other States' implementation of similar requirements and data about Georgia's low-income population indicated that Georgia's work and premium requirements were unlikely to promote Medicaid's objectives. The agency cited research showing that the work requirements were unlikely to incentivize additional employment and, if anything, would artificially depress enrollment because of the administrative burdens beneficiaries face in documenting compliance. That is because pre-pandemic, "the substantial majority of the [targeted] population in Georgia . . . were already meeting the terms of the requirement," making it "challenging for such a requirement to produce any meaningful impact" on employment outcomes, *id.* at 13, AR 14.  But the "complex and frequent reporting requirements, associated administrative burden, and

7

challenges of informing and educating beneficiaries about a work requirement has contributed to significant barriers to compliance with community engagement requirements in other states," and the agency concluded that Georgia's work requirements were unlikely to promote the Medicaid objectives. *Id.* at 6, AR 7; *see also id.* at 12–19, AR 13–20.

Finally, the Administrator responded at length to the various points raised in Georgia's March 12, 2021 letter and ultimately concluded that the State "did not respond satisfactorily to how low-income Georgians will overcome the pandemic's detrimental impact on economic opportunities," *id.* at 28, AR 29, or "offer[] sufficient evidence to support the idea that conditioning initial and continued eligibility on compliance with the work requirement is likely to be effective in positively influencing employment, independence or self-reliance," *id.* at 34, AR 35. As to the premium requirement, the Administrator concluded, "based on findings from other states with . . . demonstrations that authorized charging beneficiaries premiums beyond those authorized under the statute, [that] we do not have reason to believe that the premium policy . . . is likely to directly or indirectly promote coverage." *Id.* at 11, AR 12.

The Administrator did not withdraw authority for Georgia to implement the other components of the Pathways demonstration project and stated that "Georgia has been working with CMS to find a mutually agreeable path forward to increase[] access to health coverage in Georgia," *id.* at 35, AR 36, though the State had not submitted a revised demonstration project to address CMS's concerns. The agency "stand[s] ready to work with the state to explore other options." *Id.* The Administrator also explained Georgia's administrative appeal rights, *id.* at 36–37, AR 37–38, but Georgia did not file an administrative appeal.

### D. *This Lawsuit*

Thereafter Plaintiffs, the State of Georgia and the Georgia Department of Community Health, filed this lawsuit. Compl., ECF No. 1. Plaintiffs raise eight claims and seek declaratory and injunctive

relief. *Id.* at 21–36. Plaintiffs allege that the Administrator's partial withdrawal of authorities is contrary to law because (1) it purportedly turns the rest of the demonstration project "into a condition-free expansion of Medicaid," *id.* ¶ 85; *see also id.* ¶¶ 81–85 (Count I); (2) CMS allegedly "acted beyond its statutory authority," *id.* ¶ 91; *see also id.* ¶¶ 86–95 (Count II); and (3) the withdrawal purportedly "conflicts with the text and any discernable purpose of the Social Security Act," *id.* ¶ 100; *see also id.* ¶¶ 96–102 (Count III). Plaintiffs also allege that the withdrawal was arbitrary and capricious, *id.* ¶¶ 103–17 (Count IV); violates the agency's notice and comment obligations, *id.* ¶¶ 118–20 (Count V); violates the letter of agreement with Georgia that the agency issued and later rescinded, *id.* ¶¶ 121–24 (Count VI); violates common-law estoppel principles, *id.* ¶¶ 125–27 (Count VII); and violates the Spending Clause, *id.* ¶¶ 128–32 (Count VIII).

Plaintiffs moved for summary judgment on March 16, 2021. Pls.' Mot. for Summ. J. and Mem. in Support, ECF No. 13. Defendants hereby oppose Plaintiffs' motion, move to dismiss, and cross-move for summary judgment.

## LEGAL STANDARDS

Defendants move to dismiss the Complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Defendants also cross-move for summary judgment. Generally, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, where—as here—

a district court reviews final agency action, "the rules governing summary judgment [motions in general] do not apply[,] because of the limited role of a court in reviewing the administrative record." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps. of Eng'rs*, 354 F. Supp. 3d. 1253, 1266 (N.D. Ala. 2018). In APA cases, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the standard of review." *Id.* at 1267. It is the plaintiff's burden to show that the agency acted arbitrarily and capriciously, and any "party seeking to have a court declare an agency action to be arbitrary and capricious carries a heavy burden indeed." *Legal Envt'l Assistance Found. Inc. v. EPA*, 276 F.3d 1253, 1265 (11th Cir. 2001) (citation omitted). "The factfinding capacity of the district court is thus typically unnecessary." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). "[C]ourts are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review."[2] *Id.*

## ARGUMENT

### I.     The agency's withdrawal is committed to agency discretion by law.

The decision to withdraw permission for the Pathways program is not subject to judicial review because it is committed to agency discretion by law. At a minimum, the agency's determination is owed substantial deference.

Plaintiffs cannot state a claim under the Administrative Procedure Act (APA) when agency action is committed to the agency's discretion as a matter of law. *See* 5 U.S.C. § 701(a). Section 701(a)(2) precludes review where "a court would have no meaningful standard against which to judge the

---

[2] Because the court's review of Plaintiffs' claims is limited to the administrative record, there are no disputed material facts. *See, e.g., 3V Sigma USA, Inc. v. Richardson*, No. 2:20-CV-0807-DCN, 2021 WL 809399, at *3 (D.S.C. Mar. 3, 2021); *see also* Briefing Schedule Order at 2, ECF No. 21. Accordingly, the Defendants do not provide a "statement of the material facts as to which it is contended there exists no genuine dispute." L. R. 56.1.

agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). An agency decision is not subject to judicial review when it "involves complicated balancing of a number of factors which are peculiarly within its expertise." *Id.*

The withdrawal at issue here involves this "complicated balancing" and is the type of decision committed to agency discretion by law. The statute directs the Secretary to exercise his "judgment" about which programs will "assist in promoting the objectives" of Medicaid. 42 U.S.C. § 1315(a). Based on that judgment, the Secretary "may waive compliance . . . to the extent and for the period he finds necessary." *Id.* § 1315(a)(1). And the Secretary "may suspend or terminate" any demonstration program "based on a finding that the demonstration project is not likely to achieve the statutory purposes." 42 C.F.R. § 431.420(d)(2). Where, as here, the statute confers authority that the agency "may" exercise, and there is a "backdrop of a statutory and regulatory regime" that provides the court no measurable standards, it is "all the more apparent that the decision at issue is committed to agency discretion." *Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.*, 677 F.3d 1073, 1084 (11th Cir. 2012). For these reasons, the withdrawal is committed to agency discretion by law, and Plaintiffs' Complaint should be dismissed.

At a minimum, the statutory text indicates that withdrawal determinations are entitled to the utmost deference. A decision that a demonstration project is not likely to further the goals of the Medicaid program is a classic predictive judgment. Judicial review under the "arbitrary and capricious" standard is "particularly deferential in matters implicating predictive judgments." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009); *see also Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1513, 1514 (D.C. Cir. 1989) (courts use "an unusually deferential application of the 'arbitrary or capricious' standard" where agencies rely on their expertise to make predictive judgments). Predictive judgments earn judicial deference because such projections are "a kind of agency function that the Supreme Court has recognized to be . . . peculiarly subject to the expert experience, discretion, and judgment" of the

agency. *Sunshine State Bank v. Fed. Deposit Ins. Corp.*, 783 F.2d 1580, 1582 (11th Cir. 1986) (emphasis omitted). In short, "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Heckler*, 470 U.S. at 831–32; *see also Conservancy of Sw. Fla.*, 677 F.3d at 1084 (agencies are better suited to the "complex balancing of factors, such as the agency's priorities and the availability of resources").

Here, the predictive judgment about Georgia's demonstration project requires policy and subject-matter expertise to decide a question that Congress vested squarely in the agency's discretion: the project's likely utility in furthering broader Medicaid goals. Judicial deference is therefore at its apex and it is for exactly these reasons that courts have concluded that Section 1115 grants "broad power" and "wide discretion" to the agency.[3] Even if the Secretary's decision is subject to judicial review, it should be upheld.

## II.   The agency's withdrawal was not in excess of authority or contrary to law.

### A.  *The agency's withdrawal is well within its regulatory authority.*

In Count II, Plaintiffs allege that CMS acted *ultra vires* in withdrawing authority for the work and premium requirements of Georgia's demonstration project. But the agency had ample authority to act. As specified in the withdrawal letter, AR 3, CMS relied on authority under 42 C.F.R. § 431.420(d)(2), which specifically authorizes the agency to "withdraw waivers or expenditure authorities based on a finding that the demonstration project is not likely to achieve the statutory

---

[3] *C.K. v. N.J. Dep't of Health & Hum. Servs.*, 92 F.3d 171, 187 (3d Cir. 1996); *Aguayo v. Richardson*, 473 F.2d 1090, 1104–05 (2d Cir. 1973); *Wood v. Betlach*, 922 F. Supp. 2d 836 (D. Ariz. 2013); *Phx. Baptist Hosp. & Med. Ctr. v. United States*, 728 F. Supp. 1423, 1426 (D. Ariz. 1989), *aff'd*, 937 F.2d 452 (9th Cir. 1991); *Ga. Hosp. Ass'n v. Dep't of Med. Assistance*, 528 F. Supp. 1348, 1355 (N.D. Ga. 1982); *Blue Cross Ass'n v. Califano*, 473 F. Supp. 1047, 1067 (W.D. Mo. 1979), *rev'd on other grounds*, *Blue Cross Ass'n v. Harris*, 622 F.2d 972 (8th Cir. 1980); *Crane v. Mathews*, 417 F. Supp. 532, 539 (N.D. Ga. 1976).

purposes."[4] *Id.* The regulation goes on to provide that "[t]he terms and conditions for the demonstration will detail any notice and appeal rights for the State for a termination, suspension or withdrawal of waivers or expenditure authorities." *Id.* § 431.420(d)(3). The Georgia project's STCs, meanwhile, note that "CMS must promptly notify the state in writing of the determination and the reasons for the withdrawal, together with the effective date, and afford the state an opportunity to request an administrative hearing to challenge CMS' determination prior to the effective date." STC 10, AR 4195. The Secretary's withdrawal letter easily satisfies Section 431.420(d)(2) and the STCs by including extensive findings on why Georgia's work and premium requirements are unlikely to achieve Medicaid's statutory purposes, an effective date of January 22, 2022, and an explanation of Georgia's administrative appeal rights.[5] AR 2–37.

---

[4] The Secretary promulgated this regulation more than 10 years ago, Medicaid Program; Review and Approval Process for Section 1115 Demonstrations, 77 Fed. Reg. 11678-01 (Feb. 27, 2012), in a valid exercise of the Secretary's statutory authority under 42 U.S.C. § 1302(a) to "make and publish such rules and regulations . . . as may be necessary to the efficient administration" of the Medicaid program, *id.*; *see also* 77 Fed. Reg. at 11695. Plaintiffs do not challenge the lawfulness of this regulation. *See generally* Compl.

[5] Plaintiffs' reliance on the Fifth Circuit's decision in *Forrest General Hospital v. Azar*, 926 F.3d 221, 233 (5th Cir. 2019), is misplaced. *See* Pls.' Mot. at 15. In *Forrest General*, the court examined the scope of a Mississippi demonstration project that the Secretary approved in the aftermath of Hurricane Katrina to determine whether the project extended Medicaid coverage to inpatient treatment of uncompensated care pools (UCCP) for a period of time, which would affect the Medicaid reimbursement rate for certain hospitals. *Id.* at 224. The court determined that the Secretary's approval authorized inpatient coverage for the UCCPs under Medicaid and that the agency should have reimbursed the hospitals accordingly. 926 F.3d. at 222. In the litigation as to the scope of the waiver, the Secretary took the opposite position—*i.e.*, that the Secretary had not authorized inpatient coverage. The court found that the Secretary could not limit the authorization retrospectively during litigation. *See id.* at 233 ("[o]nce the Secretary authorizes a demonstration project, no take-backs"). But in finding that the Secretary may not retroactively revise what he had already approved, the Fifth Circuit said nothing about whether the Secretary may *prospectively* withdraw authority for a demonstration in accordance with 42 C.F.R. § 431.420(d), or under any other authority, for that matter. "The language in the Court's opinion upon which respondent relies cannot be taken as a decision upon a point which the facts of the case did not present." *United States v. Neifert-White Co.*, 390 U.S. 228, 231 (1968); *see also Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 35 (2012).

Rather than analyzing the governing regulation—or even mentioning it—Plaintiffs argue that the only authority the Secretary could have relied on was "inherent" authority, which they claim does not apply to the instant withdrawal in any case. Pls.' Mot. at 16. Granted, "in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions." *Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002); *see also Gun S., Inc. v. Brady*, 877 F.2d 858, 863 (11th Cir. 1989). But here, where the regulation *does* expressly authorize the agency to withdraw waiver authorities, resort to inherent-authority principles is unnecessary.[6]

Regardless, these inherent-authority principles also would be sufficient to support the Administrator's reconsideration of the prior approval. When reviewing an agency's exercise of inherent authority to reconsider a prior decision, courts balance "two opposing policies . . . : the desirability of finality, on the one hand, and the public interest in reaching what ultimately, appears to be the right result on the other." *Bookman v. United States*, 453 F.2d 1263, 1265 (Ct. Cl. 1972) (quoting *Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 321(1961)). The Eleventh Circuit has not set a specific standard to evaluate an agency's inherent reconsideration authority, but other circuit courts have stated that an agency may "undertake [] reconsideration" under its inherent authority "only if it does so within a reasonable time period and affords the claimant proper notice of its intent to reconsider the decision." *Dun & Bradstreet Corp. Found. v. U.S. Postal Serv.*, 946 F.2d 189, 193 (2d Cir. 1991); *see also Macktal*, 286 F.3d at 825–26 (noting the additional limitation that an agency's final action may not be arbitrary, capricious, or an abuse of discretion as set forth in the APA, 5 U.S.C. § 706(2)).

---

[6] Further, given the nature of the Secretary's initial approval under Section 1115, the Secretary's withdrawal authority is especially appropriate as a function of the statute itself.  Under Section 1115, the Secretary is approving time-limited experiments that the Secretary determines will promote the objectives of Medicaid.  42 U.S.C. § 1315(a)(1). The Secretary approves those projects "to the extent and for the period he finds necessary." *Id.* If the Secretary acquires new information showing that the experiment is harming those objectives—or not advancing them while imposing other harmful consequences—it is only logical that the Secretary may halt the experiment. Moreover, States can have only limited reliance interests in continuing an experimental and time-limited project.

Here, the agency timely undertook a reconsideration of its approval by issuing a preliminary determination less than four months after the initial approval, AR 4156–57, and a final determination nine months after receiving Georgia's response, all before Georgia's project ever went into effect. The "complexity of the [initial] decision" and depth of reasoning supporting the withdrawal, "that the decision was [both] factually [and] legally based," and the fact that the agency "acted according to its general procedures for review" as set forth in 42 C.F.R. § 431.420(d)(2) and in STC 10 of the initial approval all weigh in favor of the reasonable nature of the time lapse. *Dun & Bradstreet*, 946 F.2d at 194. So too does the fact that the agency considered Georgia's potential reliance interests in issuing its withdrawal before Georgia implemented the project.

Moreover, the agency not only provided notice to Georgia when it issued its preliminary determination letter in February 2021 but also gave the State an opportunity to submit additional information in support of Georgia's position for retaining the full project. AR 4157; *see Macktal*, 286 F.3d at 826. Therefore, the Administrator's decision to withdraw authorization also fell within her inherent authority to reconsider prior decisions.[7] *Dun & Bradstreet*, 946 F.2d at 194.

Plaintiffs rely heavily on a preliminary injunction issued by a district court in *Texas v. Brooks-LaSure*, 6:21-cv-00191, 2021 WL 5154219 (E.D. Tex. Aug. 20, 2021), to argue that the agency lacked inherent authority to partially withdraw approval for the project. But that case is materially different. There, the agency had initially approved the project without requiring the project to undergo the federal notice-and-comment process as required under 42 C.F.R. § 431.416. *Id.* at *2–3; *see also* 42

---

[7] Finally, as explained further below, the Secretary's withdrawal was not arbitrary or capricious because the agency thoroughly explained why withdrawing authority for the work and premium components of Georgia's Pathways project was warranted. *See infra* sec. III. The APA's separate limitation on agency action, issued under implicit authority or otherwise, therefore does not apply. *See Macktal*, 286 F.3d at 825–26.

15

U.S.C. § 1315(d)(2)(C). Thereafter, the agency withdrew authority for the project on the basis that the prior approval was legally invalid. Texas, 2021 WL 5154219, at *3.

At least four facts materially distinguish the *Texas* case from this one. *First*, to withdraw authority for Texas's project, the agency did not purport to follow a statutory or regulatory process—like the one set forth in 42 C.F.R. § 420.431(d)(2) and relied upon by the agency here—which, according to the Texas court, weighed in favor of finding the revocation unlawful in that case. *Id.* at *9. *Second*, "CMS did not purport to reconsider whether Texas's program approved . . . would in fact meet the objectives and limitations stated in § 1115(a)," *Id.* Here, by contrast, the agency did exactly that, and the complexity of that determination militates in favor of finding a reasonable time lapse here. *See Dun & Bradstreet*, 946 F.2d at 194. *Third*, the Texas court preliminarily concluded that "the probable impact of an erroneous agency decision absent reconsideration does not move the needle much either way" given the procedural nature of the notice-and-comment error, *Texas*, 2021 WL 5154219, at *9, whereas here the agency's partial withdrawal is based squarely on CMS's substantive judgment that the work and premium requirements do not further the objectives of Medicaid, AR 2–37. *Fourth*, the court in Texas found that the agency "did not provide Texas notice of its intent to reconsider its approval of Texas's demonstration program" or "an opportunity to comment," which "favors Texas's likely success." *Texas*, 2021 WL 5154219, at *9–10. But here, the agency provided both ample notice and an opportunity for Georgia to "provide information or comment on the possibility of rescission." *Id. Texas*, therefore, does not demonstrate that the agency's partial withdrawal of authorities for Georgia's demonstration is invalid.

Because the agency properly acted under 42 C.F.R. § 431.420(d)(2) in withdrawing authority for the work and premium requirements in Georgia's Pathways project, and, in the alternative, had the inherent authority to withdraw approval for a portion of the project, the agency did not act *ultra vires* and Count II of Plaintiffs' Complaint fails as a matter of law.

16

### B.  The agency's withdrawal accords with Section 1115.

In Count III, Plaintiffs contend that the agency's partial withdrawal violates 42 U.S.C. § 1315. This Court's review is limited to deciding whether the agency's withdrawal was a permissible interpretation of Section 1115. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984); *see also Miami-Dade Cnty. v. EPA* 529 F.3d 1049, 1062 (11th Cir. 2008). The agency's withdrawal accords with Section 1115 because the statute's capacious, discretion-conferring language, 42 U.S.C. § 1315(a)(1), coupled with the nature of demonstration projects as time-limited experiments, easily allows the agency to withdraw a waiver if it later concludes the project should be suspended.

Plaintiffs identify no actual conflict between the text of Section 1115 and the agency's withdrawal, which is fatal to their claim. *See* Pls.' Mot. at 16–18. Rather, they take aim at the agency's substantive reasons for the withdrawal by arguing about how the agency "measured the impact of the qualifying hours requirement." *Id.* at 17. But this argument cannot form the basis for a claim that the agency acted contrary to Section 1115. To be sure, the APA permits courts to "insist that an agency . . . articulate a satisfactory explanation for its action.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). But courts do so when evaluating whether an agency action must be set aside because it "is 'arbitrary' or 'capricious,'" *see id.* (quoting 5 U.S.C. § 706(2)(A)), not when evaluating whether the challenged action is substantively contrary to the statute it implements, *see Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 521 (2d Cir. 2017) (describing the two "distinct standards for reviewing rules promulgated by administrative agencies"); *accord Arent v. Shalala*, 70 F.3d 610, 619 (D.C. Cir. 1995); *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 92 (D.C. Cir. 2020).[8] Plaintiffs'

---

[8] In *Alabama Power Company v. FERC*, 22 F.3d 270, 272 (11th Cir. 1994), the Eleventh Circuit stated that under step two of the *Chevron* analysis, "[t]he agency's construction will be deemed reasonable if it is not arbitrary, capricious, or clearly contrary to law," *id.*, illustrating the overlapping nature of *Chevron* step two review and the arbitrary-and-capricious standard, *see Arent*, 70 F.3d at 619.

disagreement with the agency's reasoning, to the extent it is reviewable, is thus to be resolved under the arbitrary-and-capricious standard of review. And, as explained further below, the agency's decision easily meets that standard.

Further, there is no doubt that the agency's judgment also accords with the objectives of Medicaid, which appropriates federal funds "[f]or the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish" medical assistance to needy individuals.[9] 42 U.S.C. § 1396-1. The agency concluded that based on the available evidence, CMS did not "have reason to believe that the premium" component of Georgia's project "is likely to directly or indirectly promote coverage." Withdrawal at 11, AR 12. Similarly, the agency decided that it would be "challenging" for a work requirement in Georgia "to produce any meaningful impact on employment outcomes by incentivizing behavioral changes in a small fraction of beneficiaries or potential beneficiaries," *id.* at 13, AR 14, and that "there is no evidence available to suggest that imposing" a work requirement "is likely to have a positive effect on beneficiary coverage, health care access[,] or health outcomes." *Id.* at 16, AR 17. Thus, the Secretary's withdrawal focused on the Medicaid objectives. *See* Pls.' Mot. at 17. Once more, Plaintiffs simply disagree with the agency's substantive reasoning about whether Georgia's work and premium requirements further those objectives, which

---

But here, where Plaintiffs identify no action taken by the agency that is outside the bounds of the agency's statutory authority or in conflict with Section 1115 and simply argue that the agency's withdrawal was illogical, *see* Pls.' Mot. at 17, Plaintiffs' arbitrary-and-capricious claim is the only proper way to examine the validity of CMS's reasoning, to the extent the agency's withdrawal decision is even judicially reviewable. Indeed, Plaintiffs raise an identical argument later in their brief in contending that the agency's withdrawal was arbitrary and capricious, Pls.' Mot. at 23, and Defendants address the substance of the argument below in responding to that claim. *See infra* p. 28.

[9] Congress did not define the "objectives" of the Medicaid statute. *Calif. Welfare Rts. Org. v. Richardson*, 348 F. Supp. 491, 494 (N.D. Cal. 1972). Courts often look to the Act's appropriation section as a source from which statutory purposes can be inferred. *See* 42 U.S.C. § 1396-1.

is not a basis to invalidate CMS's actions as contrary to law.[10] *See id.* at 17–18 (arguing that the agency's

withdrawal does not further the statutory purposes identified above); *Arent*, 70 F.3d at 619.

### III.    The agency's withdrawal was not arbitrary or capricious.

#### A.  *The Administrator reasonably explained her decision to partially withdraw authorities for Georgia's project.*

In Count IV, Plaintiffs claim that the agency's partial withdrawal of authorities was arbitrary

and capricious. As an initial matter, "[t]he arbitrary and capricious standard is 'exceedingly

deferential.'" *Ga. Dep't of Educ. v. U.S. Dep't of Educ.*, 883 F.3d 1311, 1314 (11th Cir. 2018) (quoting

*Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008)). "[T]he role of courts in reviewing

arbitrary and capricious challenges is to 'simply ensur[e] that the agency has acted within a zone of

reasonableness.'" *Missouri v. Biden*, 142 S. Ct. 647, 654 (2022) (quoting *FCC v. Prometheus Radio Project*,

141 S. Ct. 1150, 1158 (2021))); *see also Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43 (The standard is "narrow,

and a court is not to substitute its judgment for that of the agency."). And as explained above, judicial

deference to the agency's withdrawal is at its apex where, as here, the decision implicates the agency's

predictive judgment. *Rural Cellular Ass'n*, 588 F.3d 1095 at 1105.

---

[10] Plaintiffs also claim that CMS "misreads" the Families First Coronavirus Response Act (FFCRA), Pub. L. No. 116-127, 134 Stat. 178 (2020), in stating that an aspect of Georgia's work requirements conflicted with that statute. Pls.' Mot. at 18. But the agency did no such thing. It noted that "implementation of the work requirement to suspend coverage or disenroll beneficiaries who become eligible under the demonstration during the public health emergency for COVID-19" would violate the FFCRA because that statute's "temporary increase in federal Medicaid . . . is conditioned on the state's maintenance of certain existing Medicaid parameters," which includes the requirement to "maintain the enrollment of beneficiaries who were enrolled as of, *or who become enrolled after*, March 18, 2020, through the end of the month in which the public health emergency ends." Withdrawal at 2, AR 3 (emphasis added). The agency sensibly concluded that "if Georgia implements this demonstration prior to the end of the public health emergency and begins enrolling beneficiaries, the state must maintain that Medicaid coverage as long as it continues to accept FFCRA enhanced" Medicaid funding, *id.* at 3, even though Georgia's project requires the State to disenroll beneficiaries for noncompliance with the work requirement. Plaintiffs acknowledge this conflict between the terms of the project and the FFCRA but confusingly and cursorily dismiss it as "irrelevant." Pls.' Mot. at 18.

The agency's withdrawal was reasonable, fully explained, and entitled to maximum deference as a function of both (1) recently available health and economic data about the continued effects of the COVID-19 pandemic and (2) the agency's reevaluation of the efficacy of work and premium requirements in the State. *See* Withdrawal at 4, AR 5.

First, the agency re-examined Georgia's premium requirement and reviewed a dozen studies that researched the effects of premium requirements implemented in other Section 1315 demonstration projects. *Id.* at 9–12 nn.17–18, AR 10–13. The research showed that "charging beneficiaries premiums beyond those authorized under the statute resulted in shorter enrollment spells, and were associated with lower initial enrollment rates and increased obstacles to accessing care in several states." *Id.* at 9, AR 10. The agency concluded that there was no "reason to believe that the premium" requirement initially approved for Georgia "is likely to directly or indirectly promote coverage." *Id.* at 11, AR 12. Further, implementing the requirement "could be detrimental to the health of the demonstration's intended beneficiaries" by creating impediments to coverage, "including eligibility suspension, disenrollment, or inability to access demonstration coverage in the first place."[11] *Id.* The agency's thorough analysis of the available evidence and reasoned explanation easily satisfies the arbitrary-and-capricious standard. *Ga. Dep't of Educ.*, 883 F.3d at 1314.

Next, the agency reconsidered Georgia's work requirement, taking into account the demographics of Georgia's low-income population, evidence from similar requirements implemented in other states' Section 1115 demonstration projects, the ongoing COVID-19 pandemic, and the evidence and arguments that Georgia submitted. Withdrawal at 12–34, AR 13–25.

---

[11] CMS further noted that "the pandemic-related challenges discussed [*supra*] . . . in connection with the work requirement could also make it even more difficult for intended demonstration beneficiaries to make initial and ongoing premium payments," and "the health consequences of being unable to initially access or to maintain coverage due to inability to meet a premium . . . requirement could be exacerbated." Withdrawal at 27, AR 28.

The agency made several conclusions from the available information, all of which weighed in favor of withdrawing authority for the work requirement because the requirement would not promote Medicaid's statutory purposes. To begin, the agency concluded that "the available data indicated that the substantial majority of the population that would be targeted by the work requirement in Georgia's demonstration were already meeting the terms of this requirement," making it "challenging for such a requirement to produce any meaningful impact on employment outcomes by incentivizing behavioral changes" as Georgia and the Secretary's prior approval had expected. *Id.* at 13, AR 14 (citing Garfield et al. (2021). Work Among Medicaid Adults; Huberfeld, N. (2018). Can Work be Required in the Medicaid Program? New England Journal of Medicine; Goldman, A.L., Woolhandler, S, Himmelstein, D.U., Bor, D.H. & McCormick, D. (2018). Analysis of work requirement exemptions and Medicaid spending. JAMA Intern Med).

At the same time, the requirements were likely to "heighten[] the risk of denying or suspending eligibility among those subject to the requirement," Withdrawal at 13, AR 14. That risk is evident from (1) "existing evidence from states" that implemented similar requirements in different demonstration projects, (2) "evidence from other public programs with work requirements," and (3) the overall work patterns and job market opportunities for the low-income adults who would be subject to such requirements. Withdrawal at 18, AR 19. All three data sources demonstrate that those who are already working (the large majority of intended beneficiaries) will likely have trouble documenting their compliance with the work requirements, while those who are not working the required hours often cannot do so because of caregiving responsibilities or difficulty in procuring consistent and stable employment. *Id.* at 16–18, AR 17–19; *see also id.* (pointing to "challenges with beneficiary outreach efforts to ensure understanding of program requirements . . . barriers to complying with reporting requirements, and subsequent coverage losses among individuals subject to such requirements").

The COVID-19 pandemic had also, in the agency's judgment, heightened the health and economic risks of implementing Georgia's work requirement, "[g]iven how long the pandemic has lasted" and "the available data on the various health and infrastructure indicators in Georgia," *Id.* at 19, AR 20, which show that low-wage earners "continue to experience disproportionately lower employment rates than other populations, while also experiencing overall higher rates of COVID cases and deaths," *id.*[12] (citing Opportunity Insights: Economic Tracker. (2021). Percent Change in Employment; Butler, T.S. (2021); Worldometer. (2021). United States Coronavirus Cases. Retrieved on December 10, 2021 from https://www.worldometers.info/coronavirus/country/us/). That is particularly true because Georgia's project did not count caregiving as a "qualifying activity" or recognize a good-cause exception from the work requirement for caregivers, and the pandemic has disproportionately affected caregivers because caregiving responsibilities have "intensified" during the pandemic due to school closures, "lack of affordable child care," the duty to care for relatives suffering from COVID-19, and quarantine obligations. *See* Withdrawal at 13, AR 14; *see also id.* at 21, AR 22 (citing Cohen, S., Kunicki, Z., Drohan, M. & Greaney, M. (2021). Exploring Changes in Caregiver Burden and Caregiving Intensity due to COVID-19. Retrieved from https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7919204/).

Finally, the agency examined Georgia's response to CMS's preliminary determination and concluded that "neither the state's . . . letter . . . nor any other information that has become available in the time since that letter resolves the concerns" raised by the agency in its preliminary determination. Withdrawal at 28, AR 29. For one, Georgia "did not respond satisfactorily to how low-income Georgians will overcome the pandemic's detrimental impact on economic opportunities." *Id.* at 28, AR 29. Second, "Georgia rank[ed] higher than the national average in terms of the overall number of

---

[12] This data was unavailable when the prior Administrator approved the project. *See* AR 20.

COVID-19 cases and . . . deaths. . . while . . . vaccination rates . . . are . . . below the national average"

at the time of the agency's withdrawal, indicating that the pandemic's effects on beneficiaries' health,

caregiving responsibilities, and available employment presented more of a barrier to beneficiaries being

able to complete Georgia's work requirement than the State presented. *Id.* Third, the available evidence

was insufficient for CMS "to establish that the state's plans to educate beneficiaries are sufficiently

robust." *Id.* at 30, AR 31. And finally, Georgia did not "offer any evidence on how the work

requirement will result in greater independence or self-reliance" or show the requirement "would be

likely to succeed in generating greater levels of employment," *id.* at 34, AR 35. Here too, the agency's

exhaustive review is clearly "reasonable and reasonably explained." *Prometheus*, 141 S. Ct. at 1158.

### B.  *Plaintiffs' arguments to the contrary must all be rejected as impermissible attempts to substitute their own judgment for that of the agency.*

Plaintiffs take a scattershot approach to attacking the agency's reasoning, but their arguments

all miss the mark. First, Plaintiffs argue that withdrawing authority for the work and premium

requirements "will ultimately result in less Medicaid coverage for Georgians" because "Georgia has

neither the appropriations nor the staff to implement the expansion contained in Pathways." Pls. Mot.

at 19. But Georgia did not raise this argument in its response to CMS's preliminary determination.[13]

*See* March 12, 2021 Letter, AR 4148. As such, Plaintiffs have waived their right to raise this argument

now in litigation. "Under ordinary principles of administrative law, a reviewing court will not consider

---

[13] The only obstacle Georgia identified to implementing the project without the work and premium requirements appeared to be legal: the State suggested it was not allowed to enter into a demonstration that did not contain those requirements. March 12, 2021 Letter at 3, AR 4150. However, Georgia fails to substantiate this argument; none of the legal citations the State provides in either the March 12, 2021 letter or its brief bear out this assertion. And as the Administrator noted in her withdrawal letter, in 2019 Georgia's governor "signed the Patients First Act (S.B. 106), which authorities the state to submit a section 1115 demonstration request that includes an increase in the Medicaid income eligibility threshold of up to 100 percent of FPL," which "preserves Georgia's authori[ty] to provide health coverage through [a] . . . demonstration, without the work requirement or the . . . premium requirement." Withdrawal at 35, AR 36.

arguments that a party failed to raise in timely fashion before an administrative agency." *Mahon v. U.S. Dep't of Agric.*, 485 F.3d 1247, 1254 (11th Cir. 2007); *see also BNSF Ry. Co. v. Surface Transp. Bd.*, 453 F.3d 473, 479 (D.C. Cir. 2006). That is because "[a]gencies have no obligation to anticipate every conceivable argument" or scenario without the interested parties first bringing them to the agency's attention in the underlying administrative proceedings. *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013). Indeed, the available information suggested that the State was interested in reaching a mutually agreeable way forward with the agency, since Georgia indicated in July that it was assessing options to resolve the issues CMS identified in its February 12, 2021 letter.[14] July 27, 2021 Letter, AR 4146.

Further, the full project was not, in the agency's judgment, designed to promote Medicaid coverage. As the agency noted, "prior to the pandemic, the available data indicated that the substantial majority of the population that would be targeted by the work requirement . . . were already meeting the terms of this requirement," Letter at 13, AR 14, and that "[a] sizeable number of non-working Georgians may be absent from the labor force due to caregiving responsibilities, which would neither excuse an individual from the work requirement nor count toward meeting them" under Georgia's demonstration, *id.* Therefore, the vast majority of Georgians targeted by the project were either already working or cannot work, rendering dubious Georgia's claims that the work requirement would spur additional employment. In addition, beneficiaries who initially enroll in Medicaid due to their preexisting employment may have difficulty keeping their coverage due to the vagaries of their employment and the administrative difficulties in documenting monthly compliance. As the agency

---

[14] Similarly, Plaintiffs' argument that the agency's withdrawal "fails to once mention the significant resources Georgia expended and actions it took in reliance on the Approval" ignores the fact that Georgia failed to raise those costs in its response to the agency's preliminary determination. *See generally* March 12, 2021 Letter, AR 4148. Moreover, the agency provided Georgia with ample notice in issuing a preliminary determination more than three months before the project was scheduled to go into effect and made its final determination when the project was still stayed, while working with Georgia in the meantime to try to reach a mutually agreeable solution. *See* AR 2, 36.

noted, given that "consistent and stable employment is often out of reach for beneficiaries who might be subject to a community engagement requirement," and the complications and confusion that come from beneficiaries having to continually document compliance to maintain eligibility, "there is no evidence available to suggest that imposing these requirements is likely to have a positive effect on beneficiary coverage." Letter at 16, AR 17.  In any event, it would be *Georgia* that is choosing to decrease Medicaid coverage in the State by rejecting the opportunity to implement the rest of its demonstration project or work with the agency to come up with an alternative solution.[15]

Nor does the agency's withdrawal rely on impermissible factors. *See* Pls.' Mot. at 19–20. As explained above, the agency's withdrawal focused on whether the work and premium requirements would promote Medicaid coverage overall. *See* Letter at 3–34, AR 4. In the lone example that Plaintiffs provide, where the agency noted that "premiums beyond those specifically permitted under the Medicaid statute are unlikely to facilitate our priority in advancing health equity," Withdrawal at 11–12, AR 13, CMS had already independently found that the agency "did not have reason to believe that the premium policy" initially approved in Georgia's project "is likely to directly or indirectly promote coverage." Letter at 11, AR 12. Instead, the evidence suggested that the requirement "could be detrimental to the health of the demonstration's intended beneficiaries." *Id.* The agency therefore did not "depart from" statutory principles "altogether to achieve some other goal," *Qwest Corp. v. FCC*, 258 F.3d 1191, 1200 (10th Cir. 2001), but rather noted that her conclusion based on the statutory purposes of Medicaid also accorded with a related objective of minimizing health disparities. *See also*

---

[15] Georgia also argues that the agency's withdrawal somehow "makes it impossible to effectuate the expansion because the qualifying activities requirement is the core of the waiver." Pls.' Mot. at 19. But Plaintiffs do not explain why it cannot work with CMS to revise the project as CMS stands ready to do and as Georgia earlier indicated it would do. The agency explained that CMS withdrew approval for the work and premium requirements without revising the other terms of the project because otherwise Georgia "could [have begun] implementing the demonstration with a work requirement as early as January 1, 2022," and because Georgia had not submitted a demonstration amendment request to mitigate the agency's already-expressed concerns. Withdrawal at 1, AR 2.

*Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1321 (11th Cir. 2021) ("Courts must uphold rules that are rational, [and] based on consideration of the relevant factors . . . .") (internal citations and quotation marks omitted).

Plaintiffs next advance another version of the same argument made in various forms throughout their brief: that the agency's withdrawal amounted to a coercive, unconditional Medicaid expansion in the State of Georgia. Pls.' Mot at 20–21. But as Defendants explain below in responding to Plaintiffs' other versions of this claim, the agency's withdrawal creates no obligation for Georgia to expand Medicaid in the State; Georgia is free to walk away from the demonstration project altogether or work with CMS to come up with a mutually agreeable solution. *See infra* sec. VII. The withdrawal therefore does not amount to coercion or an unwanted expansion of Medicaid in Georgia.

Plaintiffs also take issue with the agency's discussion of the COVID-19 pandemic. Pls.' Mot. at 21. But the agency reasonably concluded based on new data from the months following the Secretary's initial approval that those subject to Georgia's work requirements would have a harder time meeting and maintaining those requirements due to the pandemic given (1) the lingering health complications that many experience after contracting COVID-19, Withdrawal at 20, AR 21; (2) the lack of affordable child care and "increased transportation barriers," caused by the pandemic *id.* at 21, AR 22; (3) "discrepancies in internet accessibility" that can prevent access to and reporting of qualifying activities as more jobs and classes have shifted online, *id.* at 22, AR 23; and (4) the fact that as of December 2021, "employment rates for low-wage earners have not returned to pre-pandemic levels," *id.* Georgia offers no response to these points, instead implausibly asserting that "CMS fails to explain" why it has changed its mind about Georgia's work requirement program. Pls.' Mot. at 21.

But contrary to Plaintiffs' contentions, the agency did indeed "engage with its prior factual findings," Pls.' Mot. at 22, and adequately explained its change in position under *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Under *Fox*, "it suffices that the new policy is permissible under

26

the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* at 516. A more detailed justification than what accompanied the initial agency action is unnecessary unless, for example, the agency's "new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* The agency's withdrawal satisfies either standard. As the agency explained, "CMS . . . reevaluated both the risks posed by the pandemic and its aftermath and the potential benefits of continuing the work requirement" and "determined that the earlier approval overweighed the potential benefits to Georgia's Medicaid program from the work requirement while underweighting the requirement's potential negative effects, particularly in light of the ongoing pandemic," Withdrawal at 4, AR 5. And Defendants detailed the agency's reevaluation of both the general evidence regarding the effects of work and premium requirements as well as the impact of COVID-19 on the feasibility of those requirements. *See supra* sec. III.A; *see Qwest Corp. v. FCC*, 689 F.3d 1214, 1230 (10th Cir. 2012) (commission change in position reasonable where the commission "offered an extensive discussion of its reasons for abandoning the prior policy" for "an approach . . . in the Commission's view, better in keeping with the underlying purposes" of the statute).

Moreover, the agency acknowledged that "CMS approved Georgia's work requirement within the State's demonstration in the midst of the COVID-19 pandemic in October 2020" but defended the agency's change in position on the pandemic's impact because "CMS has since assessed more recently available evidence about the effects of the pandemic and its implications for the feasibility of this requirement." Withdrawal at 19, AR 20. "These explanations relying on new data are sufficient to satisfy the more detailed explanatory obligation discussed by *Fox*," even assuming it applies here. *Mingo Logan Coal Co. v. Env't Prot. Agency*, 829 F.3d 710, 727 (D.C. Cir. 2016).

Plaintiffs' attacks on the "baseline" the agency purportedly used in evaluating Georgia's work requirements and the "false equivalence" drawn between Georgia's work requirements and those of

other states are also unavailing. Contrary to Plaintiffs' contention, the Administrator did not analyze Georgia's work requirements against "a hypothetical world of condition free expansion," nor did she "ignore[] the fundamental difference between" Georgia's project and other states' demonstrations. Pls.' Mot. at 23. Rather, the agency noted the nature of Georgia's work requirements in explaining that, while "Georgia's demonstration would not eliminate coverage for currently enrolled beneficiaries, the work requirement would prevent enrollment by potential demonstration beneficiaries who are not meeting or do not document and successfully prove that they are meeting the requirement." This result "would also result in eligibility suspension and possible disenrollment for beneficiaries who become enrolled but cease to successfully report their compliance with the requirement." Withdrawal at 16, AR 17. The agency also acknowledged that "the Georgia Pathways . . . demonstration is distinct" from other states' projects "in that its work requirement must be met in order to become eligible for demonstration coverage," but found that comparisons to other states' projects were useful insofar as "there is evidence of the potential impact of community engagement requirements in several other states that tied such requirements to continued eligibility for Medicaid coverage." *Id.* at 14, AR 15.

Importantly, the agency also noted that Georgia's work requirements were "likely to have *more* deleterious effects on beneficiaries than those experienced in other states that implemented a community engagement requirement" because "the demonstration coverage at the outset would be conditional on compliance with meeting the requirements, thereby restricting initial enrollment," and because "compliance is . . . likely to be more difficult . . . since the requirement is not structured to include any qualifying exemption, good cause exceptions, or credits towards required hours to accommodate caregiving obligations." *Id.* at 15, AR 16 (emphasis added). The agency's analysis is thus properly grounded in the specifics of Georgia's program and recognized how Georgia's work requirements favorably and unfavorably compared to those implemented in other states.

28

*Finally*, Plaintiffs' skeletal argument that the reasoning in the agency's withdrawal letter was pretextual should be dismissed out of hand as wholly lacking in foundation. *See* Pls.' Mot. at 24. Plaintiffs cite no portion of the record to establish that the agency's explanation for the withdrawal "is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019). And they fail to show a "disconnect" between the agency's withdrawal and the "explanation given" that the potential negative effects from the work and premium requirements outweigh their potential, narrow benefits in promoting the objectives of Medicaid, which the agency supported with robust findings. *Dep't of Com.*, 139 S.Ct. at 2575; *see also Dallas Safari Club v. Bernhardt*, 518 F. Supp. 3d 535, 544 (D.D.C. 2021) ("[U]nlike *Department of Commerce*, where the Court found 'the sole stated reason' for the Secretary's action had been 'contrived,' 139 S. Ct. at 2575, here, each of the agency's stated reasons finds at least some support in the record."). The agency's withdrawal decision should thus be upheld as reasonable.

## IV.     The agency's withdrawal was not subject to notice-and-comment obligations.

In Count V, Plaintiffs argue that the agency should have followed the exact same process to withdraw partial authority for Georgia's project as it used to approve the project. But no such requirement exists. Section 1115 does not provide for any notice-and-comment procedures for project withdrawals. And 42 C.F.R. § 431.420(d), which, as explained *supra*, authorizes the agency to withdraw authority for a demonstration project, similarly places no such procedural requirements on the agency. The regulation merely requires the agency to make a finding that the project "is not likely to achieve the statutory purposes" and states that "[t]he terms and conditions for the demonstration will detail any notice and appeal rights for the State for a termination, suspension or withdrawal of waivers or expenditure authorities." *Id.* § 431.420(d)(2), (d)(3). The time-limited and experimental nature of Section 1115 projects supports the Secretary's flexibility to halt a demonstration upon learning that the project no longer furthers Medicaid's objectives without engaging in notice-and-comment.

29

Plaintiffs' reliance on *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 100 (2015), is misplaced because at issue there were specific, statutory procedural requirements relating to agency rulemaking, which is different from the kind of informal adjudication that occurred here. *See Neustar, Inc. v. FCC*, 857 F.3d 886, 893 (D.C. Cir. 2017) (distinguishing between rulemaking and informal adjudications). The APA defines "rule making" as the "agency process for formulating, amending, or *repealing* a rule." 5 U.S.C. § 551(5) (emphasis added). The APA's rulemaking procedures state that "[g]eneral notice of proposed rule making shall be published in the Federal Register," followed by a comment process, except that notice requirements generally do not apply to "interpretive rules, general statements of policy," and other similar actions. 5 U.S.C. § 553(b), (c). *Perez* held that for interpretive rules, no notice-and-comment was required for their amendment or repeal because unlike legislative rules, they are exempt from the notice-and-comment requirements, 5 U.S.C. § 553(b)(3)(B). Here, no statute or regulation requires notice and comment for the withdrawal of authorities for a demonstration project. While 42 U.S.C. § 1315 requires a process for public notice-and-comment at the state and federal levels relating to "applications for, and renewals of, a demonstration project," *id.* § 1315(d)(2); *see also* 42 C.F.R. §§ 431.408, 431.416, it requires no such process for withdrawal of authorities for a project.[16]

## V.   The agency's withdrawal did not violate any cognizable agreement with Georgia.

Plaintiffs argue that the agency was contractually obligated to proceed with the project after the January 4, 2021 letter sent by CMS to Plaintiffs. This argument fails for multiple reasons. First, the January 4, 2021 letter was not a contract. Second, the terms that governed the interactions between

---

[16] *Department of Homeland Security v. Regents of the University of California*, 140 S.Ct 1891, 1913–14 (2020), is also of no help to Plaintiffs. *See* Pls.' Mot.at 24. That case did not require the agency to undertake notice and comment but rather concluded that the agency's actions were arbitrary and capricious because in changing course, the agency did not "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 1914. Here, the agency took into account Georgia's potential reliance interests by affording the State notice and an opportunity to respond to the agency's preliminary determination, AR 4157, and by ensuring that its withdrawal decision preceded the implementation of Georgia's demonstration project, Withdrawal at 1, AR 2.

the agency and Plaintiffs–the regulations and the STCs–specifically state that the Administrator may withdraw permission for the project if, in her judgment, the project "would no longer be in the public interest or promote the objectives" of the Medicaid program. STC at 29, AR 4195.

First, the January 4 letter is not a binding contract between the parties. A plaintiff seeking to establish the existence of a contract with the government must properly plead each required element: "(1) mutuality of intent, (2) consideration, (3) unambiguous offer and acceptance, and (4) actual authority on the part of the government's representative to bind the government in contract." *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012) (citing *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003)); *see also Night Vision Corp. v. United States*, 469 F.3d 1369, 1375 (Fed. Cir. 2006). A valid contract does not exist if any of these elements is missing.

Plaintiffs do not, and cannot, point to consideration exchanged between the parties such that the January 4, 2021 letter functioned as a binding contract. In order to satisfy the consideration requirement for contracts with the federal government, a plaintiff must show that the agreement will "render a benefit to the government, and not merely a detriment to" the other party. *St. Bernard Par. Gov't. v. United States*, 134 Fed. Cl. 730, 735 (2017), *aff'd* 916 F.3d 987 (Fed. Cir. 2019) (citation omitted). *See also Metzger, Shadyac & Schwarz v. United States*, 12 Cl. Ct. 602, 605 (1987) ("[G]overnment officials do not have authority to make contracts in which no benefit flows to the government."). Plaintiffs do not argue that the federal government received any benefit from entering into an agreement with Georgia, and its contract argument should fail for that reason too.

Second, the terms that *did* govern the relationship between the parties specifically authorize the Administrator to withdraw permission for the project. The regulations governing demonstration projects, along with the STCs of this specific project, both contemplate that the agency has the discretion to withdraw previously approved demonstration authorities in appropriate circumstances. The regulation, 42 C.F.R. § 431.420(d)(2), provides: "The Secretary may also withdraw waivers or

31

expenditure authorities based on a finding that the demonstration project is not likely to achieve the statutory purposes." And the STCs governing the demonstration project provide, in relevant part:

> **Withdrawal of Waiver or Expenditure Authority.** CMS reserves the right to withdraw expenditure authorities and end the demonstration at any time it determines that continuing the expenditure authorities would no longer be in the public interest or promote the objectives of title XIX. CMS must promptly notify the state in writing of the determination and the reasons for the withdrawal, together with the effective date, and afford the state an opportunity to request an administrative hearing to challenge CMS' determination prior to the effective date [....] STC at 29, AR 4195.

These sources provide the agency with ample authority to withdraw permission for the project "based on a finding" that the project is "not likely to achieve the statutory purposes." The agency made extensive findings in the withdrawal letter, Withdrawal at 2, AR 3, and Plaintiffs ignore this language.

In short, the agency's determination that the demonstration project was not likely to achieve the statutory purposes did not violate any "contract" with Plaintiffs. Plaintiffs do not point to any consideration exchanged, and no contract was formed. Instead, the Administrator was obliged only to follow the statute, regulations, and STCs, which she did. As a result, Plaintiffs have failed to properly plead the existence or breach of any cognizable agreement.

## VI.     The agency's withdrawal cannot be challenged under estoppel principles.

In Count VII of the Complaint, Plaintiffs challenge the withdrawal under estoppel principles. This count should be dismissed for three independently sufficient reasons.[17]

First, Plaintiffs have not alleged a waiver of sovereign immunity applicable to the estoppel claim. Any "waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, . . . and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (internal citation omitted). Neither an agency's "broad power to promulgate regulations" nor its behavior in litigation

---

[17] Plaintiffs do not press this argument in their summary-judgment motion; it should therefore be considered abandoned. *See e.g., McMaster v. United States*, 177 F.3d 936, 940–41 (11th Cir. 1999) (a claim included in the complaint is abandoned when the plaintiff fails to argue the claim to the district court). For this reason alone, this count should be dismissed at the threshold.

with the plaintiff is sufficient to waive sovereign immunity. *Thompson v. McHugh*, 388 F. App'x 870, 873-74 (11th Cir. 2010). "Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane,* 518 U.S. at 192. Plaintiffs do not identify an unequivocal statutory waiver of immunity applicable to their estoppel claim.

Second, this count should be dismissed because any "payment of money from the Treasury must be authorized by a statute." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). The Appropriations Clause "prohibits monetary payments from the federal treasury that have not been authorized by Congress" and so equitable estoppel is "unavailable in a claim against the government for funds from the public treasury." *Shuford v. Fid. Nat. Prop. & Cas. Ins. Co.*, 508 F.3d 1337, 1342–43 (11th Cir. 2007) (citing *Richmond*, 496 U.S. at 424–43). The "fundamental and comprehensive purpose" of the Appropriations Clause is to "assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good[,] and not according to the individual favor of Government agents or the individual pleas of litigants." *Richmond*, 496 U.S. at 428. The power to reach those "difficult judgments" is given squarely to Congress, and not to the Executive or to the Judiciary. Given this, "it would be most anomalous for a judicial order to require a Government official . . . to make an extrastatutory payment of federal funds." *Id.* at 430. Plaintiffs are asking for the remedy termed "most anomalous" by the Supreme Court in *Richmond*. Tellingly, Plaintiffs offer no post-*Richmond* authority explaining why the logic of *Richmond* does not directly control these facts. An estoppel claim cannot lie against the government where federal funds are at issue; Count VII should be dismissed for this reason also.

Finally, the Complaint does not plead the necessary facts. In this Circuit, the elements of common law equitable estoppel are:

> (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe [that] the party asserting [ ] estoppel would rely on it; 4) the party asserting the estoppel did not know, nor should

it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

*Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1326 (11th Cir. 2008). Or, in a sentence, plaintiffs seeking estoppel must establish "affirmative and egregious misconduct." *Sanz v. U.S. Sec. Ins. Co.*, 328 F.3d 1314, 1319–20 (11th Cir. 2003) (per curiam). But the Complaint does not allege even one of these five elements. Plaintiffs have not alleged any misrepresentation the part of the government, and do not assert that the agency was aware of "true facts" while representing otherwise to Plaintiffs. Neither do Plaintiffs allege that the agency intended any misrepresentation in order to induce reliance by Plaintiffs.

Plaintiffs abandoned Count VII in the Motion; identify no relevant waiver of sovereign immunity; and cannot offer facts to sustain a claim for estoppel. Count VII should be dismissed.

## VII.   The agency's withdrawal does not violate the Spending Clause.

Finally, in Counts I and VIII, Plaintiffs allege the Secretary's withdrawal violates the Spending Clause of the U.S. Constitution. This argument must be dismissed because it fails as a matter of law.

When Congress exercises its power under the Spending Clause and offers funds to the States, it may attach conditions to those funds. "In return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The claim available under the Spending Clause is that Congress has exceeded the bounds of its authority in enacting a statute, for example by imposing coercive conditions on states. *See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 576–77, 580-82 (2012); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295-96 (2006); *South Dakota v. Dole*, 483 U.S. 203, 207–08, 211-12 (1987). Plaintiffs do not make this type of claim. They do not challenge the constitutionality of 42 U.S.C. § 1315, nor any other part of the Social Security Act, nor any other congressional enactment. And to the extent the promulgation of a regulation could serve as the basis for a Spending Clause claim, Plaintiffs also have not challenged the constitutionality of any of the applicable regulations. On this basis alone, Plaintiffs have failed to state a Spending Clause claim.

In addition to this insurmountable flaw, Plaintiffs' reliance on *NFIB* further demonstrates why their claims fail. First, the States in *NFIB* challenged the constitutionality of the Affordable Care Act (ACA) under the Spending Clause, *see supra*. By contrast, Plaintiffs' Complaint asserts that "CMS is attempting to coerce Georgia into expanding Medicaid." *See* Compl. ¶ 131. This allegation is a freestanding claim, untethered to any challenge to the relevant Spending Clause legislation itself—that is, the Social Security Act. *Compare Dole*, 483 U.S. at 207–08, 210 (explaining the five-part test legislation must satisfy to be constitutional under the Spending Clause). The Complaint therefore names *NFIB*, but fails to articulate a Spending Clause challenge because it fails to actually challenge legislation enacted with Congress's spending power.

Second, *NFIB* makes a clear distinction between *new* and *existing* funds. In *NFIB*, the Court found certain Medicaid conditions in the ACA impermissibly coercive because these conditions required states to accept Medicaid expansion or lose their *existing* Medicaid funds. *NFIB*, 567 U.S. at 581–85. But the Court also held that Congress could make the *new* funding authorized by the ACA contingent on Medicaid expansion. *Id.* at 576, 585–86 (Ginsburg and Sotomayor, JJ., agreeing with this aspect of the plurality opinion); 687–88 (joint dissent). Plaintiffs cannot show that they will lose their *existing* Medicaid funding as a result of the withdrawal. At most, the state would merely return to the normal "without waiver" requirements of its Medicaid State Plan—under which the federal government would continue to provide more than half of the funding to provide health care to the state's qualifying low-income population. *See* 42 U.S.C. § 1315; *see generally* 42 U.S.C. § 1396(a) *et seq.* While CMS "anticipate[d] that the state will be fully able to implement the other authorized components" of Georgia's demonstration project in the absence of the work and premium requirements, the agency in no way required, coerced, or otherwise pressured the state into implementing a demonstration project. Letter at 35, AR 36. Instead, CMS expressed its willingness to engage with Georgia to implement the authorized components of the demonstration and to continue

"working . . . to find a mutually agreeable path forward to increase[] access to health care coverage in Georgia." *Id.*; *see also id.* at 35–36, AR 36–37; *see also id.* (expressing a desire "to continue to work" with the state "on approaches to health care coverage for Medicaid beneficiaries and uninsured individuals in Georgia that are likely to promote the objectives of Medicaid").

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed or, in the alternative, summary judgment should be granted to Defendants.[18]

Dated: May 5, 2022                                    Respectfully submitted,

                                                     BRIAN M. BOYNTON
                                                     Principal Deputy Assistant Attorney General

                                                     MICHELLE R. BENNETT
                                                     Assistant Branch Director
                                                     Civil Division

*/s/ O. Woelke Leithart*                             */s/ Vinita B. Andrapalliyal*
Idaho Bar No. 9257                                   VINITA B. ANDRAPALLIYAL
Assistant United States Attorney                     HANNAH M. SOLOMON-STRAUSS
U.S. Attorney's Office                               Trial Attorneys
Post Office Box 8970                                 United States Department of Justice
Savannah, Georgia  31412                             Civil Division, Federal Programs Branch
Telephone:  (912) 652-4422                           P.O. Box No. 883, Ben Franklin Station
E-mail: Woelke.Leithart@usdoj.gov                    Washington, DC 20044
                                                     Telephone: (202) 305-0845
*Attorneys for Defendants*                           E-mail: vinita.b.andrapalliyal@usdoj.gov

## CERTIFICATE OF SERVICE

Per Local Rule 5.1, Defendants certify that they effected service of this filing on all other parties to this action by filing it with the Court's electronic filing system.

                                    */s/ Vinita B. Andrapalliyal*
                                    Vinita B. Andrapalliyal

---

[18] If this Court denies the parties' pending joint motion for leave to file excess pages, ECF No. 22, Defendants respectfully request leave to resubmit a brief that complies with the page limit.