**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | |
|---|---|
| THE STATE OF GEORGIA; GEORGIA DEPARTMENT OF COMMUNITY HEALTH,<br><br>*Plaintiffs*,<br><br>v.<br><br>CHIQUITA BROOKS-LASURE, in her official capacity as Administrator, Centers for Medicare & Medicaid Services, et al.,<br><br>*Defendants.* | Case No. 2:22-cv-6-LGW-BWC |

**BRIEF OF AMICI CURIAE THE NATIONAL HEALTH LAW PROGRAM, THE SOUTHERN POVERTY LAW CENTER, GEORGIANS FOR A HEALTHY FUTURE, GEORGIA LEGAL SERVICES PROGRAM, THE GEORGIA INTERFAITH PUBLIC POLICY CENTER, AND ATLANTA LEGAL AID SOCIETY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, CROSS-MOTION FOR SUMMARY JUDGMENT**

**IDENTITY AND INTERESTS OF THE AMICI CURIAE**

Founded in 1969, the National Health Law Program is a public interest organization dedicated to improving access to quality health care for low-income and underserved individuals. The National Health Law Program advocates, educates, and litigates at the federal and state levels. Since its founding, one of the Program's priorities has been to ensure that Section 1115 demonstration projects meet the procedural and substantive requirements that Congress set forth for their approval.

The Southern Poverty Law Center (the "SPLC") is a catalyst for racial justice in the South and beyond, working in partnership with communities to dismantle white supremacy, strengthen intersectional movements, and advance the human rights of all people. The Economic Justice

1

Project at the SPLC works creatively alongside, and under the leadership of, directly impacted community members to provide legal advocacy, support, and education to dismantle exploitative systems that deprive people of wealth on account of their race and economic status and to support equitable systems of self-determination and economic reinvestment, particularly in historically marginalized Black and Brown communities. To advance that work, SPLC litigates and advocates to make sure access to healthcare is not dependent on a person's race or economic status. This includes advocating for meaningful access to State Medicaid programs in the South.

Georgians for a Healthy Future ("GHF") is a consumer health advocacy organization that collaborates with directly impacted community members and convenes partner groups to advance policy change that fosters health equity for all Georgians. GHF analyzes health data and policies; collects personal testimonies from Georgians; develops understandable health policy information and actionable tools for Georgians advocating about issues that impact their health; and engages with state and federal policy makers on such issues. One of GHF's long-standing policy priorities is to ensure Georgia's Medicaid program provides fair, adequate, and equitable coverage to meet the health needs of low-income and marginalized Georgians.

Georgia Legal Services Program (GLSP) provides civil legal services to Georgians in the 154 counties outside of metropolitan Atlanta. GLSP's mission is to provide free civil legal services to persons with low incomes, creating equal access to justice and opportunities out of poverty. GLSP represents Georgia families, primarily with incomes less than 125% of the federal poverty level to secure their rights, including access to healthcare through the Georgia Medicaid program. GLSP has litigated Medicaid rights for our clients in the Georgia appellate and federal courts and has clients who will be adversely impacted if the proposed work requirements or premium charges for Medicaid eligibility are implemented by the State.

The Georgia Interfaith Public Policy Center ("GIPPC") is a state-wide organization whose mission is to educate, empower, and advocate for the common good by uniting Georgia's people of faith. Our work arises from mutual faith-based values of love, justice, mercy, and hospitality. It demonstrates neither love, justice, nor mercy to limit healthcare coverage to *some* of the poor in Georgia and exclude others through work requirements and premiums.

Since 1924, Atlanta Legal Aid Society has offered free civil legal aid for low-income people across metro Atlanta. We regularly help clients with medical problems and specifically with issues relating to the Medicaid program. We are home to a Health Law Unit that helps clients with chronic conditions access health insurance, among other services. Because we often see uninsured Georgians in our work, Atlanta Legal Aid is particularly able to identify issues with recent Medicaid proposals.

As such, the *amici* have a strong interest in the outcome of this case.[1]

## INTRODUCTION

Section 1115 of the Social Security Act gives the Secretary of the Department of Health and Human Services ("Secretary" or "HHS") the authority to waive compliance with certain Medicaid Act requirements to enable a state to implement a time-limited "experimental, pilot, or demonstration project" that is "likely to assist in promoting the objectives" of the Medicaid Act. 42 U.S.C. § 1315(a). On October 15, 2020, the Centers for Medicare & Medicaid Services ("CMS") within HHS approved Georgia's request for a Section 1115 project. Letter from Seema Verma, Adm'r., Ctrs. for Medicare & Medicaid Servs., to Frank W. Berry, Comm'r, Ga. Dep't of Cmty. Health (Oct. 15, 2020), AR 4167-88 ("2020 Approval Letter"); CMS, Expenditure

---

[1] *Amici curiae* state that no counsel for a party authored this brief in whole or in part and no person, other than the *amici*, its members, or its counsel made a monetary contribution to its preparation or submission.

Authority and Special Terms and Conditions, No. 11-W-00342/4 (2020), AR 4189-4239 ("2020 STCs"). The approval permitted the State to cover only a portion of the expansion population described in the Medicaid Act.[2] Specifically, the State was authorized to cover individuals aged 19 to 64 who have household income up to 95% of the federal poverty level ("FPL") and are not otherwise eligible for Medicaid – if they meet certain conditions. 2020 STCs at 1, 4, AR 4189, 4192. To enroll in coverage, individuals would be required to verify that they are working or engaging in specified work-related activities for 80 hours each month. *Id*. at 1, 4, 9, AR 4189, 4192, 4197. In addition, individuals with household income at or above 50% of FPL would have to pay a premium before their coverage could begin. *Id*. Individuals would need to continue to comply with the work and premium requirements every month to retain coverage.[3] *Id*. at 1, 2, 12-13, 15-17, AR 4189, 4190, 4200-01, 4203-05. The approval allowed the project to go into effect nine months later, on July 1, 2021. 2020 Approval Letter at 1, AR 4167. Georgia anticipated that the project would cover 31,093 individuals in the first year of implementation. *Id*. at 17, AR 4183. Researchers estimated that without the work requirements in place, 269,000 people would receive

---

[2] *See* 42 U.S.C. § 1396a(a)(10)(A)(VIII) (requiring Medicaid-participating states to furnish Medicaid to adults who are not otherwise eligible for Medicaid and are under 65 years of age, not entitled to Medicare Part A or enrolled in Part B, and whose income does not exceed 133% of the federal poverty level); *id*. § 1396d(y) (establishing an enhanced federal reimbursement rate of 90% for medical assistance provided to the Section VIII population in 2020 and each year thereafter). *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 585 (2012), held that requiring states to implement Section VIII would be unconstitutionally coercive and prohibited the Secretary from enforcing 42 U.S.C. § 1396c to withhold Medicaid payments from a state refusing to take up the expansion. "That fully remedies the constitutional violation." *Id*. at 586. Thus, when a state elects to cover individuals described in Section VIII, the Secretary does not have any additional leeway under Section 1115 with respect to that population. *See Stewart v. Azar*, 313 F. Supp. 3d 237, 269 (D.D.C. 2018) (noting that when evaluating a Section 1115 request, HHS "must start with the presumption that the expansion group is on par with other protected populations").

[3] The Secretary permitted the State to ignore additional Medicaid Act requirements, including the requirement to provide three months of retroactive coverage to beneficiaries and the requirement to furnish transportation to and from covered health care services. 2020 STCs at 2, AR 4190. Those restrictions are not at issue in this case.

coverage through the project in the first year. *See* Laura Harker, *Expand Medicaid Fully; Reject Risky and Expensive State Plan*, GA. BUDGET & POL'Y INST. (Feb. 17, 2021), https://gbpi.org/expand-medicaid-fully-reject-risky-and-expensive-state-plan/, AR 1808.

Soon after taking office in January 2021, President Biden signed an executive order concerning Medicaid and the Affordable Care Act ("ACA"). Exec. Order No. 14,009, 86 Fed. Reg. 7793 (Jan. 28, 2021). The order directed the Secretary to review all "demonstrations and waivers … that may reduce coverage under or otherwise undermine Medicaid or the ACA." *Id*. § 3(ii); *see also Fact Sheet: President Biden to Sign Executive Orders Strengthening Americans' Access to Quality, Affordable Health Care*, White House (Jan. 28, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/28/fact-sheet-president-biden-to-sign-executive-orders-strengthening-americans-access-to-quality-affordable-health-care/ (confirming that this directive "include[ed] work requirements"). Consistent with the executive order, and nearly five months before the effective date of the Georgia project, CMS withdrew a 2018 Dear State Medicaid Director Letter that had announced the administration's new policy encouraging states to employ work requirements and explained what states needed to do to implement them. Tami Luhby, *Biden Moves to Unwind Trump's Medicaid Work Requirements*, CNN.com (Feb. 12, 2021), https://www.cnn.com/2021/02/12/politics/medicaid-work-requirements-biden/index.html (discussing withdrawal of CMS, SMD 18-0002, Dear State Medicaid Director Letter (Jan. 11, 2018), AR 4394-4403). CMS also provided notice to each state that had received approval to implement work requirements, including Georgia, that it was revisiting the approval and had made a preliminary determination that work requirements would not promote the objectives of the Medicaid Act. *See* Letter from Elizabeth Richter, Acting Adm'r, CMS, to Frank W. Berry, Comm'r, Ga. Dep't of Cmty. Health (Feb. 12, 2021), AR 4156-58

(inviting Georgia to submit information that, in its view, would counsel against withdrawing the work requirements). The notice also indicated that CMS would review the other authorities included in the initial approval. *Id.* at 2, AR 4157. As a result of the notice, Georgia decided to postpone implementation of its project until the end of 2021. Letter from Caylee Noggle, Comm'r, Ga. Dept. of Cmty. Health (July 27, 2021), AR 4146.

After completing its review of the Georgia project, and before Georgia implemented the project, CMS rescinded the authorities allowing work requirements and premiums based on its findings that they are not likely to promote the objectives of the program. Letter from Chiquita Brooks-LaSure, Adm'r., Ctrs. for Medicare & Medicaid Servs., to Caylee Noggle, Comm'r, Ga. Dep't of Cmty. Health (Dec. 23, 2021), AR 2-38 ("2021 Rescission Letter"). CMS followed this same process to revoke work requirements in each state that had been given permission to impose them following issuance of the January 2018 Dear State Medicaid Director letter.[4]

---

[4] *See* Letter from Elizabeth Richter, Acting Adm'r, CMS, to Lori Shibinette, Comm'r, N.H. Dep't of Health & Hum. Servs. (March 17, 2021), https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/nh-granite-advantage-health-care-program-ca2.pdf; Letter from Elizabeth Richter, Acting Adm'r, CMS, to Dawn Stehle, Deputy Dir. for Health & Medicaid, Ark. Dep't of Hum. Servs. (March 17, 2021), https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/ar-works-ca2.pdf; Letter from Elizabeth Richter, Acting Adm'r, CMS, to Kate Massey, Dir., Mich. Medical Servs. Admin. (April 6, 2021), https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/mi-healthy-michigan-ca2.pdf; Letter from Elizabeth Richter, Acting Adm'r, CMS, to Jim Jones, Medicaid Dir., Div. of Medicaid Servs., Wis. Dep't of Health Servs. (April 6, 2021), https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/wi-badgercare-reform-ca2.pdf; Letter from Chiquita Brooks-LaSure, Adm'r, CMS, to Allison Taylor, Medicaid Dir., Ind. Fam. & Soc. Servs. Admin. (June 24, 2021); Letter from Chiquita Brooks-LaSure, Adm'r, CMS, to Jami Snyder, Dir., Az. Health Care Cost Containment Sys., (June 24, 2021), https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/az-hccc-cms-ltr-st-06242021.pdf; Letter from Chiquita Brooks-LaSure, Adm'r, CMS, to Maureen Corcoran, Medicaid Dir., Ohio Dep't of Medicaid (Aug. 10, 2021), https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/oh-work-requirement-community-engagement-state-ltr-08102021.pdf; Letter from Chiquita Brooks-LaSure, Adm'r, CMS, to T. Clark Phillip, Interim Dir., S.C. Dep't of Health & Hum. Servs. (Aug.

In the sections below, the *amici* offer explanation to the Court as to why rescission of the work requirements and premiums was necessary to adhere to Section 1115, addressing in particular Georgia's contention that CMS used the wrong baseline for determining the effect of the work requirements and premiums on Medicaid coverage.

**ARGUMENT**

In Title XIX of the Social Security Act (the Medicaid Act), Congress has offered states a deal. If a state chooses to participate in Medicaid—and all have—the federal government will contribute the lion's share of the cost of furnishing medical assistance. In return, the state agrees to pay the remaining costs. To receive federal funding, the state must also adhere to numerous, detailed, specific requirements that Congress has placed in the Medicaid Act. For example, states must meet requirements for determining eligibility and the scope of coverage. *Cf. Jones v. T.H.*, 425 U.S. 986, 986 (1976) (holding Utah law inconsistent with Title XIX because it added a requirement for obtaining Medicaid). Congress also does not allow states to pick and choose among individuals who fit within a group described in the Medicaid Act as a covered group. 42 U.S.C. § 1396a(a)(10)(B). The Secretary is responsible for ensuring that states comply with the comprehensive federal scheme governing Medicaid and is required to take specific steps, culminating with terminating federal funding, when states fail to comply. *See, e.g., id.* § 1396c.

This federal scheme, as constructed by Congress, makes Section 1115's authorization allowing the Secretary to approve state-based, time-limited experiments that are likely to promote

---

10, 2021), https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/sc-healthy-connections-works-state-ltr-08102021.pdf; Letter from Chiquita Brooks-LaSure, Adm'r, CMS, to Emma Chacon, Interim Dir., Div. of Medicaid & Health Fin., Utah Dep't of Health (Aug. 10, 2021), https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/ut-primary-care-network-state-ltr-08102021.pdf.

the objectives of the Medicaid Act an unusual feature of the federal-state Medicaid partnership. As the Ninth Circuit Court of Appeals put it,

> This [Social Security Act] legislative scheme, with its mandatory language and detailed requirements, evidences a clear Congressional intent to take certain decisions away from state officials. In granting a § 1315(a) [1115] waiver, the Secretary allows the state to deviate from the minimum requirements which Congress has determined are necessary prerequisites to federal funding. While, ordinarily, the Secretary might reasonably argue that she ought to give state officials considerable discretion as to how to run a program, these federalism arguments have less weight in the context of a waiver of a congressional requirement. We are not examining the Secretary's authority to interfere with state officials' discretion, but rather her authority to waive compliance with federal statutes.

*Beno v. Shalala*, 30 F.3d 1057, 1068 (9th Cir. 1994). Thus, Georgia is wrong to suggest that the State and the Secretary stand on equal footing in "negotiating" a Section 1115 project. *See, e.g.*, Pls.' Mot. for Summ. J. and Mem. in Supp. at 5, ECF. No. 13 ("Ga. Br.").

**I.      In Rescinding the 2020 Approval, CMS Used the Correct Baseline for Determining if Work Requirements and Premiums Would Promote the Medicaid Act's Objectives.**

In Section 1115, Congress explicitly provided that the Secretary can only approve an experiment that is "likely to assist in promoting the objectives" of the Medicaid Act. 42 U.S.C. § 1315(a). The core objective of the Act is to furnish medical assistance to the low-income populations identified in the statute. *Stewart v. Azar*, 366 F. Supp. 3d 125, 138-39 (D.D.C. 2019) (quoting 42 U.S.C. § 1396-1); *see also*, *e.g.*, *Gresham v. Azar*, 950 F.3d 93, 99-100 (D.C. Cir. 2021), *vacated as moot*, __141 S. Ct. __, 2022 WL 1131359 (2022). Consequently, when evaluating a Section 1115 project, the Secretary must consider its effect on Medicaid coverage. *Stewart,* 366 F. Supp. 3d at 140.

Accepting that premise, Georgia argues that rescinding the work and premium requirements was contrary to Section 1115 and arbitrary and capricious because it will "ultimately result in *less* coverage" for individuals in the State. Ga. Br. at 17, 19. Georgia acknowledges that withdrawing the work and premium restrictions will lead to "*more than quadruple* the number of

8

individuals" receiving Medicaid coverage. *Id.* at 13. However, it contends that the State cannot afford to provide coverage to that number of people, leaving it with no choice but to abandon the project and provide coverage to no one. *Id.* at 17-18, 19. Georgia argues that because it plans to terminate the project if the rescission stands, when evaluating the effect of the work and premium requirements on coverage, CMS should have compared coverage provided with those restrictions to no coverage at all. *Id.* at 17, 23.

This cannot be the correct approach. As the District Court for the District of Columbia found, that interpretation "is utterly unreasonable in its breadth. . . ." *Stewart*, 366 F. Supp. 3d at 154 (internal quotations omitted). *Stewart* involved a challenge to the approval of a Section 1115 project in Kentucky that imposed work requirements, premiums, and other restrictions on the Medicaid expansion population that would undoubtedly result in substantial coverage loss. *See id.* at 140. As Georgia does here, the State and Secretary in *Stewart* argued that the approval would increase coverage because, without it, the State would terminate the Medicaid expansion altogether due to fiscal concerns. *Id.* at 153. The Court rejected the argument, explaining that it would render Section 1115 authority limitless: The entire Medicaid program is optional for states. Taken to its logical conclusion, the theory would mean that when a state threatens do away with Medicaid "if the Secretary does not approve whatever waiver of whatever Medicaid requirements they wish to obtain," the state's waiver application would be approvable "because any waiver would be coverage promoting compared to a world in which the state offers no coverage at all." *Id.* at 154. Medicaid would become an à la carte menu, with states permitted to mix and match coverage as they wish, so long as some number of individuals remain enrolled in the program. However, the Medicaid Act does not "leave[] the Secretary so unconstrained, nor . . . the states . . . so armed to refashion the program Congress designed in any way they chose." *Id.* at 131.

Further, Georgia's argument is inconsistent with the text of Section 1115. *Id*. at 154. In requiring the Secretary to evaluate whether a project is likely to assist in promoting the objectives of the Medicaid Act, Section 1115 "assumes the implementation of the Act." *Id*. As a result, the relevant baseline for determining whether a waiver will promote coverage is compliance with the requirements of the statute. *Id*. Section 1115 only gives the Secretary authority to waive compliance with certain provisions of the Medicaid Act "to the extent and for the period . . . necessary" to carry out the project. 42 U.S.C. § 1315(a), (a)(1). Those limitations "would make little sense . . . where the relevant consideration was not full compliance with the Act's requirements but instead no engagement whatsoever in the program."[5] *Id*.

In sum, when evaluating the effect of a Section 1115 waiver, the Secretary must compare coverage provided with the waiver in place to coverage provided in accordance with the requirements of the Medicaid Act. As described below, that is the comparison that CMS made when it rescinded the premium and work requirements in Georgia.

## II.   The Georgia Premiums Do Not Promote the Objectives of Medicaid.

When examining the effect of Georgia's approved premiums on coverage, CMS compared coverage provided with the premiums in place to coverage provided in accordance with the

---

[5] Georgia may seek to distinguish *Stewart* on the basis that Kentucky already covered the expansion population when it received permission to implement work requirements and other restrictions on coverage, whereas Georgia did not. *Cf*. Ga. Br. at 23 (arguing that, unlike other Section 1115 projects with work requirements, Georgia's does not impose the restrictions on existing Medicaid recipients). In other words, Georgia could argue that the relevant baseline for determining whether a project is coverage-promoting depends on the status quo in the state prior to the approval of the waiver (in Georgia, no expansion coverage at all). But that interpretation of Section 1115 would also lead to utterly unreasonable results. It would mean that a state could transform a coverage-reducing waiver to a coverage-promoting one by terminating its Medicaid program on day 1 and reinstating coverage – with the waiver – on day 2. That is not what Congress intended when it added Section 1115. To say the least, it does not reflect an "intelligible principle." *Whitman v. American Trucking Ass'n, Inc.*, 531 U.S. 457, 471 (2001).

requirements of the Act and correctly found that the premiums were not likely to promote the objectives of Medicaid. *See* 2021 Rescission Letter at 9-11, AR 10-12. In support of its decision, CMS cited extensive recent research from other states that have received a Section 1115 waiver permitting them to impose premiums higher than those allowed under the Medicaid Act. *See id*.; 42 U.S.C. §§ 1396o(a)(1), 1396o-1(a)(2)(A), (b)(1)(A) (prohibiting states from imposing premiums on individuals with household income below 150% of FPL). As CMS described, that research shows that premiums result in lower initial enrollment rates, shorter enrollment spells, and higher likelihood of disenrollment. *See* 2021 Rescission Letter at 9-11, 27, AR 10-12, 28. It also demonstrates that premiums have a disproportionate effect on Black individuals and individuals with lower incomes. *See id.* at 11-12, 31 n. 132, AR 12-13, 32 (citing Sanford F. Schram et al., *Deciding to Discipline; Race, Choice, and Punishment at the Frontlines of Welfare Reform*, 74 Am. Sociological Rev. 398, 414-15 (2009), AR 3621-45 (finding racial discrimination in the administration of public benefits)).

Numerous studies, conducted over the course of more than two decades, have reached the same conclusions, establishing that charging low-income individuals premiums deters and reduces coverage.[6] *See, e.g.,* Samantha Artiga et al., Kaiser Fam. Found., *The Effects of Premiums and Cost Sharing on Low-Income Populations: Updated Review of Research Findings* (2017), https://www.kff.org/medicaid/issue-brief/the-effects-of-premiums-and-cost-sharing-on-low-income-populations-updated-review-of-research-findings/. For example, a 1999 study of low-income health programs in several states found that premiums amounting to 1% of family income

---

[6] Comments on Georgia's initial application pointed to much of this research. *See, e.g.*, Letter from Jane Perkins, Legal Dir., Nat'l Health Law Program, to Alex Azar, Sec'y, Dep't of Health & Hum. Servs. at 27-29 (Feb. 7, 2020), https://gov1.qualtrics.com/ControlPanel/File.php?F=F_elWH7SOhFFhE65D, AR __ (pages not stamped).

reduce enrollment by nearly 15%, while premiums set to 3% of family income reduce enrollment by approximately 50%. *See* Leighton Ku and Teresa Coughlin, *Sliding-Scale Premium Health Insurance Programs: Four States' Experiences*, 36 INQUIRY 471, 476 (Winter 1999-2000), https://pubmed.ncbi.nlm.nih.gov/10711321/. In 2003, Oregon experimented with imposing sliding scale premiums ($6-$20) and higher cost sharing on certain Medicaid enrollees with household income below 100% of the FPL. Almost half of the affected individuals lost Medicaid coverage within the first six months after the changes. Of those who lost coverage, 40% identified the increase in premiums as the main reason for their disenrollment. Bill J. Wright et al., *The Impact of Increased Cost Sharing on Medicaid Enrollees*, 24 HEALTH AFFAIRS 1106, 1110 (2005), https://www.healthaffairs.org/doi/10.1377/hlthaff.24.4.1106. Further research examined the impact of the Oregon premiums after 30 months and found that only 33% of enrollees required to pay premiums remained continuously enrolled over the 30 months, compared with 69% of enrollees not subject to premiums. Bill J. Wright et al., *Raising Premiums and Other Costs for Oregon Health Plan Enrollees Drove Many to Drop Out*, 29 HEALTH AFFAIRS 2311, 2313 (2010), https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2010.0211. Those who left the program "experienced greater unmet health care needs, reduced use of care, more medical debt, and greater household financial strain" than individuals who were not subject to the premiums and higher cost sharing. *Id.* at 2315.

Another study examined the effect of increases in premiums in the Children's Health Insurance Program (which provides coverage to children and youth with incomes slightly above Medicaid income eligibility limits) in Kansas, New Hampshire, and Kentucky and found that they reduced initial enrollment and led to substantial disenrollment. *See* Genevieve Kenney et al., *Effects of Premium Increases on Enrollment in SCHIP: Findings from Three States*, 43 INQUIRY

378, 387-88 (2006), https://pubmed.ncbi.nlm.nih.gov/17354372/. Notably, the changes had a disproportionate effect on certain individuals. In Kentucky, for example, "larger disenrollment effects were found for nonwhite children relative to white children," while in New Hampshire, disenrollment effects were concentrated among children with lower income (185-250% of FPL compared to 250-300% of FPL). *Id*. at 388. The New Hampshire finding was consistent with prior research showing that premiums have a more pronounced effect on families with lower income. *Id*. at 389. Additional research confirmed these results. *See, e.g.*, Jill Boylston Herndon et al., *The Effect of Premium Changes on SCHIP Enrollment Duration*, 43 HEALTH SERVS. RES. 458 (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2442374/ (finding that increasing premiums from $15 to $20 per month for children in families from 151-200% of FPL decreased length of enrollment, with a greater decrease among lower income children); Salam Abdus et al., *Children's Health Insurance Program Premiums Adversely Affect Enrollment, Especially Among Lower-Income Children*, 33 HEALTH AFFAIRS 8, (2014), https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2014.0182?url_ver=Z39.88-2003&rfr_id=ori%3Arid%3Acrossref.org&rfr_dat=cr_pub%3Dpubmed (finding that a premium increase of $10 per month reduced enrollment in Medicaid and CHIP, with a greater effect on children below 150% of FPL); Brendan Saloner et al., *Access to Care Among Individuals Who Experienced Medicaid Lockouts After Premium Nonpayment* 2 JAMA NETWORK OPEN e1914561 (2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2753978 (finding that individuals locked out of the Wisconsin Medicaid program for failure to pay premiums were significantly more likely than individuals enrolled in the program to be Black non-Hispanic).[7] *Cf.*

---

[7] As comments on Georgia's initial Section 1115 application explained, the work requirements would also cause disproportionate harm to people of color. *See, e.g.*, Letter from the Ctr. for Law

*Newton-Nations v. Betlach*, 660 F.3d 370, 381 (9th Cir. 2011) (expressing doubt that imposition of heightened cost sharing can be experimental under Section 1115 given the body of research looking at the effects of cost sharing on the poor).

### III. Section 1115 Does Not Give the Secretary the Authority to Condition Medicaid Coverage on Compliance with These Work Requirements.

Using the appropriate baseline (coverage provided in accordance with the requirements of the Medicaid Act), CMS also determined that the work requirements were not likely to promote the objectives of Medicaid. 2021 Rescission Letter at 7, AR 8. In support of its conclusion, CMS outlined the substantial evidence demonstrating that the work requirements would reduce coverage and noted the complete lack of evidence suggesting that they would have any positive effect on low-income individuals in Georgia. *See id*. at 12-19, AR 13-20. CMS went on to explain why the COVID-19 pandemic and its aftermath exacerbate the risks associated with the work requirements. *See id*. at 19-27, AR 20-28.

What is more, the Secretary did not have the authority to approve Georgia's work requirements in the first place. In Section 1115, Congress gave the Secretary the narrow authority to "waive compliance" with certain provisions of the Medicaid Act. 42 U.S.C. § 1315(a) (allowing waiver of provisions in § 1396a, while Medicaid extends from §§ 1396-1396w-6). The term "waive" is unambiguous. It means "[t]o refrain from insisting on (a strict rule, formality, etc.); to forgo." *Black's Law Dictionary* (10th ed. 2014). It does not confer the authority to fundamentally modify, amend, or change statutory provisions. When Congress wants to provide the authority to

---

& Soc. Pol'y to Alex Azar, Sec'y, Dep't of Health & Hum. Servs. (Feb. 6, 2020), AR 7066-68; Letter from Raising Women's Voices for the Health Care We Need, to Seema Verma, Adm'r., CMS. (Feb. 7, 2020), https://gov1.qualtrics.com/ControlPanel/File.php?F=F_6Dm21mQLLBwoNSJ, AR __ (pages not stamped).

modify statutory provisions, it does so explicitly. *See, e.g.*, 42 U.S.C. § 1135(b) (giving the Secretary the authority to "temporarily waive or modify the application of . . . the requirements of title[]. . . XIX . . . or any regulation thereunder" during an emergency period when certain conditions are met).

Authorizing a state to transform Medicaid by *creating* new, mandatory work requirements cannot be understood as a *waiver* of compliance with an existing condition or requirement of coverage under the Medicaid Act. *See Syed v. M-I, LLC,* 853 F.3d 492, 502 (9th Cir. 2017) ("To authorize is to 'grant authority or power to.' *American Heritage Dictionary* 120. To waive is to 'give up . . . voluntarily' or 'relinquish.' *Id.* at 1947. Authorization bestows, whereas waiver abdicates."), *cert. denied*, 138 S. Ct. 447 (2017).

Further, Section 1115 permits the Secretary only to "waive compliance" for a time-limited experiment that is "likely to assist in promoting the objectives" of the Medicaid Act. 42 U.S.C. § 1315(a). Again, the central purpose of the Act is to furnish medical assistance to low-income individuals; withholding that assistance from people who are otherwise eligible for coverage under the statute but do not meet a work requirement is directly contrary to that purpose. The difference between the statutes governing the various safety net programs illustrates this point. Temporary Assistance for Needy Families ("TANF"), which also is part of the Social Security Act, and the Supplemental Nutrition Assistance Program ("SNAP") expressly authorize work requirements; the Medicaid Act does not. *Compare* 42 U.S.C. § 607 (requiring states to ensure that most TANF recipients engage in "work activities" and that benefits be reduced or terminated if an individual does not) *and* 7 U.S.C. §§ 2015(d), (o) (requiring individuals to meet work requirements as a condition of participation in SNAP), *with* 42 U.S.C. § 1396a(a)(10) (requiring states to provide medical assistance to individuals who meet the criteria listed); *see also* Personal Responsibility

15

and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105 (amending eligibility criteria for SNAP, TANF, and Medicaid, but including work requirements in only SNAP and TANF). This difference shows that Congress knows how to include work requirements when it wants to, and it chose not to include them in Medicaid. *See Gresham*, 950 F.3d at 230-31; *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) ("When Congress includes particular language in one section of a statute but omits it in another," it is "presume[d] that Congress intended a difference in meaning." (internal quotation marks omitted and alterations adopted)).

Moreover, Congress did not just include work requirements in SNAP and TANF—it prescribed detailed regimes outlining the nature of the requirements, including how they would balance against other congressional policy priorities, such as minimum wage and nondiscrimination protections. *See, e.g.*, 42 U.S.C. § 607 (detailing TANF work requirements, exemptions, and penalties for beneficiaries, and creating non-displacement protections for other workers); *id.* § 604a (addressing role of religious organizations and establishing nondiscrimination protections for contracting organizations and beneficiaries); 7 U.S.C. § 2029(a)(1) (directing SNAP benefit amounts to account for minimum wage laws). These detailed regimes demonstrate that the nature and scope of any work requirement is a decision left to Congress in the first instance.

Congress has had several opportunities to import the work requirements into the Medicaid program, but has not done so. Recently, the 115th Congress unsuccessfully attempted to authorize states to implement work requirements. *See* American Health Care Act, H.R. 1628, 115th Cong., § 117 (2017) (failed proposal to amend § 1396a with the following: "a State may elect to condition medical assistance to a nondisabled, nonelderly, non-pregnant individual under this title upon such an individual's satisfaction of a work requirement"); Medicaid Reform and Personal Responsibility Act of 2017, S. 1150, 115th Cong. (2017) (failed proposal to amend § 1396a to

16

require states to "condition medical assistance . . . upon . . . an individual's satisfaction of a work requirement."). In addition, when Congress repealed Aid to Families with Dependent Children ("AFDC") in favor of TANF in 1996, it amended Medicaid's Section 1396u to maintain consistency for certain joint TANF/Medicaid recipients, including by allowing states to terminate the Medicaid benefits of individuals—and only those individuals—who had their TANF benefits terminated for failure to comply with TANF's work requirements. *See* 42 U.S.C. § 1396u-1(b)(3)(A). At that time, Congress could have amended the Medicaid Act to permit work requirements generally, but it did not. That is revealing. *See Gresham,* 950 F.3d at 231 ("The fact that Congress did not similarly amend Medicaid to add a work requirement for all recipients—at a time when the other two major welfare programs had those requirements and Congress was in the process of amending welfare statutes—demonstrates that Congress did not intend to incorporate work requirements into Medicaid through § 1396u-1(b)(3)(A).") Where a statute "expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded." *Teles AG v. Kappos*, 846 F. Supp. 2d 102, 111 (D.D.C. 2012) (citation omitted); *see also Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993).

For more than 50 years, the federal agency in charge of administering Medicaid understood Congress's intent and did not permit states to impose work requirements as a condition of Medicaid eligibility. CMS had denied requests to adopt work requirements, because they "could undermine access to care" and are not consistent with the objectives of the program. Letter from Andrew M. Slavitt, Acting Adm'r, CMS, to Thomas Betlach, Dir., Az. Health Care Cost Containment Sys. (Sept. 30, 2016), AR 4265-66. *See also* Letter from Vikki Wachino, Dir., CMS, to Jeffrey A. Meyers, Comm'r, N.H. Dep't of Health & Hum. Servs. at 1 (Nov. 1, 2016), AR 4386.

17

In sum, Section 1115 does not permit the Secretary to circumvent the will of Congress and transform Medicaid from a medical assistance program into a program designed to incentivize work. Nothing in Section 1115 suggests a broad agency authority for such a rewrite. "[H]ad Congress wished to assign that [authority] to [the] agency, it surely would have done so expressly." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (citing *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014)).

## CONCLUSION

The *amici* request that this Court deny Plaintiffs' motion for summary judgment and grant Defendants' motion to dismiss or motion for summary judgment.

Dated: May 12, 2022

Respectfully submitted,

*/s/ Jane Perkins*
Jane Perkins*
North Carolina Bar No.: 9993
Catherine McKee*
North Carolina Bar No.: 47109
NATIONAL HEALTH LAW PROGRAM
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
(919) 968-6308
perkins@healthlaw.org

*/s/ Caitlin J. Sandley*
Caitlin J. Sandley
Georgia Bar No.: 61030
SOUTHERN POVERTY LAW CENTER
400 Washington Ave.
Montgomery, Alabama 36104
(334) 303-6822
cj.sandley@splcenter.org

Jamie Rush*†
Georgia Bar No.: 999887
Malissa Williams* †
Georgia Bar No.: 964322
Thomas Jurgens †

18

Georgia Bar No.: 103911
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
(404) 673-6523
jamie.rush@splcenter.org

*Counsel for Amici Curiae*

\* petition for *pro hac vice* pending
† petition for admission pending

## CERTIFICATE OF SERVICE

Per Local Rule 5.1, the *amici* certify that they effected service of this filing on all parties to this action by filing it with the Court's electronic filing system.


Dated: May 12, 2022                                           /s/ *Caitlin J. Sandley*
                                                              Caitlin J. Sandley