# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

|  |  |
|---|---|
| THE STATE OF GEORGIA, and GEORGIA DEPARTMENT OF COMMUNITY HEALTH, | |
| Plaintiffs, | |
| v. | 2:22-CV-6 |
| CHIQUITA BROOKS LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services, et al., | |
| Defendants. | |

## ORDER

In October 2020, the Centers for Medicare and Medicaid Services ("CMS") approved a "demonstration project" called "Georgia Pathways." Under the demonstration, Georgia would offer a new pathway to Medicaid coverage for low-income Georgians who do not currently qualify. Applicants must satisfy two eligibility criteria: (1) complete eighty hours per month of qualifying activities like work or education, and (2) pay a small monthly premium.

Just a few months later, though, CMS changed its mind. Despite originally finding that the demonstration would increase Medicaid coverage, that the conditions of coverage were attainable, and

that the resulting expansion in healthcare coverage would be beneficial during the pandemic, the Agency said that it had come to believe Pathways was unlikely to further the purposes of Medicaid. It announced it was rescinding approval for the eligibility conditions—the namesake "pathways" and the core of the demonstration itself.

That decision (the second one) was arbitrary and capricious for several reasons. CMS failed to consider or weigh the possibility that rescinding would mean less Medicaid coverage in Georgia. The Agency measured Pathways against a baseline of full Medicaid expansion, rather than taking the demonstration on its own terms. It judged Pathways by fundamentally inapt comparisons to other demonstrations. It considered and relied on an impermissible factor, "health equity." It failed to consider reliance interests on the original decision. And CMS failed to explain why it changed its mind about the key issues underlying the approval. Thus, the rescission violated the APA's core command that agencies engage in reasoned decisionmaking—and the proper course is to set it aside. Georgia's motion for summary judgment, dkt. no. 13, is **GRANTED**, and CMS's cross motion, dkt. no. 23, is **DENIED**.

**BACKGROUND**

A. *Statutory and Regulatory Background*

   1. <u>Medicaid Generally</u>

Medicaid is a "system of 'cooperative federalism'" in which the states and the federal government work together to provide medical assistance for the needy. <u>See</u> <u>Harris v. McRae</u>, 448 U.S. 297, 308 (1980) (quoting <u>King v. Smith</u>, 392 U.S. 309, 316 (1968)); 42 U.S.C. § 1396a *et seq.* Medicaid is designed "[t]o enable states to 'furnish ... medical assistance'—i.e., healthcare services—to certain vulnerable populations and to furnish those populations with rehabilitation and other services to help them 'attain or retain capability for independence or self-care.'" Administrative Record ("AR") 4169 (quoting 42 U.S.C. § 1396-1).

States that participate in Medicaid must propose comprehensive plans that meet federal requirements. <u>See</u> 42 U.S.C. § 1396a; 42 C.F.R. §§ 430.10-25. The state plan defines which individuals are eligible for benefits and what sort of medical services the state will cover. 42 U.S.C. § 1396a(a)(10)(A), (a)(17). "Once each plan is approved, the States 'administer Medicaid with little to no oversight, but the federal government pays a large portion of state administrative expenses.'" <u>Texas v. Brooks-LaSure</u>, No. 6:21cv191, 2021 WL 5154219, at *1 (E.D. Tex.

Aug. 20, 2021) (quoting Nicole Huberfeld, Federalizing Medicaid, 14 U. Pa. J. Const. L. 431, 447 (2011)).

At present, Medicaid requires only that participating states cover "certain discrete categories of needy individuals—pregnant women, children, needy families, the blind, the elderly, and the disabled." Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 575 (2012) ("NFIB") (citing 42 U.S.C. § 1396a(a)(10)). Since the enactment of the Patient Protection and Affordable Care Act, states have had the choice to "expand medical coverage to low-income adults who did not previously qualify." Gresham v. Azar, 950 F.3d 93, 96 (D.C. Cir. 2020) (citing 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII); NFIB, 567 U.S. at 583. The State of Georgia has not fully expanded its Medicaid program. AR 4149 (citing O.C.G.A. § 49-4-142.1 et seq.).

2. Medicaid Demonstration Projects

To make sure that Medicaid's general requirements do not stand in the way of useful innovation in low-income healthcare coverage, Section 1115 of the Social Security Act allows states, with the permission of the federal government, to experiment with innovative approaches to Medicaid administration. See 42 U.S.C. § 1315(a); Forrest Gen. Hosp. v. Azar, 926 F.3d 221, 224 (5th Cir. 2019). As a technical matter, this works by granting states permission to deviate from Medicaid's minimum requirements in

approved "experimental, pilot, or demonstration project[s]." 42 U.S.C. § 1315(a).

Any project "which, in the judgment of the Secretary [of the Social Security Administration], is likely to assist in promoting the objectives [of Medicaid]" can be approved "to the extent and for the periods he finds necessary to enable [the] State . . . to carry out [the] project[.]" Id. § 1315(a)(1); see also Crane v. Mathews, 417 F. Supp. 532, 536-37 (N.D. Ga. 1976).[1]  So, for example, a state might choose to pursue a demonstration project which "provide[s] benefits to people who wouldn't otherwise be eligible for Medicaid benefits; and the costs of these benefits are treated as if they are matchable Medicaid expenditures." Forrest Gen. Hosp., 926 F.3d at 224.

There are a few steps to securing approval for a demonstration project. First, "the State must conduct a 30-day notice-and-comment period [on its desired demonstration project] . . . along with at least two public hearings[.]" Texas, 2021 WL 5154219, at *1 (citing 42 C.F.R. § 431.408). Then, the state must file an application with CMS. Id. Once that is done, CMS "solicit[s] public comment in a federal notice-and-comment period." Id. (citing 42

---

[1] The Secretary of the Social Security Administration has delegated the approval of demonstration projects to the administrator of CMS, 42 C.F.R. § 430.25(f)(2), so in this case Georgia dealt with CMS—and discussion of the demonstration process will reference CMS and its administrators, not the Secretary of the Social Security Administration.

C.F.R. § 431.416). And, finally, the Secretary (or his designee, here the CMS administrator) decides whether to approve or deny the demonstration application. 42 U.S.C. § 1315 (d); 42 C.F.R. § 431.412.

Though the Social Security Act does not mention a power to withdraw approval once it is given, see 42 U.S.C. § 1315, CMS has promulgated regulations authorizing itself to do that, in two circumstances. First, a demonstration may be "supend[ed] or terminate[d]" if "the State has materially failed to comply with the terms of the demonstration project." 42 C.F.R. § 431.420(d)(1). And second, "waivers [and] expenditure authorities" may be "withdraw[n]" if the Secretary finds "that the demonstration is not likely to achieve the statutory purposes." Id. § 431.420(d)(2).[2]

*B. Factual Background*

1. The Georgia Pathways Program

In late 2019, the State of Georgia decided to pursue a demonstration project aimed at expanding Medicaid coverage to more people. AR 9365; see also O.C.G.A. § 49-4-142.3 (authorizing Georgia's waiver request to CMS). In Georgia's words, the idea was

---

[2] These regulations were promulgated under 42 U.S.C. § 1302(a), which gives the Secretary of Health and Human Services power to "make and publish such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of functions with which [he] is charged under this chapter [i.e., the Medicaid Statute.]" See 77 Fed. Reg. 11695.

to "voluntarily expand Medicaid coverage to tens of thousands of otherwise-ineligible, low-income Georgians while also ensuring that those individuals were taking steps to benefit themselves and their communities" by "conditioning coverage on participants meeting . . . a minimum number of 'qualifying hours' through work, job training, education, volunteering, or other similar activities." Dkt. No. 1 ¶¶ 5, 39; see AR 9365. In simpler terms, Georgia proposed to demonstrate a conditional Medicaid expansion.

The demonstration, called "Georgia Pathways," has three requirements. *First*, the applicant must earn less than 100% of the federal poverty line (technically 95%, with a 5% household "income disregard"). Id. 9375. *Second*, the applicant must complete and report a minimum of eighty hours of "qualifying activities"— meaning employment, job training, community service, or certain kinds of education—in the previous month, and then maintain that pace each month to maintain eligibility. Id. 9375-79. And *third*, applicants earning above fifty percent of the federal poverty line must pay a small monthly premium. Id. 9382-83 ($7.00 for participants with incomes of fifty to eighty-four percent of the poverty line, $11.00 for participants with incomes of eighty-five to ninety-five percent of the poverty line).

Georgia worked with CMS officials for months to secure permission for the Pathways demonstration. See, e.g., id. 9492-

96, 9547-51, 9569-72, 9596-97, 9618-19, 9655-59. Georgia agreed, for example, to build in a "good cause" exception to ensure that a beneficiary was not disenrolled simply because (among other possible reasons) he missed work after contracting or being exposed-to COVID-19, or because the place at which he obtained qualifying hours was closed due to COVID. Id. 4205-07. Georgia also agreed to count hours studying for a general education diploma, to count hours participating in Georgia Vocational Rehabilitation Agency programs, and to provide reasonable accommodations to potential beneficiaries under the Americans with Disabilities Act. Id. 4205.

### 2. CMS Approves Georgia Pathways

After a notice and comment period, AR 4178, CMS approved Georgia Pathways on October 15, 2020, id. 4167.[3] The approval letter explained that the purpose of Medicaid is to "enable states to 'furnish . . . medical assistance'—i.e. healthcare services—to certain vulnerable populations[,] and to furnish those populations with rehabilitation and other services to help them 'attain or retain capability for independence or self-care.'" Id. 4169 (quoting 42 U.S.C. § 1396). CMS found that Pathways met that goal. See id. 4167-88.

---

[3] CMS declined to approve two aspects of Georgia's proposed project, but those requirements are not at issue here. Dkt. No. 23 at 5 n.1 (citing AR 4173-74).

A few of CMS's findings are particularly important.

1) First, CMS found that "the only impacts on eligibility or enrollment will be to expand" Medicaid eligibility and coverage, because Georgia Pathways "applies only to beneficiaries who previously were not eligible for Medicaid[.]" Id. 4170. Indeed, CMS indicated that Pathways "is expected to result in a significant coverage expansion in Georgia"—crediting the State's estimate that "approximately 64,336 individuals will enroll in Medicaid throughout the life of this demonstration." Id. 4175.

2) Next, CMS also found that the qualifying hours requirement was "attainable" and approved the steps Georgia took "to include protections to ensure that individuals can reasonably be expected to meet the requirements." Id.

3) CMS also agreed that the demonstration "would promote the sustainability" of Medicaid and therefore support greater long-term access to coverage for low-income people, since the qualifying hours requirement would help beneficiaries gain financial security, "averting their need for future, longer term public assistance[.]" Id. 4176-77.

4) Finally, CMS found that Georgia Pathways would further Medicaid's objective of "attain[ing] or retain[ing] capability for independence or self-care" by producing

greater financial independence for the newly eligible beneficiaries and yielding data for future research and study. Id. 4169, 4177–78 (quoting 42 U.S.C. § 1396).

CMS also considered, and rejected, various arguments lodged against the demonstration during the notice and comment period.

1) First, CMS answered concerns that current Medicaid participants would lose coverage, emphasizing that the demonstration project would *expand* eligibility and would not affect current beneficiaries. Id. 4179.

2) Next, CMS addressed concerns about the potential for a disparate impact to people "with health issues and to other groups like low-income families and people who are lesbian, gay, bisexual, and transgender." Id. On that score, CMS explained that it (1) required the State to monitor any such impact and report it to CMS and (2) reserved the "right to require the State to submit a corrective action plan" to address disparate impacts. Id.

3) CMS also considered concerns about the premium requirement, pointing out that (1) the premiums operated on a sliding scale, (2) the premiums were not required for the poorest potential beneficiaries, and (3) a premium requirement helped prepare beneficiaries for the eventual transition to private insurance. Id. 4180.

4) Then, CMS acknowledged concerns related to the COVID-19 pandemic, but it explained that the demonstration responded to the pandemic by including pandemic response in the good-cause exception for failing to satisfy the qualifying hours requirement. Id. 4181. The Agency also reiterated that "expanding Medicaid coverage to individuals not previously eligible will have significant positive impact on access to health care during and after a public health emergency." Id.

5) As for concerns about the reporting requirement, CMS pointed to the fact that Georgia must provide multiple avenues to report qualifying hours and accommodate beneficiaries who have trouble reporting their hours due to a disability. Id. 4181-83.

6) And finally, responding to criticisms that Georgia Pathways suffered flaws similar to work requirement demonstrations in other states, CMS reiterated that Pathways was _different_ from prior demonstrations in that it offered a _new_ pathway to coverage for individuals who would not otherwise have access to Medicaid—rather than imposing the conditions on the entire Medicaid-eligible population. Id. 4184-86.

Even so, CMS acknowledged that the COVID-19 pandemic "may add to the concern among stakeholders," and it noted that "[i]t is

11

unknown whether the public health emergency will still be in effect" on the demonstration's effective date and "how state and individual circumstances will change between now and [that] time." Id. 4181.

Georgia began implementation efforts soon after CMS approved Pathways. Id. 3946-3983 (implementation report for October 15 to December 31, 2020). As of early 2021, the state was "nearly 50% complete with implementation activities for the first phase"—i.e., the enrollment of new beneficiaries, and "ha[d] completed 75% of new development necessary to enable a July 1, 2021 implementation." Id. 3948; see also id. (describing phases two and three and their implementation timetables once phase one was complete). Georgia told CMS that it was "making progress on design and engaging partners" to implement the demonstration. The State also described "planning related to the anticipated extension of the Federal Public Health Emergency . . . as well as the State's progress in collaborating with Care Management Organizations[ ], and the development of an engagement strategy to help Pathways beneficiaries gain and maintain participation[.]" Id.; see generally id. 3949-3983 (describing these efforts in more detail); see also id. 3988 (informing CMS a few months later that "implementation activities for the first phase overall" had

reached "80% complete" and "88% [for] activities necessary to enable a July 1, 2021 implementation").

>   3.   <u>The January 4, 2021 Supplemental Agreement</u>

In early January, CMS sent a supplemental agreement meant to "provide additional details" about the potential process by which it might, at some point, terminate or withdraw approval of the project. <u>Id.</u> 4164 (sent January 4, 2021). Georgia signed the agreement the next day. <u>Id.</u> 4166. The agreement emphasized that "[b]y their nature, section 1115 demonstrations represent a contract between the state and federal government[s]." <u>Id.</u> 4164. The agreement went on to outline a process for giving Georgia notice and an opportunity to be heard if CMS later sought to withdraw approval of the demonstration, including that CMS "shall make the effective date for [the withdrawal] no sooner than 9 months after the date on which CMS transmits its determination[.]" <u>Id.</u> 4165.

>   4.   <u>CMS Reconsiders its Approval of Pathways</u>

A few weeks after a new administration took office, CMS sent Georgia one letter saying that the Agency was reconsidering its approval of Pathways, AR 4157, and another letter informing the State that the Agency was rescinding the January agreement, <u>id.</u> 4154-55 (citing a "need for flexibility to make and effectuate determinations under 42 C.F.R. 431(d)(1)-(2)"). The

reconsideration letter informed Georgia that CMS had "preliminarily determined that allowing work and other community engagement requirements to take effect in Georgia would not promote the objectives of the Medicaid program" because of COVID-19. Id.

Contrary to the determination it made a few months earlier, CMS now felt that "[t]he COVID-19 pandemic has made community engagement [requirements] infeasible" because "it would be unreasonably difficult or impossible for many individuals to meet the community engagement requirement, which would significantly compromise the demonstration's effectiveness in promoting coverage for its intended beneficiaries." Id. 4156. "In addition," CMS reasoned, "uncertainty regarding the lingering health consequences of COVID-19 infections further exacerbates the harm of lack of access to benefits for individuals who would be unable to access coverage . . . because of their inability to meet the community engagement requirement." Id.

Based on that, the Agency said, it was "commencing a process of determining whether to withdraw the authorities . . . [permitting] the state to require work and other community engagement activities as a condition of Medicaid eligibility[,] while leaving in place the demonstration's other provisions, including the extension of Medicaid eligibility to certain otherwise-ineligible individuals." Dkt. No. 1 ¶ 69; AR 4157; see

also id. (inviting the State to "submit . . . any additional information that . . . may warrant not withdrawing those authorities").[4]

Georgia responded in opposition. Id. 4148. Georgia argued to the Agency that CMS's reconsideration letter fundamentally mistook the Pathways program for a requirement that *existing* participants in Medicaid satisfy work requirements—rather than a route to coverage for people *not* currently receiving Medicaid. Id. AR 4149–50. Correctly conceived, Georgia said, "any attempt to excise the qualifying hours and activities would make it impossible to effectuate the expansion [of Georgia's Medicaid program]"—since "the qualifying hours and activities are core to the waiver." Id. at 4150. Indeed, "[i]mplementing Pathways absent qualifying hours and activities would eliminate the mechanism for enrolling individuals in Medicaid and, ultimately, defeat[] the purpose of the demonstration waiver." Id. Georgia also argued that the COVID-19 crisis did not justify rescinding the letter; that rescinding approval for the demonstration would be arbitrary and thus unlawful; and that the Agency could not unilaterally rescind the January agreement letter. Id. 4150–51.

---

[4] Around the same time, in an implementation report to CMS, Georgia "acknowledge[d] receipt" of CMS's initial reconsideration letter and informed the Agency that the State was "continuing forward with implementation activities" while it reviewed the Agency's correspondence. AR 3948.

Still, in light of the uncertainty about the demonstration's future, Georgia paused the implementation of Pathways a week before it was supposed to go into effect (i.e., July 1, 2021). Id. 4627.

5. CMS Withdraws Approval of Pathways

CMS formally withdrew its approval of Georgia Pathways on December 23, 2021. AR 2–38. In particular, the Agency rescinded approval of the qualifying hours and premium requirements. Id. 2–3, 35–37. But CMS said that the remaining part of the demonstration—the expansion of Medicaid coverage itself—would remain in place. Id. 36–37 ("[w]e anticipate that the state will be fully able to implement the other authorized components . . ." and therefore "[t]he current established timeline for the quarterly and annual monitoring reports . . . will remain in effect").[5]

As with the reconsideration letter, CMS primarily relied on COVID-19 as the reason for withdrawing approval for the premium and qualifying hour requirements. Id. 4–8. In general terms, the Agency said that "the short-to-long term adverse implications of the COVID-19 pandemic on the economic opportunities for . . .

---

[5] CMS represents that this really means Georgia may, not must, pursue the demonstration without the conditions for gaining coverage. Dkt. No. 23 at 2, 26 ("Georgia is free to walk away"). That point proves consequential, because some of Georgia's claims seem to rely on the premise that forcing Georgia to proceed with a demonstration it did not propose is coercive in violation of the Spending Clause, dkt. no. 1 ¶¶ 81–85 (Count One), 128–32 (Count Eight). CMS stood by its statement at the hearing, and the Court takes CMS at its word.

potential beneficiaries . . . amplifie[d] the risk of attaching a work requirement to eligibility for coverage" in terms of "the ability of individuals to start and continue meeting the work requirement." Id. 28. As for premiums, CMS "determined that, generally, charging beneficiaries premiums can present a barrier to coverage, and therefore, any premiums beyond those specifically permitted under the Medicaid statute are not likely to advance the objectives of Medicaid." Id. 10; see also id. 10-12 (reasoning that the inability to make and continue premium payments, as well as confusion about the requirement itself, would lessen total enrollment). Thus, in simplest terms: the Agency thought that the eligibility conditions, particularly in light of the COVID-19 pandemic, make it harder to gain and keep coverage under Pathways.

CMS also pointed to evidence from other states' implementation of demonstration projects involving similar requirements. Id. 7, 13-20. The Agency found that "community engagement" requirements in other states have been confusing and burdensome, with "no evidence available to suggest that imposing these requirements is likely to have a positive effect on beneficiary coverage, health care access[,] or health outcomes." Id. 17.

Indeed, CMS asserted that Georgia's work requirements were "likely to have *more* deleterious effects on beneficiaries than

those experienced in other states[.]" Id. 16. The reasons why, according to CMS, were that (1) "demonstration coverage at the outset would be conditional on compliance with meeting the requirements, thereby restricting initial enrollment," and (2) "compliance [in general was] . . . likely to be more difficult . . . since the requirement is not structured to include any qualifying exemption, good cause exceptions, or credits towards required hours to accommodate caregiving obligations." Id. 16.[6]

Further, CMS wrote, the Families First Coronavirus Relief Act ("FFCRA") would not allow Georgia to disenroll participants already enrolled in Medicaid, even demonstration enrollees. Id. 2-3. "Therefore, if Georgia implements this demonstration prior to the end of the public health emergency and begins enrolling beneficiaries, the state must maintain that Medicaid coverage as long as it continues to accept the [Federal Medicaid Assistance Percentage funding under the FFCRA]." Id. 3.[7]

---

[6] CMS indicates in its reply brief that it meant "a specifically defined exception" for caregiving obligations, rather than "a generic" or "catch-all" good cause exception which might be construed to cover caregiving. Dkt. No. 44 at 14. Though the sentence is not perfectly clear, the Court agrees that this is likely the better reading.

[7] Georgia agrees that the FFCRA "may temporarily limit the State's ability to disenroll existing beneficiaries," but it points out that, because the individuals who become eligible under Pathways were not *previously* eligible for Medicaid, the demonstration would not impose "'more restrictive'" eligibility standards on them, and so the statute "imposes no limitations whatsoever on the use of a qualifying hours requirement as the pathway to initial coverage." Dkt. No. 13 at 18 (quoting Pub. L. 116-127, 134 Stat. 178 (2020)); Dkt. No. 43 at 8 n.2. Regardless—and

Finally, CMS responded to the arguments Georgia raised in its March 2021 letter opposing withdrawal. The Agency concluded that the State "did not respond satisfactorily to how low-income Georgians will overcome the pandemic's detrimental impact on economic opportunities" or "offer[] sufficient evidence to support the idea that conditioning . . . eligibility on compliance with the work requirement is likely to be effective in positively influencing employment, independence, or self-reliance." Id. 29, 35.

Since then, Pathways has remained on hold. AR 4110, 4112 (implementation report for December 1, 2021 through February 28, 2022). In January 2022, Georgia Governor Brian Kemp informed Defendant Chiquita Brooks Lasure, the Administrator of CMS, that the rescission was unlawful and Georgia would "cease all implementation activities" and seek relief in court. Id. 1.

*C. Procedural History*

Georgia filed this lawsuit in late January 2022, roughly one month after CMS formally rescinded approval for Pathways, dkt. no. 1, asking the Court to declare the rescission unlawful, set it

---

presumably because CMS purported to rescind the qualifying hours requirement as a whole, not just as a disenrollment mechanism—CMS does not contend that FFRCA suffices to justify the rescission. Dkt. No. 23 at 19 n.10; see generally dkt. no. 44.

aside under the APA, and enjoin its enforcement, <u>see</u> <u>id.</u> at 35–36 (prayer for relief). To that end, Georgia outlines eight claims:

1) First, the rescission violates a contractual agreement between the State and CMS to implement the Pathways program, <u>id.</u> ¶¶ 81–85;

2) Second, CMS has "no authority whatsoever to rescind, withdraw, or reconsider an approved demonstration" once approval has been given, so the purported rescission is invalid, <u>id.</u> ¶ 89; <u>see also</u> <u>id</u>. ¶¶ 86–95;

3) Third, the rescission affirmatively *violates* Section 1115 of the Social Security Act because the demonstration would advance the purposes of the Act, dkt. no. 1 ¶¶ 96–102;

4) Fourth, the rescission violates the APA because it is arbitrary and capricious, dkt. no. 1 ¶¶ 103–17;

5) Fifth, the rescission violates the APA because it was done without notice and comment, dkt. no. 1 ¶¶ 118–20;

6) Sixth, the rescission violates the January 4, 2021 agreement between Georgia and CMS, dkt. no. 1 ¶¶ 121–24;

7) Seventh, CMS is estopped from rescinding its approval of Georgia Pathways because it induced Georgia to rely on its approval, to Georgia's significant detriment, dkt. no. 1 ¶¶ 125–27;

8) Eighth, and finally, the rescission violates the Spending Clause because CMS is attempting to coerce Georgia into unconditionally expanding Medicaid by inducing substantial reliance and then changing the deal, dkt. no. 1 ¶¶ 128-32.

Georgia moved for summary judgment in mid-March. Dkt. No. 13. The parties agreed to a joint briefing schedule, including a cross motion (seeking dismissal in part and summary judgment in part) from CMS. See Dkt. Nos. 21, 23.

The Court held a hearing on June 28, 2022. Dkt. Nos. 47, 49. In the closing moments of the hearing, CMS asked, for the first time, that the Court consider remand without vacatur if it found the rescission unlawful. Dkt. No. 49 at 51:10-23, 52:10-17. The Court permitted the parties ten days to file any supplemental briefs and ordered the parties to submit briefs addressing vacatur. Dkt. No. 46.

## LEGAL STANDARDS

Because the cross motions here involve both dismissal and summary judgment, there are two relevant standards of review.

While CMS styles its motion primarily as a motion to dismiss, the parties agreed at the hearing that the arguments for dismissal relate to: (a) CMS's contention that decisions about demonstration projects are committed to agency discretion by law, dkt. no. 23 at 11; (b) Georgia's claim that CMS should be estopped from rescinding

approval for Pathways, id. at 32, and (c) Georgia's claim that the recission violates the Spending Clause, id. at 34.

As to those issues, therefore, the question is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility" if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.

The remaining issues are contested for summary judgment. The federal rules of civil procedure say that summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Sierra Club, Inc. v. Leavitt, 488 F.3d 904, 911 (11th Cir. 2007). That standard also applies on cross-motions for summary judgment. See Gerling Global Reins. Corp. of Am. v. Gallagher, 267 F.3d 1228, 1233–34 (11th Cir. 2001).

Summary disposition "is particularly appropriate in cases in which the court is asked to review . . . a decision of a federal administrative agency." Fla. Fruit & Vegetable Ass'n v. Brock, 771 F.2d 1455, 1459 (11th Cir. 1985) (quotations omitted). The reason

for this "lies in the relationship between the summary-judgment standard . . . and the nature of judicial review of administrative decisions." 10B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2733 (4th ed. 2021 Update). Judicial review, after all, is meant to determine "whether the administrative action is consistent with law—that and no more." Id. (quoting Louis L. Jaffe, Judicial Control of Administrative Action 595 (1965)); see also 5 U.S.C. § 706(2)(A).

Thus, "in most [Administrative Procedure Act] cases, the court takes the facts as found by the Agency and simply applies the law to them so that there often is no need for a trial"—or construing facts. Id.; see also Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs, 87 F.3d 1242, 1246 (11th Cir. 1996).

## DISCUSSION

CMS's decision to rescind approval for Pathways was arbitrary and capricious, and the appropriate course is to set it aside.

As a preliminary matter, CMS is incorrect that the decision is shielded from judicial review. Unreviewability is a rare exception in administrative law, and the statute and regulations here provide well-recognized standards for judging whether the Agency's decision to approve, disapprove, or withdraw approval for

a Medicaid demonstration project was lawful and a sound use of discretion.

On the merits, the Agency committed at least six critical errors. *First,* CMS failed to consider or weigh the (likely) possibility that rescinding would mean less Medicaid coverage in Georgia. *Second,* CMS measured Pathways against a baseline of full Medicaid expansion, rather than taking the demonstration on its own terms—as the statute and regulations require. *Third,* CMS doubled down on that error by judging Pathways according to fundamentally inapt comparisons—demonstrations which, *unlike* Pathways, deployed work requirements in ways that could only be coverage reducing. *Fourth,* and perhaps explaining some of the gaps in the Agency's reasoning, CMS relied on an impermissible factor: "health equity." *Fifth,* CMS ignored its obligation to consider and weigh potential reliance interests when changing its mind. *Finally*, CMS ultimately failed to explain the Agency's reasons for changing its mind about the key issues underlying the approval.

As to the remedy: the proper course is to set the rescission aside. The rescission is based on fundamental errors that, at minimum, cast real doubt on whether the Agency made the right decision. It is therefore not clear what the Agency's rationale or reasoning *might* be if it endeavored to try again—so it is simply not possible to say that the Agency would be able to justify the

same decision on remand. The foreseeable consequences of vacatur do not urge a different result. Georgia has indicated it wishes to implement the demonstration immediately, and CMS has signaled it will re-start the process of considering rescission. That is up to the parties, not the Court. And CMS has not pointed to any real harm that might befall potential beneficiaries if either or both of those things happen. Thus, the usual remedy is the appropriate one—the rescission must be vacated.

## I. The rescission is not committed to agency discretion by law.

"The APA establishes a 'basic presumption of judicial review.'" Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1905 (2020) (quoting Abbot Lab'ys v. Gardner, 387 U.S. 136, 140 (1967)). This is a "strong presumption[.]" Am. Hosp. Assoc. v. Becerra, 142 S. Ct. 1896 (2022) (quoting Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv., 139 S. Ct. 361, 370 (2018)). It is "'just' a presumption, however," Lincoln v. Vigil, 508 U.S. 182, 190 (1993) (quoting Block v. Community Nutrition Institute, 467 U.S. 340, 349 (1984)), and judicial review is not available if "[a] statute[ ] preclude[s] judicial review" or "[the] agency action is committed to agency discretion by law." 5 U.S.C. § 706(a). An action is committed to agency discretion by law where "a court would have no meaningful standard against which to judge

25

the Agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985).

CMS contends that "the decision to withdraw permission for the Pathways program is not subject to judicial review" because the choice to authorize or withdraw a demonstration project "involves [ ] 'complicated balancing' and is [therefore] the type of decision committed to agency discretion by law." Dkt. No. 23 at 10–11; Dkt. No. 44 at 3. And, to be sure, the statute and regulations make clear that these decisions are discretionary. See 42 U.S.C. § 1315(a)(1); 42 C.F.R. § 431.420(d)(2).

But the APA's carve-out for decisions committed to agency discretion is "'very narrow.'" Gresham, 950 F.3d at 98 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971)), vacated on other grounds by Arkansas v. Gresham, 142 S. Ct. 1665 (2022). A decision is committed to agency discretion only in the "rare instance" where "there is no law to apply." Overton Park, 401 U.S. at 410 (quoting S. Rep. No. 752, 79th Cong. 1st Sess., 26 (1945)); see also Dep't of Commerce v. New York, 139 S. Ct. 2551, 2568–69 (2019). "[T]he mere fact that a statute contains discretionary language does not make agency action unreviewable." Beno v. Shalala, 30 F.3d 1057, 1067 (9th Cir. 1994); cf. Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv., 677 F.3d 1073, 1085 (11th Cir. 2012) ("not every agency action that is

in some sense discretionary is exempt from APA review"). To the contrary, "[t]he granting of an exemption from statutory requirements is not an area of agency discretion traditionally [held] unreviewable," and "it would be somewhat surprising were Congress to grant unreviewable discretion to the Secretary to [decide whether or not to] exempt States from such an all-encompassing series of statutory requirements." Beno, 30 F.3d at 1067 (quotation omitted) (addressing the reviewability of demonstration project decisions).

Indeed, every court to consider the issue has held that "[t]he Medicaid statute [*does*] provide[] the legal standard" for assessing demonstration projects: "[t]he Secretary may only approve 'experimental, pilot, or demonstration project[s],' and only insofar as they are 'likely to assist in promoting the objectives' of Medicaid." Gresham, 950 F.3d at 98-99 (quoting 42 U.S.C. § 1315); cf. Beno, 30 F.3d at 1067 & n.24 (collecting cases); Texas, 2021 WL 5154219, at *7 (same conclusion). The same is true of rescissions that, like this one, are premised on the theory "that the demonstration project is *not* likely to achieve the statutory purposes." 42 C.F.R. § 431.420(d)(2); AR 3 & n.3. Thus, the rescission is reviewable on those same terms.

The only authority CMS offers in support of unreviewability provides no reason to depart from the consensus. In Conservancy of

Southwest Florida v. U.S. Fish & Wildlife Service, the Eleventh Circuit held that the decision to designate a "critical habitat" for previously-identified endangered species was committed to agency discretion by law. 677 F.3d at 1083-84. The relevant statutory text provided that "[c]ritical habitat *may* be established for those species now listed as threatened or endangered species[.]" Id. at 1083 (emphasis in original). That language was not only "permissive"—it "provide[d] absolutely no standards that constrain the Service's discretion[.]" Id. at 1084. Indeed, the conclusion that designating critical habitats was committed to agency discretion was bolstered by the fact that "the challenged agency decision [was] a refusal to initiate rulemaking," which "shares some . . . of the features that justify the [separate] presumption that an agency's decision *not* to take enforcement action" is unreviewable. Id. (emphasis added). "[L]ike the exercise of enforcement discretion, [whether to undertake rulemaking] typically involves a complex balancing of factors, such as the agency's priorities and the availability of resources," which "the agency is better equipped than courts to undertake." Id.

The only thing Conservancy has in common with this case is the permissive "may" language. Unlike a decision not to initiate rulemaking, in cases like this one, "[t]he APA provides applicable

law in requiring an agency to act within statutory authority," as well as substantive standards dealing with "limitations on inherent authority to revisit past decisions" and "[a]rbitrary-and-capricious . . . principles[.]" Texas, 2021 WL 5154219, at *7. And again: on its face, Section 1115 plainly *does* provide a standard for reasoned discretion—whether a given demonstration is "likely to assist in promoting the objectives of Medicaid." Gresham, 950 F.3d at 98–99. The statute may place that decision with the Secretary, but her reasoning is reviewable for its reasonableness—like most agency action. See id. And this case does not involve any of the inner-workings questions involved in rulemaking or agency enforcement action. See, e.g., Heckler, 470 U.S. at 830. CMS need only decide whether the state's proposed demonstration "[is or] is not likely to achieve" the purposes of Medicaid. 42 C.F.R. § 431.420(d)(2).

Thus, the "narrow exception to judicial review" simply "does not apply here." Texas, 2021 WL 5154219, at *7. CMS's motion to dismiss, dkt. no. 23, is therefore **DENIED**.[8] On to the merits.

---

[8] As discussed above, CMS also moved to dismiss Georgia's estoppel and Spending Clause claims. See supra at 22. Given the Court's conclusion on Georgia's APA claim, there is no need to rule on these other arguments for dismissal.

**II. The rescission was arbitrary and capricious.**

The APA "requires agencies [to] engage in 'reasoned decisionmaking.'" Regents of the Univ. of Cal., 140 S. Ct. at 1905 (quoting Michigan v. EPA, 576 U.S. 743, 750 (2015)). When they do not, the APA commands that courts "shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

In general, "the role of courts in reviewing arbitrary and capricious challenges is to 'simply ensur[e] that the agency has acted within a zone of reasonableness.'" Missouri v. Biden, 142 S. Ct. 647, 654 (2022) (quoting FCC v. Prometheus Radio Project, 141 S. Ct. 1150, 1158 (2021)). This standard is "'exceedingly deferential.'" Ga. Dep't of Educ. v. U.S. Dep't of Educ., 883 F.3d 1311, 1314 (11th Cir. 2018) (quoting Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008)). Particularly so "in matters implicating predictive judgments," Rural Cellular Ass'n v. FCC, 588 F.3d 1095, 1105 (D.C. Cir. 2009), like the question of whether a demonstration project "is likely to assist in promoting the objectives" of Medicaid, 42 U.S.C. § 1315(a). Cf. Sunshine State Bank v. Fed. Deposit Ins. Corp., 783 F.2d 1580, 1582 (11th Cir. 1986). It is always the plaintiff's burden to show that the Agency acted arbitrarily and capriciously, and "[the] party seeking to have a court declare an agency action to be arbitrary and

capricious carries 'a heavy burden indeed.'" Legal Env't Assistance Found. Inc. v. EPA, 276 F.3d 1253, 1265 (11th Cir. 2001) (citation omitted).

Still, courts are "not a rubber stamp[.]" In re Gateway Radiology Consultants, P.A., 983 F.3d 1239, 1263 (11th Cir. 2020). Arbitrary and capricious review "is not toothless," Texas v. Biden, 20 F.4th 928, 989 (5th Cir. 2021), indeed, "after Regents," arbitrary and capricious review "has serious bite." Wages & White Lion Inv., LLC v. FDA, 16 F.4th 1130, 1136 (5th Cir. 2021). So while a court may not "substitute its judgment for that of the Agency," FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009), the Court must still ensure that "an agency's exercise of discretion [was] both reasonable and reasonably explained," Health Freedom Defense Fund v. Biden, No. 8:21cv1693, 2022 WL 1134138, at *18 (M.D. Fla. Apr. 18, 2022) (quoting Multicultural Media, Telecom & Internet Council v. FCC, 873 F.3d 932, 937 (D.C. Cir. 2017)).

The bottom line is this: a decision is arbitrary and capricious "where 'the Agency has [1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that [(a)] runs counter to the evidence before the Agency, or [(b)] is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise.'" <u>Ala.-Tombigbee Rivers Coalition v. Kempthorne</u>, 477 F.3d 1250, 1254 (11th Cir. 2007) (quoting <u>Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29, 43 (1983)). If the Agency's explanation fails in one of those ways, then "[t]he reviewing court may not make up for [it], which is to say that 'we may not supply a reasoned basis for the agency's action that the agency itself has not given.'" <u>Id.</u> (quoting <u>Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.</u>, 419 U.S. 281, 285 (1974)). Here, the rescission fails that test, many times over.

   A. *CMS failed to consider or weigh the possibility that the rescission would result in less Medicaid coverage in Georgia.*

      When CMS approved the Pathways demonstration in October 2020, the Agency found that "the only impacts on eligibility or enrollment will be to expand" Medicaid eligibility and coverage, because Georgia Pathways "applies only to beneficiaries who previously were not eligible for Medicaid." AR 4170. Indeed, CMS believed that Pathways would "result in a significant coverage expansion in Georgia." <u>Id.</u> 4175. The Agency later changed its mind, coming to believe that the pandemic would make it harder for potential beneficiaries to satisfy the demonstration's conditions. AR 27. But when it explained its new thinking, CMS never predicted (let alone explained why) the demonstration would not result in *any* increase in Medicaid coverage, <u>see generally</u> <u>id.</u> 2-37. And

"providing health care coverage" is "indisputably . . . the principal objective of Medicaid[.]" Gresham, 950 F.3d at 99; Dkt. No. 23 at 18 & n.9 (agreeing that providing medical assistance, meaning health care coverage, is the core objective of Medicaid).[9]

Yet CMS did not grapple with the (likely) possibility that rescinding approval for Pathways would result in *less* Medicaid coverage for Georgians. See id. The concept is simple: if Pathways increases Medicaid coverage in Georgia, then it inescapably follows there would be more Medicaid coverage in Georgia *with* Pathways than *without* it. But CMS did not mention, let alone consider or weigh, that fact. It did not even identify it as a possibility. "[CMS] entirely failed to consider that important aspect of the problem." Regents of the Univ. of Cal., 140 S. Ct. at 1913 (alteration accepted) (quoting State Farm, 463 U.S. at 43); cf. Stewart I, 313 F. Supp. 3d at 259-60, 262, 265 (finding the Secretary's decision to grant Kentucky's Medicaid demonstration waiver was arbitrary and capricious because he failed to consider whether the demonstration would reduce Medicaid

---

[9] Though CMS's agreement with this principle likely resolves the interpretive issue for purposes of this case, the Court nonetheless "assumes, as [CMS] maintains, that [CMS] should receive deference in interpreting the Act's 'objectives.'" Stewart v. Azar, 313 F. Supp. 3d 237, 260 (D.D.C. 2018) ("Stewart I") (quoting 42 U.S.C. § 1315(a)); see also Dkt. No. 23 at 17 (raising Chevron deference as a defense to Georgia's argument that the rescission affirmatively violates Section 1115); Dkt. No. 44 at 8-9 (same); Dkt. No. 50 at 2-3 (invoking deference generally).

coverage); Gresham, 950 F.3d at 102 ("In this situation, the loss of coverage for beneficiaries is an important aspect of the demonstration approval because coverage is a principal objective of Medicaid"), vacated on other grounds, 142 S. Ct. 1665 (citing United States v. Munsingwear, 340 U.S. 36 (1950)).[10]

The reason why, CMS now suggests, is that CMS thought Georgia would carry out a program meant to demonstrate eligibility conditions *even without* the eligibility conditions. See Dkt. No. 23 at 24. To put it differently, CMS says that it assumed Georgia would agree to implement Pathways *without the pathways*. See Dkt. No. 13 at 14 ("the qualifying hours requirement [is] . . . the 'pathway' to obtain coverage in the first place"). That is a surprising, even counterintuitive, conclusion, and it would likely require a reasoned explanation in its own right. Regardless, Georgia responds that the Agency's supposed assumption was flatly wrong. "In the absence of the qualifying hours and premium

---

[10] This is not to say, of course, that CMS can never deny approval for any demonstration that expands coverage to any degree. The Agency might decide, provided it offers a sound explanation, that a given demonstration produces such modest gains that it would not further the purposes of Medicaid in light of other drawbacks. After all, the statute says the Secretary "may" authorize a demonstration if he believes it furthers the purposes of Medicaid, not that he "must" authorize any demonstration that meets that goal. See 42 U.S.C. § 1315(a). But even setting aside the differences between an initial approval and a rescission, some of which are discussed below, that is not what CMS said here—and the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given.'" Ala.-Tombigbee Rivers Coal., 477 F.3d at 1254 (quoting Bowman, 419 U.S. at 285.

requirements," the State says, it "has neither the appropriations nor the staff to implement the expansion contained in Pathways"—meaning that it *cannot* implement the demonstration without the conditions. Id. at 19.

CMS objects that Georgia did not raise this precise issue in its response to CMS's reconsideration letter—which would mean it cannot make the argument now. Dkt. No. 23 at 23 (citing AR 4148); Dkt. No. 44 at 11–12; see also Mahon v. U.S. Dep't of Agric., 485 F.3d 1247, 1254 (11th Cir. 2007) ("Under ordinary principles of administrative law, a reviewing court will not consider arguments that a party failed to raise in timely fashion before an administrative agency." (citation omitted)).

But that view of the record is simply too narrow by half. Georgia's response to the reconsideration letter may not have specifically said the precise words contained in its brief, but it plainly put the Agency on notice that there was no demonstration without the eligibility conditions. To begin with, Georgia's response explained that "any attempt to excise the qualifying hours and activities would make it impossible to effectuate the expansion," because "the qualifying hours and activities are core to the waiver." AR 4150. Without the qualifying hours and premiums, Georgia said, "no one currently ineligible for Medicaid would be able to enroll in Medicaid under current law." Id. So CMS was

plainly on notice that no qualifying hours meant no expansion—at least in Georgia's view. See AR 36–37 (expressing the Agency's view that "the state will be fully able to implement the other authorized components" without reference to Georgia's contrary position). And more basic still, the first heading in Georgia's response letter is that "[t]he Georgia Pathways program voluntarily grants Medicaid eligibility to individuals *who would not otherwise be covered*." AR 4149 (emphasis added). So Georgia's response letter undeniably posits that more individuals would have Medicaid benefits *with* the demonstration project (qualifying hours and all) than without it. And that, after all, is what CMS failed to consider here. CMS knew that those were the conditions Georgia had proposed to demonstrate. Id. at 4150 ("Implementing Pathways absent qualifying hours and activities . . . defeats the purpose of the demonstration waiver"). To simply assume—without explanation—that Georgia would proceed to demonstrate a program it did not propose, abandoning the key components of the program that it did, would be arbitrary in its own right.[11]

---

[11] It is no answer that CMS felt "the available information suggested that the State was interested in reaching a mutually agreeable way forward," especially when "the available information" was simply an implementation report indicating that "Georgia . . . was assessing options to resolve the issues CMS identified in its February 12, 2021 letter." Dkt. No. 23 at 24 (citing AR 4146). On its own terms, that merely shows that Georgia was open to re-evaluating or fine-tuning the eligibility conditions—not that it would come right out and agree to abandon them entirely. But even if it did, CMS did not explain its thinking on this subject in the rescission letter. See Am. Textile Mfr.

CMS, in short, failed to consider or weigh the possibility that rescinding Pathways would mean less Medicaid coverage in Georgia. Because providing health care coverage to needy individuals is the core purpose of Medicaid, the scope of Medicaid coverage is an "'important aspect of the problem,'" and the failure to consider it "alone renders [the Agency's] decision arbitrary and capricious." Regents of the Univ. of Cal., 140 S. Ct. at 1913 (quoting State Farm, 463 U.S. at 43); cf. Stewart I, 313 F. Supp. 3d at 259-60, 262, 265; Gresham, 950 F.3d at 102.

> B. *CMS measured Pathways against a baseline of full Medicaid expansion, rather than taking the demonstration on its own terms.*

The core question in deciding whether to approve (or withdraw approval for) a demonstration project is whether it—that is, the "experimental, pilot, or demonstration project" proposed by the State—"is likely to assist in promoting the objectives" of Medicaid. 42 U.S.C. § 1315(a) (approval and renewal); 42 C.F.R. § 431.420(d)(2) (withdrawal); see also 42 U.S.C. § 1396-1 (describing those purposes). That necessarily means the Secretary (or his designee) must assess the demonstration on its own terms.[12]

---

Inst., Inc. v. Donovan, 452 U.S. 490, 539 (1981) ("[T]he post hoc rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action.").

[12] It also means that the Agency may not, as CMS's briefs seem to imply, re-evaluate specific components of a demonstration for whether they, individually, further the purposes of Medicaid. Dkt. No. 50 at 3 ("While Georgia's project as a whole proposed to expand Medicaid coverage . . .

See <u>Stewart v. Azar</u>, 366 F. Supp. 3d 125, 153-54 (D.D.C. 2019) ("<u>Stewart II</u>") (explaining that "[t]he statute requires the Secretary to evaluate whether the *project* will promote the objectives of the Act" in the world as it is, not a "hypothetical future universe" (emphasis in original)). So, as Georgia puts it, "[b]ecause Pathways applies only to a new population not currently eligible for coverage, the appropriate point of comparison to determine if it furthered the objectives of Medicaid was a world without Pathways (*i.e.,* no expansion at all), not a hypothetical world of condition[-]free expansion." Dkt. No. 13 at 23.

CMS does not deny that this sort of flawed-comparison error would make the decision arbitrary and capricious, instead CMS contends it did not make that error at all. Dkt. No. 23 at 27-28. CMS insists that it "noted the nature of Georgia's work requirements," i.e., that "'Georgia's demonstration would not eliminate coverage for currently enrolled beneficiaries,'" but found that "'the work requirement would prevent enrollment by potential demonstration beneficiaries who are not meeting or do not document and successfully prove that they are meeting the

---

it contained two components the agency ultimately concluded . . . would not promote coverage among the intended beneficiaries"); Dkt. No. 44 at 11 (similar). CMS may "withdraw waivers or expenditure authorities" only if it finds "*that the demonstration project* is not likely to achieve the statutory purposes." 42 C.F.R. § 431.420(d)(2) (emphasis added). That is another way to understand CMS's error in this case.

requirement,'" resulting in "'eligibility suspension and possible disenrollment for beneficiaries who become enrolled but cease to successfully report their compliance with the requirement.'" Dkt. No. 23 at 28 (quoting AR 17).

A careful translation of that jargon actually supports—rather than refutes—the State's contentions. If, in the Agency's words, "Georgia's demonstration would not eliminate coverage for currently enrolled beneficiaries," then it is more than passing strange to think of a conditional pathway to coverage as "*prevent[ing]* enrollment by potential demonstration beneficiaries[.]" AR 17 (emphasis added).

If these hypothetical persons are not beneficiaries under current law, and they do not meet the requirements of Pathways, then the only world in which they are "*potential* [ ] beneficiaries" whose enrollment is "prevent[ed]" is one in which *everyone* is a rightful beneficiary—and any conditions on enrollment just stand in the way of coverage. Id. (emphasis added); see supra note 12. And that is undoubtedly the view the Agency articulated in the rescission. For example, CMS expressed "serious concerns about testing policies that can potentially create access barriers to healthcare coverage[.]" AR 4. CMS also said that "community engagement" requirements in other states have been confusing and burdensome, with "no evidence available to suggest that imposing

these requirements is likely to have a positive effect on beneficiary coverage, health care access[,] or health outcomes." Id. 17. But again: the Agency recognized that "Georgia's demonstration would not eliminate coverage for currently-enrolled Medicaid beneficiaries." Id. So even if Pathways does not qualify as many potential beneficiaries as CMS would like, it undeniably opens the door to coverage for *more* people. The only way to avoid that conclusion, as CMS did, is comparing the pool of potential beneficiaries under Pathways to a world where *everyone* is covered. Georgia is right: nothing but total, unconditional expansion would stand up to that baseline. [13]

---

[13] Several Amici organizations suggest that a fully-expanded Medicaid *is* the proper baseline for assessing a Section 1115 demonstration request. See Dkt. No. 31 at 8-10; see also Dkt. No. 44 at 13 (CMS echoes the same argument in its reply brief). Amici fault Georgia for "plan[ning] to terminate the project if the recission stands," and they suggest that Georgia wants CMS to "compare[] coverage provided with [the Pathways requirements] to no coverage at all." Id. at 9.

Citing a 2019 challenge to the approval of Kentucky's work-requirements demonstration project, Amici contend that "[t]aken to its logical conclusion, [Georgia's] theory would mean that when a state threatens do [sic] away with Medicaid 'if the Secretary does not approve whatever waiver of whatever Medicaid requirements they wish to obtain,' the state's waiver application would be approvable 'because any waiver would be coverage[-]promoting compared to a world in which the state offers no coverage at all." Id. at 9 (quoting Stewart II, 366 F. Supp. 3d at 154).

Of course, as Amici recognize, that is nothing like what happened here. Dkt. No. 31 at 10 n.5. Kentucky had already expanded Medicaid to cover the "expansion population," i.e., the portion of the populous brought into Medicaid coverage by the Affordable Care Act. Id. So, unlike Pathways, Kentucky's demonstration applied work requirements to existing beneficiaries. Id.; see also Stewart II, 366 F. Supp. 3d at 153. That would further the purposes of Medicaid and "promot[e]" coverage because, Kentucky (and the Secretary) argued, "absent its approval, the

That is not the test the statute or the regulations envision—
so rescinding Pathways for failing to meet it was patently
arbitrary. Cf. Stewart II, 366 F. Supp. 3d at 153-55 (the
Secretary's decision to approve Kentucky's demonstration program
was arbitrary and capricious because it assessed the demonstration

---

Commonwealth will—given fiscal strain [caused by Medicaid]—simply de-expand Medicaid." Stewart II, 366 F. Supp. 3d at 153; see also id. at 154 ("[Kentucky's] central contention is that, where a state threatens to discontinue Medicaid coverage entirely, *any* waiver approval would promote coverage" (emphasis added)).

Georgia's argument is plainly different. Georgia has not "threatened to de-expand Medicaid if its proposed demonstration is not approved." Id. The State's position is that the demonstration furthers the purposes of Medicaid because there will be more Medicaid beneficiaries in Georgia *with* the Pathways program than without it. Dkt. No. 13 at 5-6, 8-10, 19. True, the State apparently does not intend to pursue the demonstration without the conditions upon which the demonstration proposal was based, dkt no. 13 at 19, but that is hardly the same thing as threatening to shrink Medicaid coverage as a bargaining chip to secure a waiver project. That is simply a different issue. After all, the Secretary's error in that case was evaluating Kentucky's demonstration "as compared to a hypothetical future universe where there is no Act." Stewart II, 366 F. Supp. 3d at 154. That "baseline" was necessary to conclude that Kentucky's program furthered the purposes of Medicaid by protecting its sustainability. Id. Not so here—quite the opposite. One must hypothesize a world with *full* Medicaid expansion to conclude that Pathways does not—at least to some extent—further the purposes of the statute.

Amici dislike that result, suggesting that it "would mean that a state could transform a coverage-reducing waiver to a coverage-promoting one by terminating its Medicaid program on day 1 and reinstating coverage—with the waiver—on day 2." Dkt. No. 31 at 10 n.5. Doubtful. Even assuming (though one likely shouldn't) that a state would risk its Medicaid funding on such a bizarre gambit, Stewart II itself suggests that Amici's hypothetical demonstration would be "inconsistent with the text of 1115," which "assumes the implementation of the Act," meaning one cannot simply "compare[ the proposed demonstration] with a hypothetical . . . universe where there is no Act." Stewart II, 366 F. Supp. 3d at 154.

Thus, Amicis' argument lends no help to CMS—it applied the wrong baseline.

against a baseline of no expansion population, rather than the baseline of the Medicaid program as it then existed); see also Leather Indus. of Am., Inc. v. EPA, 40 F.3d 392, 404-05 (D.C. Cir. 1994) (the EPA's risk-based cap on the amount of selenium in sewage sludge disposal was arbitrary and capricious because "[t]he EPA's method of risk assessment" applied an unduly conservative baseline, i.e., "[t]he EPA [ ] failed to demonstrate a rational relationship between its highly conservative exposure assumptions and the actual usage regulated by those assumptions" (citation omitted)).

   *C. CMS judged Pathways by fundamentally inapt comparisons to other demonstrations.*

   CMS also based the rescission on conclusions drawn from comparing Pathways' qualifying hour requirement to work requirements demonstrated in other states. See AR 15-17 (Arkansas, Indiana, Michigan, New Hampshire, and Utah). CMS acknowledged that those demonstrations all involved placing requirements on current Medicaid beneficiaries—whereas Pathways "is distinct in that its work requirement must be met in order for [otherwise ineligible people] to become eligible for demonstration coverage." Id. 15. But CMS thought that those comparisons were relevant anyway "insofar as '[they provided] evidence of the potential impact of community engagement requirements . . . [on] continued eligibility

42

for Medicaid coverage.'" Dkt. No. 23 at 28 (quoting AR 15). Indeed, CMS went further and reasoned that Pathways was "likely to have more deleterious effects on beneficiaries than those experienced in other states" because (1) "the demonstration coverage at the outset would be conditional on compliance with meeting the requirements, thereby restricting initial enrollment," and (2) because "the requirement is not structured to include any [exemptions or credits] . . . to accommodate caregiving obligations." AR 16. Rescinding Pathways on this reasoning was arbitrary for largely the same reasons as the baseline error.

Once again: everyone agrees that Pathways is fundamentally different from other states' demonstrations, because the eligibility conditions apply only to *new* (as opposed to existing) beneficiaries. Compare Dkt. Nos. 13 at 23 with Dkt. No. 23 at 28. So it makes very little sense to rely on the fact that other states' demonstrations produced "no evidence . . . that . . . these requirements [are] likely to have a positive effect on beneficiary coverage, health care access[,] or health outcomes." AR 17. That is not surprising. In a state which *has* fully expanded Medicaid, it is easy to see that a newly minted work requirement can *only* produce net drop-offs in coverage. What *is* hard to see is why that says anything useful about Pathways.

Pathways, since it applies to only new beneficiaries, *can only* (1) qualify new beneficiaries or (2) effect no change on the number of beneficiaries. Those are the options. And CMS does not argue that, even under the more difficult working conditions brought on by the pandemic, Pathways would not produce *any* new beneficiaries. See Dkt. No. 49 at 30:10-31:23. So, left with the conclusion that Pathways would at least modestly expand Medicaid coverage in Georgia, the comparison to these other demonstrations makes no sense—basing a conclusion on them even less.

Along the same lines, the rescission does not suggest any reasoned basis for the conclusion that Georgia's demonstration would "have more deleterious effects on beneficiaries" than other demonstrations. See AR 16. At the risk of driving the point home too many times, Georgia's demonstration does not apply to existing beneficiaries, so it cannot possibly have a "deleterious" effect on enrollment (except, perhaps, as compared to a system of universal coverage, see supra)—let alone a *more* deleterious effect than the ostensibly comparable demonstrations. It doesn't help to say, as the rescission does, that "the [Pathways] demonstration coverage . . . would be conditional on compliance with meeting the requirements, thereby restricting initial enrollment." AR 16. After all, the only reason that would not be true in a fully expanded Medicaid population is because everyone is *already*

covered—meaning a work requirement can *only* work to disenroll people. Pathways may or may not produce more total beneficiaries than other work requirements, but that is not the same as being "more deleterious." Id. 16. Measured by the correct standard—Pathways expands coverage, and the other demonstrations of work requirements did not.

At bottom, Georgia's qualifying hours requirement may or may not be harder to meet than other states', but that simply does not support the conclusion that Pathways is not "likely to have a positive effect on beneficiary coverage, health care access[,] or health outcomes." Id. 17.[14]

\* \* \*

Thus, CMS judged Pathways by comparison to projects which demonstrated a fundamentally different paradigm of work and qualifying hour requirements. A conclusion based on that sort of flawed comparison is arbitrary—not reasoned. See North Carolina Utilities Com'n v. FERC, 42 F.3d 649, 666 (D.C. Cir. 1994) (relying on an improper comparison group to set the capital structure for rate of return was arbitrary and capricious).

---

[14] Here, as well, CMS's reasoning might also be viewed as simply evaluating the qualifying hours requirement in isolation, rather than part of a cohesive demonstration project. See generally AR 15-17. That, at least, would make sense of comparing Pathways to the other states' demonstrations. But again: that is not the analysis the regulations call for. See supra note 12.

    *D.  CMS considered impermissible factors like "health equity."*

Agency action is also arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider[.]" Ala.-Tombigbee Rivers Coal., 477 F.3d at 1254 (citation omitted). An agency may not "depart from" statutory factors "to achieve some other goal." Qwest Corp. v. F.C.C., 258 F.3d 1191, 1200 (10th Cir. 2001). Here, the clear statutory directive is that CMS decide the fate of demonstration projects based on whether they "[are] likely to assist in promoting the objectives of Medicaid." 42 U.S.C. § 1315(a); 42 C.F.R. 431.420(d)(2). Those "objectives" are not defined by the statute, but the parties agree that "[c]ourts often look to the appropriations section as a source [of] statutory purposes," dkt. no. 23 at 18 n.9; dkt. no. 13 at 8, which describes itself as "enabling each State, as far as practicable under the conditions [there] . . . to furnish (1) medical assistance [to those] . . . whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation . . . to help [them] . . . attain or retain capability for independence or self-care," 42 U.S.C. § 1396-1; see also supra note 9. "Health equity," AR 13, by which the Agency apparently means equal "health outcomes" across various demographic populations, AR 25–26, is not a statutory factor.

While the rescission mentioned "health equity" by name just once, see AR 13, the concept clearly pervades CMS's reasoning. In explaining the Agency's discomfort with Pathways' premium requirement (including that premiums "can present a barrier to coverage" and "result in shorter enrollment spells," id. 10-11), CMS made special note that "studies have also found that premium policies can exacerbate health disparities, as certain populations . . . may be disproportionately affected by these policies[.]" Id. 12. So too, discussing the Agency's revised view that the pandemic would make complying with Pathways more difficult for potential beneficiaries, id. 20-28, CMS relied on data suggesting that "[t]he pandemic has [ ] disproportionately affected female caregivers," id. 22, and Georgia's "non-White communities[.]" Id. 24. CMS also relied on data suggesting that "[e]xisting disparities in access to computers and reliable internet may [ ] exacerbate issues in finding, maintaining, and reporting employment during and after the pandemic[.]" Id. 24-25. And indeed, CMS emphasized, "the pandemic also has disproportionately impacted the physical health of racial and ethnic minority groups, who already experience disparities in health outcomes." Id. 25-26. Thus, CMS reasoned, "the short-to-long term adverse implications of the COVID-19 pandemic on the economic opportunities for Medicaid beneficiaries, potential beneficiaries, and other low-income individuals

amplifies the risks of attaching [the Pathways conditions] to eligibility for coverage." Id. 28. In other words: though Pathways is facially neutral on race, sex, and ethnicity—it was a strike against the demonstration that gains in healthcare coverage for low-income Georgians might not reflect "health equity." Id. 12-13.

CMS suggests that these references are merely harmless asides—that "[it] had already independently found that the Agency 'did not have reason to believe'" that Pathways "'[was] likely to directly or indirectly promote coverage.'" Dkt. No. 23 at 25 (quoting AR 12); see also id. (arguing the CMS administrator merely "noted that her conclusions based on the statutory purposes of Medicaid also accorded with a related objective").

But CMS does not deny that "health equity" is not a statutory factor. Indeed, CMS does and cannot deny that it gave "health equity" as a reason for its decision. Particularly since there are several large gaps in the Agency's reasoning, see generally supra, it is simply unreasonable to say that CMS did not materially "rel[y] on factors which Congress has not intended it to consider," Ala.-Tombigbee Rivers Coal., 477 F.3d at 1254, and thus "depart from" statutory factors "to achieve some other goal," Qwest Corp., 258 F.3d at 1200. Doing so is yet another reason the rescission was arbitrary and capricious. Cf. Gresham, 950 F.3d at 103 ("While

. . . it is not arbitrary or capricious to prioritize one statutorily identified objective over another, it is an entirely different matter to prioritize non-statutory objectives to the exclusion of the statutory purpose.").

   E. *CMS failed to consider or weigh reliance interests on its original decision.*

   Even if the Agency had better explained why it had so quickly changed its mind about coverage gains under Pathways furthering the purposes of Medicaid, it would still have to account for the impact of changing its mind. "When an agency changes course, as [CMS] did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" Regents of the Univ. of Cal., 140 S. Ct. at 1913 (quoting Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2126 (2016)); see also Fox, 556 U.S. at 515 (similar). "It [is] arbitrary and capricious to ignore such matters." Id. (quoting Fox, 556 U.S. at 515). Georgia points out that "the Rescission fails to once mention the significant resources Georgia expended and actions it took in reliance upon the Approval" and thus fails to "thoroughly consider and explain why these reliance interests should be brushed aside[.]" Dkt. No. 13 at 23 (citing Texas, 2021 WL 5154219, at *8).

CMS again returns that "Georgia failed to raise [these] reliance costs in its response to the Agency's preliminary determination," meaning it cannot raise them now. Dkt. No. 23 at 24 & n.14. And indeed, "[a] reviewing court generally will not consider an argument that was not raised before the Agency 'at the time appropriate under its practice.'" BNSF Ry. Co. v. Surface Transp. Bd., 453 F.3d 473, 479 (D.C. Cir. 2006) (quoting United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952)).

But Regents teaches that reliance considerations are a foundational part of reasoned decision-making when an Agency changes its mind. 140 S. Ct. at 1913-15. True, the Court said, "[a]gencies are not compelled to explore 'every alternative device and thought conceivable by the mind of man.'" Id. at 1915 (quoting Vermont Yankee Nuclear Power Corp. v. Nat. Res. Defense Council, Inc., 435 U.S. 519, 551 (1978)). But when an agency "[is] not writing on a blank slate, it [*is*] required to assess whether there [are] reliance interests" on the previous decision, "determine whether they were significant, and weigh any such interests against competing policy concerns." Id. (citations and internal quotation marks omitted); see also Texas v. Biden, 20 F.4th 928, 990 (5th Cir. 2021) ("The Court was clear that agencies *must* consider reliance interests" when considering a change in policy, "and that

failure to do so is arbitrary and capricious") (emphasis added), vacated on other grounds by 142 S. Ct. 2528 (2022)).

There is no disputing that CMS failed in that regard. Despite good reason to know Georgia relied on the approval by spending time and resources to prepare to implement Pathways,[15] the rescission never identifies any reliance interests—let alone determines their significance or weighs them against the Agency's newfound belief that the demonstration should not be allowed to proceed with the eligibility conditions.  See generally AR 2-37.

At best, CMS suggests that it *implicitly* considered Georgia's potential reliance "in issuing its withdrawal before Georgia implemented the project." Dkt. No. 23 at 15. This, CMS argues, gave the State "ample notice in issuing a preliminary determination more than three months before the project was scheduled to go into effect" and "mak[ing] its final determination while the project was stayed[.]" Id. at 24 n.14. That would make it possible to "reallocate[]" certain "forward-facing costs" which "have not been spent yet"—and suggests that Georgia "[is] starting from a

---

[15] There is no serious question—and CMS does not deny—that CMS knew Georgia expended significant time and resources, relying on the approval, to prepare to implement Pathways. See, e.g., AR 3944-3983 (implementation reports sent to CMS for October through December 2020 detailing Georgia's efforts to stand up essential facilities and contract with vendors); see also id. 3984-4027 (updated implementation reports). Indeed, Georgia's implementation efforts apparently reached "88% [completion for] activities necessary to enable a July 1, 2021 implementation" and "80% complete" for "the first phase overall." Id. 3988.

. . . smaller set of interests." Dkt. No. 49 at 38:8-17; Dkt. No. 44 at 13 n.4. Those are reasonable points, but none of them appear in the rescission. Regents of the Univ. of Cal., 140 S. Ct. at 1913-14 ("These disclaimers are surely pertinent in considering the strength of any reliance interests, but that consideration must be undertaken by the agency in the first instance, subject to normal APA review."); Am. Textile Mfr., 452 U.S. at 539 ("post hoc rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action"; "Congress [gives agencies] the responsibility . . . to explain its reasons for its actions").

CMS also contends that there is a limited extent to which reliance on demonstration approvals is legitimate, since such projects are (by definition) experimental and time limited. Dkt. No. 49 at 38:15-17; Dkt. No. 44 at 13 n.4. Perhaps—though that doesn't change the fact that a state working to implement a demonstration project still does so in reliance on the Agency's good word. See, e.g., Texas, 2021 WL 5154219 at *11 ("That answer would not fly in contracts class. . . . A party can incur substantial reliance interests in an agency's final approval of a program slated to start in the future, even if the program's implementation date has not yet arrived."). Regardless, Regents addresses that point as well. DACA was a discretionary program, which the Government argued was affirmatively unlawful and

generated no legitimate reliance interests. Regents of the Univ. of Cal., 140 S. Ct. at 1910, 1913-14. Yet the Supreme Court rejected the assertion that DHS had no obligation to consider reliance and potential alternatives. Id. at 1913-14 ("[T]he Government . . . [does not] cite[] any legal authority establishing that such features automatically preclude reliance interests, and we are not aware of any."). Thus, any argument that Georgia's reliance interests are not relatively forceful is an argument that should have been included in the rescission itself. See id.

CMS, therefore, "should have considered [these] matters[-]but did not. That failure was arbitrary and capricious in violation of the APA." Regents of the Univ. of Cal., 140 S. Ct. at 1915.

*F. CMS failed to explain why it changed its mind on the key issues underlying the approval.*

When an agency's decision "rests upon factual findings that contradict those which underlay its prior policy," the Agency may be required "to provide a more detailed justification than what would suffice for a new policy created on a blank slate." Fox, 556 U.S. at 515. "In such cases [the issue] is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy." Id. at 515–

16. "It would be arbitrary or capricious to ignore such matters." Id. at 515.

Here, after first approving Pathways in October 2020, AR 4168, CMS hinged its new decision largely on its assessment of how the demonstration would play out in the midst of COVID-19, id. 4-8, 27. But as Georgia points out, "the pandemic was at its height when the demonstration project was developed, negotiated, and approved [i.e., the summer and fall of 2020]," and "it is flagrantly arbitrary to suggest that expanding healthcare coverage would be harmful in the midst of a pandemic," particularly because, to the extent the pandemic makes it harder to gain qualifying hours, "there is significant flexibility in meeting [that] requirement." Dkt. No. 13 at 23.

CMS returns that "[u]nder Fox, 'it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the Agency believes it to be better, which the conscious change of course adequately indicates.'" Dkt. No. 23 at 27 (quoting Fox, 556 U.S. at 516). It is true that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one." Fox, 556 U.S. at 515 (emphasis in original). To that end, CMS says, "'CMS . . . reevaluated both the risks posed by the pandemic and its aftermath and the potential benefits of continuing the work

requirement' and 'determined that the earlier approval overweighed the potential benefits to Georgia's Medicaid program . . . while underweighting the requirement's potential negative effects[.]'" Dkt. No. 23 at 27 (quoting AR 5). In particular, CMS relied on "more recently available evidence about the effects of the pandemic and its implications for the feasibility of this requirement." AR 20.

But even giving the Agency the benefit of the doubt on the relative difficulty of satisfying the qualifying hours requirement, CMS still failed to give an adequate explanation for its ultimate change-of-mind under _Fox_. Most of the Agency's mentions of the October 2020 approval simply acknowledge that it happened. _See_ AR 2, 3, 8, 36. When the Agency _did_ confront the fact that the original approval was during the pandemic—it explained that its change of mind was due in part to "how long the pandemic has lasted" and "available data on the various health and infrastructure indicators in Georgia." _Id._ 20. Much of this data concerned health equity, _id._ 23–26, which—as discussed above—was plainly improper. What data could be properly considered dealt with things like:

- long-COVID, _id._ 21;

- the need to stay home to care for a child sick with COVID, _id._ 22;

- the (related) difficulty of finding child-care, id.;

- transportation difficulties, id. 23; and

- labor force participation and the aftereffects of layoffs, id. 26–27.

From all this, CMS extrapolated the conclusion that potential beneficiaries may have a harder time meeting the qualifying-hours requirement than the Agency initially thought. Id. 20–21, 23; see also id. 27.

For all that, CMS never suggested that Pathways would fail to create _any_ net gains in coverage—and it did not explain why it now believed that even modest gains in coverage failed to further the purposes of Medicaid. And that was the lynchpin of the Agency's original decision approving the demonstration. Id. 4169 ("the only impacts on eligibility or enrollment will be to expand [Medicaid] eligibility and enrollment"), 4174 (the qualifying hours requirement was "attainable" because of the steps Georgia took "to include protection to ensure that individuals can reasonably be expected to meet the requirements"), 4180 ("expanding Medicaid coverage to individuals not previously eligible will have significant positive impact on access to health care during and after a public health emergency"). To be clear, this is not necessarily to say that the Agency could not have validly changed its mind about Pathways in 2021—but rather that CMS did not take

the final step and explain *why*, other than health equity, the relative increase in difficulty justified a one-eighty on Pathways. See Fox, 556 U.S. at 515–16.

\* \* \* \* \*

In sum, CMS's decision to rescind Georgia Pathways was arbitrary and capricious for multiple reasons. CMS failed to consider or weigh the (likely) possibility that rescinding Pathways would mean less Medicaid coverage in Georgia. It used an unreasonable "total-expansion" baseline, in clear tension with the statute and regulations—for deciding whether Pathways furthered the purposes of Medicaid. Its predictions about Pathways' likelihood of furthering the purposes of Medicaid relied on comparisons to fundamentally inapt demonstrations. It improperly considered non-statutory factors like "health equity." It failed to consider whether its approval of Pathways had generated any reliance interests that counseled against changing course. And it failed to explain why it changed its conclusions on the core issue underlying the approval and rescission. The rescission therefore violated the APA, and the prejudice from that "is manifest." See Texas, 2021 WL 5154219 at \*11 (citing 5 U.S.C. § 706). Now to the remedy.

**III. The rescission must be set aside; remand without vacatur is not appropriate here.**

The APA commands, with refreshing clarity, that courts "*shall* hold unlawful and set aside agency action" that is "arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2) (emphasis added); see also Checkosky v. SEC, 23 F.3d 452, 490 (D.C. Cir. 1994) (Randolph, J., separate opinion) ("The Administrative Procedure Act states this in the clearest possible terms"—"a 'reviewing court' faced with an arbitrary and capricious decision 'shall'—*not may*—'hold [it] unlawful and set [it] aside . . . . Setting aside means vacating; no other meaning is apparent" (emphasis in original) (quoting 5 U.S.C. § 706(2)(A)); Milk Train, Inc. v. Veneman, 310 F.3d 747, 757 (D.C. Cir. 2002) (Sentelle, J., dissenting) (similar).

Vacatur is, at a minimum, the "normal remedy under the APA[.]" Georgia v. Wheeler, 418 F. Supp. 3d 1336, 1382 (S.D. Ga. 2019) (citing Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1290 (11th Cir. 2015) ("vacatur . . . is the ordinary APA remedy") (internal quotation marks omitted)); Cf. Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1110 (D.C. Cir. 2014) ("vacatur is the normal remedy"); Am. Great Lakes Ports Ass'n v. Schultz, 962 F.3d 510, 519 (D.C. Cir. 2020) (remand without vacatur is an "exception[]" to the general rule).

Even so, "it is not the only remedy available." Wheeler, 418 F. Supp. 3d at 1382 (citing Black Warrior Riverkeeper, 781 F.3d at 1290). The Eleventh Circuit has held that a reviewing court may, on finding an agency action unlawful, "remand [the matter] without vacatur" as an exercise of "equity powers under the APA." Black Warrior Riverkeeper, 781 F.3d at 1290 (quoting Van Antwerp, 526 F.3d at 1369); see also id. (noting agreement among other circuits that have considered the question); see also Charles A. Wright & Arthur R. Miller, 33 Federal Practice & Procedure § 8382 (2d ed. Apr. 2022 Update) (describing the practice as "an . . . example of judicial equitable discretion").

Black Warrior Riverkeeper instructs that remand without vacatur is appropriate—meaning a permissible remedy—"[i]n circumstances . . . where it is not . . . clear that the agency's error incurably tainted the [ ] decisionmaking process[.]" 781 F.3d at 1290; see also id. at 1291 (declining to "balance the equities" in that case "in the first instance"). The court left open whether remand without vacatur is even on the table if "the agency has erred to such an extent as to indicate that its ultimate decision was unlawful." Id.

Endorsing the framework employed by the D.C. Circuit, the Eleventh Circuit adopted a two-part test for deciding when to remand without vacatur. Courts must "consider[ ] '[1] the

seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequences of an interim change that may[,] itself[,] be changed.'" Id. at 1290 (quoting Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150–51 (D.C. Cir. 1993)); see also Van Antwerp, 526 F.3d at 1369 (Kravitch, J., concurring in part and dissenting in part) ("[I]t is appropriate to consider the balance of equities and the public interest, along with the magnitude of the agency's errors and the likelihood that they can be cured.").

Those factors do not favor remand without vacatur here.

Starting with the severity of the errors, the rescission here rested on numerous, profound flaws. "The 'seriousness' of agency error turns in large part on 'how likely it is the agency will be able to justify its decision on remand.'" Long Island Power Auth. v. FERC, 27 F.4th 705, 717 (D.C. Cir. 2022) (quoting Heartland Reg'l Med. Ctr. v. Sebelius, 566 F.3d 193, 197 (D.C. Cir. 2009)). In addition to failing to address a key aspect of the problem, the Agency's explanation for its decision relied on an incorrect baseline; drew key support from blatantly inapt comparisons; imported impermissible factors; failed to consider whether there were reliance interests and how weighty they were; and, ultimately, failed to explain why the Agency now believes that the Pathways

demonstration would *not* further the purposes of Medicaid. That is rather more than "[a]n inadequately supported rule[.]" Allied, 988 F.2d at 150; cf. Comcast Corp. v. FCC, 579 F.3d 1, 8 (D.C. Cir. 2009) (vacating an FCC rule where the error was "particularly egregious"). "Failure to consider an important aspect of the problem is a 'major shortcoming' generally warranting vacatur." Stewart II, 366 F. Supp. 3d at 155 (declining to remand CMS's approval of Kentucky's demonstration project without vacatur) (alteration accepted) (quoting Humane Soc'y v. Zinke, 865 F.3d 585, 614–15 (D.C. Cir. 2017)). So too, "[w]hen an agency exercises discretion using the wrong legal standard, its action cannot survive." Stewart I, 313 F. Supp. 3d at 272 (same). These errors "went 'to the heart' of [CMS's] decision," so "the Court [has] 'substantial doubt whether [it] chose correctly[.]'" Id. (quoting Humane Soc'y, 865 F.3d at 614).

What's more, it is not obvious what CMS's reasoning or explanation might be in a rescission without these flaws, so who can say whether "the agency will be able to justify its decision on remand[?]" Long Island Power Auth., 27 F.4th at 717. The D.C. Circuit—whose test Black Warrior Riverkeeper adopted—has "vacated [ ] rules even when [it has] 'not foreclose[d] the possibility that the [agency] may develop a convincing rationale' for re-adopting the same rule on remand[.]" Ill. Public Telecomms. Ass'n

v. FCC, 123 F.3d 693, 694 (D.C. Cir. 1997). So even if the nature of these errors raised less serious questions about whether the Agency chose correctly, there is enough uncertainty that remanding without vacatur would not be a sound exercise of discretion.

That does a share of the work on consequences, as well: "disruptive consequences matter 'only insofar as the agency may be able to rehabilitate its rationale.'" Long Island Power Auth., 27 F.4th at 717 (quoting Comcast, 579 F.3d at 9). Courts have no power to make purely consequentialist judgments about agency action. And again: whether CMS can "rehabilitate" the rescission is simply not clear.

Regardless, the foreseeable consequences of vacatur would not suggest that the Court should remand without it, anyway. This is not a case where vacatur would disrupt a large-scale industry or cause "severe economic disruptions" or "environmental consequences." Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 985 F.3d 1032, 1053 (D.C. Cir. 2021); see also Black Warrior Riverkeeper, 781 F.3d at 1290 ("vacatur could suspend a substantial amount of surface mining in the state of Alabama, all for an error that may well turn out to be inconsequential"); Cal. Cmtys. Against Toxics v. U.S. E.P.A., 688 F.3d 989, 994 (9th Cir. 2012) (declining to vacate an EPA emissions rule where vacatur would be "economically disastrous"). Nor is this a case where the

ordinary APA remedy would "cause disruptive consequences to [an] ongoing administrative process," let alone one meant to repeal and replace the offending agency action. Wheeler, 418 F. Supp. 3d at 1382-83 & n.18. Nor, indeed, is vacatur in this case "an invitation to chaos." Sugar Cane Growers Co-op. of Fla. v. Veneman, 289 F.3d 89, 97 (D.C. Cir. 2002). It is plain enough that vacatur means Georgia will likely resume its efforts to implement Pathways, dkt. no. 51 at 6-7; dkt. no. 50 at 7, and CMS will "deliberat[e] about whether . . . to [rescind or withdraw approval] again," dkt. no. 50 at 7.

CMS warns portentously that "if Georgia's project goes into effect . . . and the agency ultimately decides [to rescind] again . . . Georgia will have expended resources on aspects of the project that may ultimately be withdrawn." Id. Indeed. But whether to take that risk is up to Georgia, not the federal courts—"[t]he States are separate and independent sovereigns. Sometimes they have to act like it." NFIB, 567 U.S. at 2604.

The Agency's concern that individuals "targeted by the demonstration project will suffer confusion and changing requirements" is even less persuasive. Dkt. No. 50 at 7. As this order has discussed at length, the "target[ing]" here involves offering a pathway to Medicaid coverage for individuals who would not otherwise qualify. No "requirements" change by offering that

pathway in the first instance. Nor, for that matter, does CMS explain what confusion will result if it again decides to rescind Pathways—let alone why that compels remand without vacatur now. On the one hand, if CMS reevaluates Pathways consistent with this Order and rescinds again, then there is no confusion—newly eligible people will simply lose coverage. If, on the other hand, CMS reevaluates Pathways and decides *not* to rescind Pathways, then there is no confusion at all—the newly eligible population will have a pathway to coverage for the length of the demonstration. The only outcome with a real chance of confusing potential beneficiaries (presumably by changing the requirements of their eligibility) is the one that CMS may not pursue—i.e., rescinding approval for individual components of Pathways. See supra note 12. But even if that were a possible outcome, it is not clear why it supports remand without vacatur in light of the fact that those individuals would have *at least a chance* to gain Medicaid coverage, for *at least a time*, before then.

Ultimately, therefore, vacatur is the soundest exercise of discretion. There is no sound reason to depart from the "normal remedy." Allina, 746 F.3d at 1110. Executing the APA's explicit textual command ensures that any effort to rescind Pathways will be the product of "fully address[ing] the critical factual and legal failings on remand . . . . conduct[ing] [the] analysis anew,

[and] with an open mind—rather than" simply sending the case back for CMS to "justify maintaining the status quo." <u>Black Warrior River-Keeper, Inc. v. EPA</u>, No. 2:19-CV-0344, 2019 WL 5864138, at *3 (N.D. Ala. Nov. 8, 2019). The Court declines to order remand without vacatur.

<b>CONCLUSION</b>

"The APA requires 'reasoned decisionmaking.'" <u>Shaw v. Austin</u>, 539 F. Supp. 3d 169, 178 (D.D.C. 2021) (quoting <u>State Farm</u>, 463 U.S. at 52). CMS's rescission of the Georgia Pathways demonstration project was not reasoned—it was arbitrary and capricious on numerous, independent grounds. Thus, the State of Georgia's motion for summary judgment, dkt. no. 13, is **GRANTED**, and CMS's cross motion for dismissal or summary judgment, dkt. no. 23, is **DENIED**. The rescission of Georgia Pathways is hereby **HELD UNLAWFUL** and **SET ASIDE**. The Clerk is **DIRECTED** to close this case.

**SO ORDERED** this 19th day of August, 2022.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA